ACCEPTED
15-24-00120-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
1/9/2025 6:07 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00120-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
1/9/2025 6:07:01 PM
CHRISTOPHER A. PRINE
Clerk

# In the Fifteenth Court of Appeals
# Austin, Texas

**STATE OF TEXAS,**

*Appellant,*

*v.*

**HARRIS COUNTY, TEXAS, ET AL.,**

*Appellees.*

On Appeal from the 165th District Court, Harris County, Texas
Cause No. 2024-63919, Hon. Ursula Hall, Presiding Judge

## APPELLEES' MOTION TO VACATE INJUNCTION

Of Counsel:

Grant B. Martinez
Justin P. Tschoepe
Lily E. Hann
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
Phone: (713) 632-8000

**Christian D. Menefee**
Harris County Attorney

**Jonathan G. C. Fombonne**
Deputy County Attorney & First Assistant
State Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov

**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5101

**ATTORNEYS FOR APPELLEES**

# TABLE OF CONTENTS

Background................................................................................................1

Argument.................................................................................................3

I.     The Court improperly relied on power no party had invoked. ........................3

II.    The Court failed to exercise the necessary caution in issuing an injunction based on inherent authority. .......................................... 6

       A.    Courts must use their inherent authority with restraint and great caution—especially when interfering with other branches of the government. ....................................................................7

       B.    The justification for the injunction fails—a monthly program ending in late 2026 presents no threat to jurisdiction. .......................10

III.    The Court failed to consider the required factors for awarding injunctive relief. ..............................................................................12

Conclusion and Prayer ............................................................................14

Certificate of Conference .......................................................................16

Certificate of Service...............................................................................17

To the Honorable Fifteenth Court of Appeals:

Appellees ("Harris County") respectfully request that this Court vacate the injunction issued on December 6, 2024. This Court relied on powers no party invoked to issue an injunction nobody needed. An injunction was not necessary to enable this Court to protect its jurisdiction because, absent an injunction, courts will still have jurisdiction until at least September 2026—the date when the last payments under the Program are scheduled to go out. By issuing an injunction regardless of any threat to its jurisdiction, the Court mistakenly expanded its inherent authority, unconstrained by any limiting principle.

The Court should vacate the injunction.

## BACKGROUND

In its Motion for Temporary Order, the State's request for an injunction relied exclusively on Rule 29.3. App. 3. Harris County explained that Rule 29.3 applies only in interlocutory appeals, not to appeals from final judgments (as here). App. 4 at 15-17. Unable to defend the express basis of its motion, the State's reply retreated. The State abandoned Rule 29.3 and pivoted to relying exclusively on Rule 24.4. App. 5 at 5-6 ("The State agrees that . . . Rule 29.3 . . . does not apply."). But as Harris County explained in a sur-reply letter, Rule 24.4 is limited to supersedeas proceedings and

also does not apply. App. 6 at 2-3. Thus, the State failed to provide any valid basis for the temporary relief sought.

This Court disregarded the State's shifting arguments but nevertheless granted an injunction. App. 1. It relied on a ground no party had raised: its "inherent authority to issue orders necessary or proper to preserve its jurisdiction during the pendency of an appeal." App. 1 at 2. "To protect [its] jurisdiction pending a ruling on the merits of the case," the Court enjoined Harris County "from distributing funds under the Program during the pendency of this appeal or until further order of this Court." App. 1 at 2 (emphasis omitted).

There is no dispute that the Court's order in this case is an injunction. App. 1 (ordering Harris County to "refrain from distributing funds under the Program during the pendency of this appeal or until further order of this Court."); App. 5 at 7 (State agreeing). Nor could there be: in *In re State*, the Supreme Court noted that "a stay pending appeal is, of course, a kind of injunction." *In re State*, 2024 WL 2983176, at *2 (Tex. 2024); *Harley Channelview Properties, LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 39 (Tex. 2024) (It "is the character and function of an order that define its classification, not matters of form." (quotation marks omitted)). The character and function of this Court's order is identical to the Supreme Court's order in *In re State*, which was an injunction.

The Court should vacate its injunction for three reasons. First, it relied on a source of authority no party even mentioned. Second, in relying on that unraised and unbriefed source—its "inherent authority"—the Court overreached. It stated that it was acting to preserve its jurisdiction, but that was wholly unnecessary because its jurisdiction was not threatened at all. Third, the court failed to consider the required factors for awarding injunctive relief.

## I.    The Court improperly relied on power no party had invoked.

The Court improperly issued an injunction based on a source of authority no party invoked. The Court relied on its "inherent authority" to "protect [its] jurisdiction pending a ruling on the merits of the case." App. 1. But no party cited inherent authority as a basis for relief, and no party argued that the Court's jurisdiction was in imminent danger. *See* Apps. 3-6. Rather, the specter of mootness was far off: the State argued the case would become "moot *if eighteen months pass before the full appellate process concludes*[.]" App. 3 at 27 (emphasis added).

Ignoring the party presentation principle and relying on an unraised and unbriefed source of authority was itself error. And by doing so, the Court inadvertently showed why the principle is so important: without the adversary system, courts are more susceptible to mistakes.

The Supreme Court has emphasized that "[o]ur adversary system of justice generally depends 'on the parties to frame the issues for decision and assign[s] to courts the role of neutral arbiter of matters the parties present.'" *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782 (Tex. 2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243, 128 (2008)). The "system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw*, 554 U.S. at 244 (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring)); *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (same). "The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one." *Pike*, 610 S.W.3d at 782 (quoting *United States v. Burke*, 504 U.S. 229, 246, 112 (1992) (Scalia, J., concurring)); *see In re Office of Attorney Gen.*, 2024 WL 4863177, at *4 (Tex. 2024) (orig. proceeding) (per curiam) (collecting cases restricting courts' authority). That principle protects the Court as much as the parties. *See Loher v. Thomas*, 825 F.3d 1103, 1120 (9th Cir. 2016) (O'Scannlain, J.) ("There is a risk that the court, lacking the analysis ordinarily provided by adversarial parties, will reach the wrong conclusion on the merits and create poor precedent." (citation omitted)).

In short, "the adversary process remains the touchstone of litigation." *Rattray v. City of Brownsville*, 662 S.W.3d 860, 869 (Tex. 2023). Courts should not "become Inspector Javert, hunting for [powers] that the parties do not see or raise." *Id.*

Here, despite comprehensive briefing from both sides, this Court struck out on its own. No party advocated for the exercise of the Court's inherent authority. Nor did any party ask it to rely on Tex. Gov't Code § 22.221(a) (writ power in original proceedings), which the Order cites for support. *See* App. 1. Reinforcing the court's disregard for the State's actual arguments, the order dismissed "as moot the State's request for temporary relief and request in the alternative for an administrative stay"—i.e., everything the State argued in its motion. *Id.* at 3 (emphasis omitted).

The Attorney General may have strategically decided against invoking inherent authority because he does not think it would authorize this Court's injunction. He has repeatedly argued against such power: "Injunctions are outside the court of appeals' appellate jurisdiction, and neither Rule 29.3 ***nor the court of appeals' inherent powers*** authorizes" an injunction. Pet. for Writ of Mandamus at 12-15, *In re Abbott*, No. 22-0229 (Tex. Mar. 23, 2022) (emphasis added). In another case, the Attorney General argued: (1) that appellate courts' "inherent powers . . . necessarily cannot go beyond a court's power to act," which its "jurisdiction

- 5 -

delimits"; and (2) that "[a]ppellate jurisdiction does not encompass the power to issue injunctions, which springs from a court's original jurisdiction." Pet. for Writ of Mandamus at 10, 13-15, *In re Motheral*, No. 22-0106 (Tex. Feb. 11, 2022). Here, this Court had no original jurisdiction because the State never made a specific request to invoke the court's original jurisdiction.[1] So, the Attorney General's decision not to invoke inherent authority was consistent with his position that such authority would not authorize this Court's injunction.

By relying on a power no party mentioned, the Court deprived the parties of the opportunity to be heard regarding that power and violated the party presentation principle. This principle protects the Court as well as the parties, as shown below.

## II. The Court failed to exercise the necessary caution in issuing an injunction based on inherent authority.

Courts' inherent authority must be used cautiously and sparingly—especially when halting programs established by democratically elected policymakers. The Court's unreasoned order does not reflect the required caution and restraint.

---

[1] Courts only treat filings in a direct appeal as a request for an extraordinary writ when a party makes a "specific request to invoke the court's original jurisdiction." *Lewis v. Star Realty Inc.*, 2021 WL 4095251, at *4 n.5 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (observing, additionally, the failure to "satisfy the mandatory formal requirements for the extraordinary, equitable remedy of mandamus"); *see also CMH Homes v. Perez*, 340 S.W.3d 444, 452-54 (Tex. 2011); *Hodge v. Kraft*, 490 S.W.3d 510, 517 n.2 (Tex. App.—San Antonio 2015, no pet.); *Toney v. Strickland*, 2024 WL 4629167, at *2 n.2 (Tex. App.—Austin 2024, no pet. h.). Here, the State has made no such request, so it has not invoked this Court's original jurisdiction.

The Court invoked its "inherent authority to issue orders necessary or proper to preserve its jurisdiction," but that was unnecessary because its jurisdiction was not remotely threatened. App. 1. A *threat* to jurisdiction must be a prerequisite for using inherent authority to *preserve* jurisdiction. Otherwise, injunctions based on inherent authority can be issued at whim.

### A. Courts must use their inherent authority with restraint and great caution—especially when interfering with other branches of the government.

"All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit." Tex. Const. art. I, § 2. At every level, the Community Prosperity Program reflects the will of the people: The U.S. Congress provided the funds and specified their authorized uses; in the same year the Gift Clause was added to the Texas Constitution, the Texas Legislature required counties to "provide for the support of paupers"; and the Harris County Commissioners Court determined that the Program would benefit the County and its needy residents.[2]

Conversely, courts' "inherent powers are shielded from direct democratic controls." *Brewer v. Lennox Hearth Products, LLC*, 601 S.W.3d 704, 718 (Tex. 2020)

---

[2] *See* 42 U.S.C. § 803; Act of July 22, 1876, 15th Leg., R.S., ch. 55 §4, 1876 Tex. Gen. Laws 51, 51-52 (App. 7), *codified as amended*, Tex. Loc. Gov't Code § 81.027.

(citation omitted). Because of that shielding "and because of their very potency, inherent powers must be exercised with restraint, discretion, and great caution." *Id.* (alterations and quotation marks omitted).

"Inherent authority has been likened to an imperial power with intrinsic potency[.]" *Id.* at 708 (quotation marks and footnote omitted). To "wield inherent powers of intrinsic potency and unconstrained breadth necessitates . . . restraint and caution." *Id.* at 723. Courts' inherent authority should not be "a broad reservoir of power, ready at an imperial hand, but a limited source." *Id.* at 708 n.3 (quoting *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1406–07 (5th Cir. 1993)). "[A]n argument for the existence of such a power must be grounded on more than mere judicial convenience." *Nat. Gas Pipeline*, 2 F.3d at 1409.

"In short, the inherent power springs from the well of necessity, and sparingly so." *Id.*; *accord Brewer*, 601 S.W.3d at 708, 718 (recognizing that "inherent powers must be used sparingly" and "only to the extent necessary").

Further warranting caution here, the Legislature and the Supreme Court have established a carefully delimited system for relief during the pendency of an appeal. For example, Rule 29.3 provides for relief during an interlocutory appeal. Similarly, Rule 24 and Civil Practice and Remedies Code Chapter 52 provide a highly reticulated system for superseding the adverse effects of a final judgment during an

appeal. *See generally In re Longview Energy Co.*, 464 S.W.3d 353 (Tex. 2015) (orig. proceeding) (discussing supersedeas scheme). And the Legislature has authorized the courts of appeals to issue writs of injunction, but only in the context of an original proceeding. Tex. Gov't Code § 22.221(a); *see In re Geomet Recycling LLC*, 578 S.W.3d 82, 90 (Tex. 2019) (orig. proceeding). Because the Legislature and the Supreme Court have defined appellate courts' authority to issue jurisdiction-preserving injunctions, expansive exercises of inherent authority would eviscerate those carefully defined limits.

Finally, as the Supreme Court has recognized, "the need for courts to mind their jurisdictional bounds is perhaps at its greatest in cases involving questions of public importance, where the potential for undue interference with the other two branches of government is most acute." *Morath v. Lewis*, 601 S.W.3d 785, 789 (Tex. 2020). Thus, this Court was required to act with restraint and caution in using its inherent authority.

Without any explanation or reasoning, the Court's order cannot and does not reflect the necessary caution and restraint. The Court stated that it was acting to protect its jurisdiction, but that was wholly unnecessary because its jurisdiction was not threatened at all. In using its authority to take unnecessary action, the Court glossed over the law's numerous "safeguards against an overreaching temporary

injunction." *See Harley*, 690 S.W.3d at 37 (noting that the "law generally does not permit prejudgment enforcement of a party's claims for relief").

In sum, this Court erred in exercising its inherent authority without the necessary "restraint, discretion, and great caution." *Brewer*, 601 S.W.3d at 718. It should remove the unnecessary and improper injunction that impedes democratically established policies.

**B.     The justification for the injunction fails—a monthly program ending in late 2026 presents no threat to jurisdiction.**

The Court's express justification fails because an injunction was unnecessary to preserve jurisdiction. Without an injunction, jurisdiction will exist so long as payments are being made under the Community Prosperity Program up through at least September 2026. App. 4 at 20-21. Prior to the injunction, the County was not even going to begin releasing funds to participants until May 2025. App. 4 at 3, 12, 14, 20-21. Given the expedited briefing schedule, the Court had ample time to address whether the Program is constitutional long before it was to begin, let alone end. The Court could grant effective relief up until the issuance of the *last payment*, in 2026, so there was no threat to its jurisdiction, and an injunction was unwarranted.

Because the Court can grant effective relief for at least the next 21 months, mootness will not threaten its jurisdiction. As the Supreme Court recently explained: "mootness is difficult to establish. The party asserting it must prove that intervening

events make it impossible for a court to grant any effectual relief whatever to the prevailing party." *In re Dallas County*, 697 S.W.3d 142, 151 (Tex. 2024) (orig. proceeding) (quotation marks omitted); *Abbott v. Mex. Am. Legislative Caucus*, 647 S.W.3d 681, 689 (Tex. 2022) (same). "[I]f even one issue remains live . . . , the suit as a whole is not moot." *Heckman v. Williamson County*, 369 S.W.3d 137, 167 (Tex. 2012). "Courts do not act in anticipation of potential mootness, either; only after a case becomes moot does a court lose jurisdiction." *Dallas County*, 697 S.W.3d at 151.

Until the last of the 18 payments goes out in 2026, it will not be impossible for appellate courts to "grant any effectual relief whatever," so courts will not lose jurisdiction. *Id.* Indeed, because each monthly payment is identical, the Court will have jurisdiction over *every single issue* in the case until the last payment is made. The financial impact of the suit may decrease, but the issues to be decided will not disappear or change at all.

The Supreme Court has distinguished *financial* from *jurisdictional* consequences. In *Builder Recovery Services, LLC v. Town of Westlake*, the defendant argued that the plaintiff's claims regarding a 15% fee became moot when the defendant lowered the rate to 3%. 650 S.W.3d 499, 503 (Tex. 2022). The Supreme Court rejected that argument: "A claim that a percentage-of-revenue fee of *any size* is unlawful is not mooted by an intervening adjustment to the *size* of the fee. The

parties' dispute in this regard is just as 'live' under the 3% fee as it was under the 15% fee." *Id.* at 504. So, too, here. The State's claim that the Community Prosperity Program is unlawful is not mooted by a decrease in the *amount* available to disperse. The dispute is just as live with one payment remaining as with 18 payments remaining.

Because Harris County would not begin issuing payments until May 2025 (at the earliest) and because it would continue to do so through at least September 2026, there was no threat to the Court's jurisdiction. So, granting an unnecessary appellate injunction based on inherent authority—where the court's jurisdiction was not remotely threatened—constituted error.

## III. The Court failed to consider the required factors for awarding injunctive relief.

Additionally, the Court erred by granting an injunction without discussing or referencing the two factors appellate courts *must* consider when issuing injunctive relief. Just as in *In re State*, "the familiar considerations governing injunctive relief in other contexts will generally apply in this context as well," so "the likely merits and the balance of harms are two *required* considerations." 2024 WL 2983176, at *2-3 (emphasis added).

"[T]he likely merits of the parties' respective legal positions are *always* an important consideration." *Id.* at *2 (emphasis added). The merits are "important"

because there "is little justice in allowing a party who will very likely lose on the merits to interfere with the legal rights of the opposing party during the appeal." *Id.* "The relevance of the merits to requests for injunctive relief does not vanish when courts must rule expeditiously." *Id.* at *3.

Balancing the harms is also mandatory. *Id.* An "essential consideration attendant on any request for injunctive relief . . . is the injury that will befall either party depending on the court's decision." *Id.* "Courts must likewise consider the harm that other parties or the public will suffer if relief is granted[.]" *Id.*

Here, the Court improperly eschewed these requirements and issued injunctive relief without analyzing the merits or balancing the equities. The Court's failure to engage in the required analysis was harmful because both factors cut in Harris County's favor.

In its response to the State's motion for injunctive relief, Harris County explained why it will succeed on the merits. App. 4 at 22-61. It detailed the multiple ways the State failed to carry its burden to establish the trial court's jurisdiction: (1) the State did not show the trial court's jurisdiction over any defendant, so the trial court properly dismissed the action; (2) the Attorney General lacked authority to represent the State in the trial court; and (3) the Community Prosperity Program is constitutional. App. 4 at 22-61.

The second "required" analytical factor also favors Harris County: the equities are on its side. App. 4 at 63-65. A stay harms Harris County because, although the injunction does not mention the merits, the order nonetheless causes significant uncertainty on whether the Program will ultimately be allowed to succeed. This shadow alone risks discouraging the County from continuing to pursue and defend the Program and may cause it to prematurely toss years of preparation and work. The time and cost lost will not be recoverable.

On the other hand, refusing a stay will not harm the State (1) because the program does not violate the law and (2) because Harris County will not issue payments before May 2025. The Court expedited the appeal, and briefing will be complete by the end of January. App. 1. The Court thus has sufficient time to conduct a merits review before any payments issue. Given that ample time, the injunction prevents no (alleged) harm to the State.

## Conclusion and Prayer

The Court should vacate its injunction of the Community Prosperity Program. Harris County prays for all other relief to which it is entitled.

Dated: January 9, 2025

Grant B. Martinez
State Bar No. 24104118
gmartinez@yettercoleman.com
Justin P. Tschoepe
State Bar No. 24079480
jtschoepe@yettercoleman.com
Lily E. Hann
State Bar 24133836
lhann@yettercoleman.com
**Yetter Coleman LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
Phone: (713) 632-8000

Respectfully submitted,

**CHRISTIAN D. MENEFEE**
Harris County Attorney

*/s/ Jonathan G.C. Fombonne*
**JONATHAN G.C. FOMBONNE**
Deputy County Attorney and First Assistant
State Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
**TIFFANY S. BINGHAM**
Managing Counsel
State Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov
**CHRISTOPHER GARZA**
Senior Assistant Harris County Attorney
State Bar No. 24078543
Christopher.Garza@harriscountytx.gov
**ELEANOR MATHESON**
Assistant Harris County Attorney
State Bar No. 24131490
Eleanor.Matheson@harriscountytx.gov
**RYAN COOPER**
Assistant Harris County Attorney
State Bar No. 24123649
Ryan.Cooper@harriscountytx.gov
**EDWARD D. SWIDRISKI III**
Assistant Harris County Attorney
State Bar No. 24083929
Edward.Swidriski@harriscountytx.gov

**Office of The Harris County Attorney**
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5101

*Counsel for Appellees*

## CERTIFICATE OF CONFERENCE

I certify that on January 9, 2025, I conferred via email with William Farrell, counsel for appellant, who indicated that appellant opposes this motion.

*/s/ Jonathan G.C. Fombonne*
Jonathan G.C. Fombonne

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing has been forwarded to all counsel of record on January 9, 2025, via the Court's electronic filing system.

*/s/ Jonathan G.C. Fombonne*
Jonathan G.C. Fombonne

# In the Fifteenth Court of Appeals
# Austin, Texas

**State of Texas,**

*Appellant,*

*v.*

**Harris County, Texas, et al.,**

*Appellees.*

On Appeal from the 165th Judicial District Court, Harris County, Texas
Cause No. 2024-63919, Hon. Ursula Hall, Presiding Judge

## Appendix

Tab

1. Order Granting Injunctive Relief

2. Amended Final Judgment

3. State's Motion for Temporary Order (without appendix)

4. Harris County's Response to Motion for Temporary Order and Motion for Expedited Appeal (without appendix)

5. State's Reply Brief on Its Motion (without appendix)

6. Harris County's Sur-Reply Letter

# TAB 1



**In The**

# Fifteenth Court of Appeals

_____

**NO. 15-24-00120-CV**

_____

**STATE OF TEXAS, Appellant**

**V.**

**HARRIS COUNTY, TEXAS, ET AL., Appellees**

---

**On Appeal from the 165th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2024-63919**

---

## ORDER

This is an appeal from an order granting a plea to the jurisdiction. Appellant the State of Texas (the "State") filed a motion seeking temporary relief under Rules 24.4 and 29.3 of the Texas Rules of Appellate Procedure to enjoin Appellees Harris County and Harris County officials from implementing the Community Prosperity Program (the "Program") during the pendency of this appeal. In the alternative, the State requests that the Court issue an administrative stay prohibiting the implementation of the Program during the pendency of this appeal and to also

expedite this appeal.

Appellees oppose the requests for temporary relief and an administrative stay, but they do not oppose the request for expediting the appeal. Appellees also move to expedite the appeal.

Since the filing of the motion, the trial court has amended the judgment. Under Rule 27.3 of the Texas Rules of Appellate Procedure, the Court is permitted to "treat actions relating to the appeal of the first order or judgment as relating to the appeal of the subsequent order or judgment." Tex. R. App. P. 27.3 We treat the State's motion as relating to the appeal of the amended judgment.

The Court has the inherent authority to issue orders necessary or proper to preserve its jurisdiction during the pendency of an appeal. *In re Sheshtawy*, 154 S.W.3d 114, 120 & n.50 (Tex. 2004); *Richards v. League of United Latin Am. Citizens (LULAC)*, 863 S.W.2d 449 (Tex. 1993); Tex. Gov't Code § 22.221(a). To protect our jurisdiction pending a ruling on the merits of the case,

**the Court ORDERS that Appellees refrain from distributing funds under the Program during the pendency of this appeal or until further order of this Court**.

The Court **GRANTS** the motion of the State and Appellees to expedite the appeal. The Court hereby **ORDERS:**

- the State to file its appellant's brief within 14 days after the date the clerk's record is filed or the date the reporter's record is filed, whichever is later;

- the Appellees to file their brief within 14 days after the date that the appellant's brief is filed;

- and the State to file its reply brief, if any, within 7 days of the date

that the appellees' brief is filed.

**The Court will not grant extensions to file the clerk's record and reporter's record**.

We **DISMISS AS MOOT** the State's request for temporary relief and request in the alternative for an administrative stay.

PER CURIAM

Before Chief Justice Brister and Justices Field and Farris.

# TAB 2

FILED
Marilyn Burgess
District Clerk

NOV 25 2024
Time: 9:50 am
Harris County, Texas
By_____ M Singleton
Deputy

CAUSE NO. 2024-63919

| | | |
|---|---|---|
| STATE OF TEXAS, *Plaintiff,* | § § § | IN THE DISTRICT COURT |
| v. | § § | |
| HARRIS COUNTY, TEXAS, HARRIS COUNTY COMMISSIONER COURT, LINA HIDALGO, in her official capacity as Harris County Judge, RODNEY ELLIS, in his official capacity as Commissioner of Harris County Precinct 1, ADRIAN GARCIA, in his official capacity as Commissioner of Harris County Precinct 2, TOM RAMSEY, in his official capacity as Commissioner of Harris County Precinct 3, and LESLEY BRIONES, in her official Capacity as Commissioner of Harris County Precinct 4, HARRIS COUNTY PUBLIC HEALTH, BARBIE ROBINSON, in her official capacity as Executive Director of Harris County Public Health, *Defendants.* | § § § § § § § § § § § § § § § § § § § § § | 165ᵗʰ JUDICIAL DISTRICT HARRIS COUNTY, TEXAS |

**AMENDED FINAL JUDGMENT**

The Court replaces its Order granting the Harris County Defendants' plea to the jurisdiction, signed on October 24, 2024, with this Amended Final Judgment.

On October 24, 2024, the Court considered Harris County Defendants' Plea to the Jurisdiction filed in the above-styled and numbered cause. After having considered the pleadings, all documents on file with the Court, testimony of witnesses, exhibits, and arguments of counsel, the Court **GRANTS** the Harris County Defendants' Plea to the Jurisdiction.

On November 22, 2024, the Court considered the Harris County Defendants' Sworn Motion to Show Authority Under Rule 12 (the "Motion"). After having considered the motion, response, any replies, and arguments of counsel, the Court **GRANTS** the Motion.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Certified Document Number: 117698961 - Page 1 of 2

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that the Court refuses to permit the Attorney General and attorneys working for his office from appearing on behalf of the State of Texas in this Court in this case. Unless a person who is authorized to prosecute this case on behalf of the State appears by November 25, 2024, it is further ORDERED that all pleadings filed in this action by the Attorney General purportedly on behalf of the State are stricken.

IT IS THEREFORE FURTHER ORDERED, ADJUGED, and DECREED that Harris County Defendants' Plea to the Jurisdiction is GRANTED and all parties and all claims are dismissed for lack of jurisdiction. All costs shall be borne by the party incurring them.

This Order is Final and Appealable.

SIGNED this 23rd day of November, 2024 at 8:06 p.m.

_____
JUDGE PRESIDING

Certified Document Number: 117698961 - Page 2 of 2

- 2 -



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 25, 2024

Certified Document Number:        117698961 Total Pages:  2

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# TAB 3

ACCEPTED
15-24-00120-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/12/2024 12:42 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-24-00120-CV**

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/12/2024 12:42:28 PM
CHRISTOPHER A. PRINE
Clerk

The State of Texas,

*Appellant*,

*v.*

Harris County, Texas; Harris County Commissioners Court; Lina Hidalgo, in her official capacity as Harris County Judge; Rodney Ellis, in his official capacity as Commissioner of Harris County Precinct 1; Adrian Garcia, in his official capacity as Commissioner of Harris County Precinct 2; Tom Ramsey, in his official capacity as Commissioner of Harris County Precinct 3; Lesley Briones, in her official capacity as Commissioner of Harris County Precinct 4; Harris County Public Health; and Leah Barton, in her official capacity as Executive Director of Harris County Public Health,

*Appellees.*

On Appeal from the 165th Judicial District Court, Harris County

## APPELLANT'S MOTION FOR TEMPORARY ORDER AND ALTERNATIVE MOTION FOR EXPEDITED APPEAL

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

KIMBERLY GDULA
Chief, General Litigation Division

WILLIAM D. WASSDORF
Deputy Chief
State Bar No. 24103022
Will.Wassdorf@oag.texas.gov

/s/ William H. Farrell
WILLIAM H. FARRELL
Assistant Attorney General
Texas State Bar No. 00796531
Biff.Farrell@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 463-2120 Fax: (512) 320-0667

**Counsel for Appellant**

2

**To the Honorable Fifteenth Court of Appeals:**

"Requiring the government to follow the law benefits everyone." *In re State of Texas,* No. 24-0325, 2024 WL 2983176, at *5 (Tex. June 14, 2024). For over a century, the Texas Supreme Court has recognized that "[n]o feature of the Constitution is more marked than its vigilance for the protection of the public funds and the public credit against misuse. This is exemplified by numerous provisions in the instrument." *Bexar County v. Linden*, 220 S.W. 761, 761 (Tex. 1920). To prevent improper patronage, the Constitution creates "a positive and absolute," *id.* at 762, ban on most gifts of public funds to private individuals, *see, e.g.*, Tex. Const. art. III, § 52(a). And to ensure the equality of rights guaranteed when men "form a social compact," it precludes arbitrariness in the provision of "exclusive separate public emoluments." *Id.* art. I, § 3.

Defendant Harris County's lottery-based Community Prosperity Program (the "Program") violates these provisions. Harris County intends on issuing its first payments under its newly revised basic income program in January 2025 to approximately 1,850 Harris County residents selected by lot from a pool of potential beneficiaries. Those payments are expected to continue for the next eighteen months.

This "new" program works irreparable harm to the State.[1] Our Supreme Court has repeatedly held that "[a]s a sovereign entity, the State has an intrinsic right to

---

[1] The "original" version of the program, "Uplift Harris," is the subject of No. 15-24-00061-CV, *State v. Harris County,* currently pending in this Court. Harris County and other defendants are currently implementing some minor program changes and intend to launch a similar program with a new name.

. . . enforce its own laws." *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (quoting *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015)), and an interest "in the maintenance and operation of its municipal corporations in accordance with th[at] law," *id.* (quoting *Yett v. Cook*, 281 S.W. 837, 842 (Tex. 1926)). Absent temporary relief, Texas "would be impotent" to enforce its most fundamental law, the Constitution, *id.*, under this case's circumstances None of these funds will ever be recoverable once spent. Moreover, absent temporary relief, it is highly unlikely that this Court, let alone the Texas Supreme Court, will have a chance to determine whether those payouts are constitutional before the arbitrary January 2025 start date baked into the program. Because it is highly unlikely that the Court will decide this appeal before the date on which Harris County intends to issue its first payment in January 2025, the State requests an order preventing the County from issuing any payments under the Program pending appeal because, as the Texas Supreme Court explained in the last case halting the County's previous program, "this potential violation of the Texas Constitution cannot be remedied or undone if payments commence while the underlying appeal proceeds." *In re State,* 2024 WL 2983176, at \*5. Alternatively, the State requests an expedited appeal such that both this Court, and if necessary, the Texas Supreme Court will have the opportunity to decide this case by the end of December, along with an administrative stay of the County's new program in the interim. **Though the State does not file this motion as an emergency motion,** *see* **Tex. R. App. P. 10.3, it requests a ruling as soon as possible so that it may seek further review if necessary.**

4

## BACKGROUND

### I.  Factual Background

Signed on March 11, 2021, the American Rescue Plan Act (ARPA) provided federal funding to provide relief for COVID-19. American Rescue Plan Act of 2021, Public Law 117-2. Rather than spend that money for its intended purpose—a much-needed response to a global pandemic—Harris County Judge Lina Hidalgo, County Commissioner Rodney Ellis, and then-Executive Director of Harris County Public Health Barbie Robinson announced that they would use it to fund "Uplift Harris." Press Release, *Harris County Commissioner Ellis, County Judge Hidalgo to Introduce Uplift Harris* (June 5, 2023), https://www.hcp1.net/Connect-With-Us/Newsroom/commissioner-ellis-judge-hidalgo-to-introduce-uplift-harris-an-arpa-funded-guaranteed-income-program [hereinafter "Commissioner Press Release"]. According to Harris County Public Health (HCPH), Uplift Harris was designed as a guaranteed-income program that "would "provide guaranteed, continuous, unconditional financial assistance to qualified households for an eighteen-month period." App.D.1.

HCPH asserted that the main "goal of the program was to improve participants' financial and health outcomes." App.D.1 But the funds were *not* being distributed to those with either the worst financial circumstances or the worst potential health outcomes, let alone individuals whose financial or health circumstances were caused or exacerbated by COVID. Instead, anyone within "[t]wo cohorts of applicants [was] eligible for Uplift Harris Guaranteed Income Pilot funds." App.D.1-2.

5

Geographic cohort: Eligibility is based on income and geography. Applicant's household income must be below *200% of the federal poverty line (FPL)* and reside in one of the identified high-poverty ZIP codes.

ACCESS Harris: Active participants of Accessing Coordinated Care and Empowering Self Sufficiency (ACCESS) Harris County are qualified to apply through their participation in ACCESS Harris and having a household income *below 200% FPL*. ACCESS cohort participants can reside anywhere in Harris County.

App.E.19-20 (emphasis added).[2] By tying eligibility to income below 200% of the federal poverty line, Uplift Harris created a pool of recipients far greater than the number of individuals that would be eligible for Medicaid even under the Affordable Care Act, Medicaid & CHIP, HealthCare.gov, https://www.healthcare.gov/medicaid-chip/medicaid-expansion-and-you/ (last visited Nov. 7, 2024) (noting that eligibility is set at 138%), which the Texas Legislature has repeatedly declined to accept, *see* David Balat, *Texas Improves Health Care, Without Expanding Medicaid*, Tex. Pub. Pol'y Found. (July 1, 2021), https://www.texaspolicy.com/texas-improves-health-care-without-expanding-medicaid/.

Moreover, likely because ARPA was not designed for this purpose, not every individual within the proposed pool would have received funding. And, as County Commissioner Tom Ramsey recognized, this created "many potential problems" because the County must "try to identify 1,800 people that you're going to give $500

---

[2] The Program's eligibility requirements remain unchanged, as Harris County is limiting participation to those residents originally selected under the "Uplift Harris" program.

a month to—no restrictions." FOX 26 Houston, *Guaranteed Income Program 'Uplift Harris' Finalized Details*, YouTube (Jan. 9, 2024), https://www.youtube.com/watch?v=Vc-0U4WKHxw. To identify those people, the County determined that recipients would be randomly selected to receive the funds through a lottery.

Before the application window closed on February 2, 2024, Defendants collected 82,000 applications, which they winnowed down to the 55,000 they deemed eligible for their payout program. Defendants ran their lottery, selected their participants, and announced that the first $500 payment would be distributed to the recipients as early as April 24, 2024, Press Release, HCPH, *Uplift Harris Guaranteed Income Pilot Announces Award Notifications Starting Today* (March 18, 2024), https://tinyurl.com/HarrisUplift.

The State sued Harris County, arguing that Uplift Harris violated the Gift Clauses. Emergency litigation ensued, and the Texas Supreme Court held that Uplift Harris was likely unconstitutional. Acknowledging that the State "ha[d] raised serious doubt that the Uplift Harris program [could] satisfy the 'public control' requirement,'" the Supreme Court granted the State's Rule 52.10 Motion on June 14, 2024, and ordered Harris County to refrain from distributing funds under the Uplift Harris program until further order of that Court. *In re State,* 2024 WL 2983176, at *4. The State's appeal regarding Uplift Harris remains pending before this Court. *Supra* p.2 n.1.

In response to the Supreme Court's ruling, Harris County chose to amend Uplift Harris and create a new program. App.F.1. On August 27, 2024, Harris County

7

approved the County Judge's execution of this amendment and renamed its basic income program the "Harris County Community Prosperity Program." App.J.1. But the Program is simply Uplift Harris with some minor changes. Those changes include issuing re-loadable debit cards; prohibiting direct deposit, withdrawal of cash, or receiving cash back at the point of purchase; and limiting spending categories through the use of merchant category codes ("MCCs"). App.H.3. MCCs are four-digit numbers assigned by the payment processor based on the goods and services the business provides. A Program participant is unable to use his or her debit card at businesses without an approved MCC. While a liquor store, gun store and general store would all have different MCCs, Harris County remains unable to determine what items are being purchased at a particular business as long as the transaction occurs at a business with an approved MCC. All other terms and conditions of the Uplift Harris program remain the same—other than its new name. App.H.4. Relevant here, Harris County intends to give Program recipients $500 to spend on a monthly basis for eighteen months. App.L.30:22-24. The first such payments will begin in January 2025. App.L.34:22-23.

## II. Procedural Background

On September 19, 2024, the State sued Harris County and the relevant county officials for violating article III, section 52(a) (the Gift Clause) and article I, section 3 of the Texas Constitution (the Texas Equal Protection Clause), as well as for failing to comply with two provisions of the Local Government Code, Tex. Loc. Gov't Code §§ 81.027, 381.003. App.B. The State sought a temporary restraining order, temporary and permanent injunctions, and declaratory relief. App.B. The trial court

denied Texas's motion for a temporary injunction and granted the Defendants' plea to the jurisdiction. App.A.

The State appealed the orders denying the temporary injunction, App.A., and granting the plea to the jurisdiction, App.K, and now seeks a temporary order under Texas Rule of Appellate Procedure 29.3, or, alternatively, an expedited appeal.

## STANDARD OF REVIEW

Rule 29.3 authorizes a court of appeals to "preserve the parties' rights until disposition of the appeal." Tex. R. App. P. 29.3. In ruling against Harris County in the Uplift Harris litigation, the Texas Supreme Court clarified that in ruling on a motion for temporary relief under Rule 29.3, a court must consider (1) the likelihood of success on the merits and (2) the balance of harms. *In re State*, 2024 WL 2983176, at *2–3. As when a trial court evaluates a request for a temporary injunction, the Supreme Court explained, the primary question in the Rule 29.3 context is "the likely merits of the parties' legal positions." *Id.* at *3. If the party seeking relief is likely to prevail, the court will then consider (1) whether it "will suffer irreparable harm if relief is not granted," (2) any harm "that other parties or the public will suffer if relief is granted," and (3) "any potential injury to non-parties caused by granting or denying relief." *Id.* In addition to the likely merits and balance of harms, a court may, in its discretion, "take into account other case-specific equitable considerations" when circumstances so warrant. *Id.*

9

# ARGUMENT

## I. The Program Is Unlawful.

The Program is plainly *ultra vires* for two primary reasons. *First*, it constitutes an impermissible gift of public funds to private individuals in contravention of the Texas Constitution's Gift Clauses. *Second*, the random "lottery" the County has deployed to select recipients of public emoluments violates Texas's Equal Protection Clause.

### A. The Program violates the Gift Clauses.

The Supreme Court has recently clarified what the Gift Clauses require. "A challenged public expenditure satisfies [section] 52(a)'s Gift Clause when (1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; and (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished." *Borgelt v. Austin Firefighters Ass'n, IAFF Loc. 975,* 692 S.W.3d 288, 301 (Tex. 2024). The Program does not satisfy this test.

#### 1. The Program is entirely gratuitous.

To start, a $500-per-person payout that the County provides just because it has the funds is entirely gratuitous. As the Texas Supreme Court has explained, "[a] political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002). That consideration can take many forms, including meeting otherwise applicable legal requirements. For example, providing school vouchers may reduce the costs of

funding public schools, which the Texas Constitution requires. *See* Tex. Const. art. VII, § 1. And funding preventative care may help to satisfy the obligations that the acceptance of Medicaid funding imposed on the State. *See, e.g.*, Alison Mitchell, et al., Cong. Rsch. Serv., R43357, Medicaid: An Overview 12 (2023).

Harris County gets nothing for paying Program funds. Indeed, from all appearances, the County is simply trying to spend the money it received from the federal government—funded by Texas taxpayers in other locations—for a completely a different purpose. *See* App.J.8 (indicating that selection criteria is not based on effects of COVID). More specifically, the Program's own website indicates that the only requirement the Program lays on applicants for the funds is that they reside within ten specified zip codes or are enrolled in ACCESS Harris. App.J.8. Because fund recipients do not give consideration in exchange for program funds, those funds are an unconstitutional gift. *See Tex. Mun. League*, 74 S.W.3d at 383.

For many of the reasons already discussed, Harris County doesn't receive a benefit in return for the program funds. *Supra* p. 8. In *Texas Municipal League*, cities derived a public benefit because the expenditure of funds aided in fulfilling the cities' statutory obligation to provide benefits to injured employees. *Id.* at 384-85. By contrast, Harris County cannot identify a single statutory mandate that its program fulfills—a program that is, after all, funded by money the County received for an entirely different purpose. It is no answer to simply say the program reduces poverty or "may" improve self-sufficiency. "Seeing what happens" is far from a "clear" public benefit. *See id.* at 383.

11

The County argued Tex. Const. art. III, § 52(a) authorizes the County to implement economic development programs, App.C.24, and the Program qualifies as an economic development program under Local Gov't Code §§ 381.003(a) and 381.004. However, the Supreme Court has previously indicated it is "skeptical of the County's position as this preliminary stage." *In re State,* 2024 WL 2983176, at *4. "Under the County's permissive reading of section 52-a, nearly any direct gift of public money that will likely be spent by the recipient could qualify as 'economic development'—on the theory that any boost in overall consumer spending is good for the economy. If this is right, then section 52-a comes close to repealing the Gift Clauses' ban on 'gratuitous payments to individuals.'" *Id.* (citing *Tex. Mun. League*, 74 S.W.3d at 383). Similar to Uplift Harris, the Program fails to serve "the public purposes of development and diversification of the economy of the state" as envisioned by section 52-a." *Id.*

**2. The Program does not serve a public purpose.**

Although Texas law has long recognized the importance of providing for the less fortunate, *e.g.*, Tex. Loc. Gov't Code § 81.027, a cash payout that certain lucky individuals happen to receive does not meet the standard for what serves a public purpose. Even if one accepts that the Program has some tangential and attenuated public benefits, its *primary* purpose is to benefit private individuals. The Program's website indicates that it "aims to promote the self-sufficiency of Harris County residents by enhancing their financial stability." App.H.2. The State does not dispute that this would be considered a laudable goal, but, as discussed below, the Texas Constitution specifies how it may be achieved. *Infra* pp. 14.

The County insists that the funds come from a one-time payment by the federal government to respond to a once-in-a-lifetime pandemic that has long since been declared over. H.J. Res. 7, April 10, 2023. Had Harris County invested the funds in some form of healthcare or poverty-related infrastructure, that might have "promoted the self-sufficiency of Harris County residents." App.H.2. Instead, Harris County has decided to cut eighteen one-time checks to recipients in limited zip codes, which checks the recipients can spend on essentially whatever they want as long as the merchant has the proper MCC. App.G.1; *see infra* p. 13.

**3. The Program lacks controls.**

Neither the County nor its public-health department retains control over disbursed funds. A public entity must exercise control over the way a grant of "public money or thing of value," Tex. Const. art. III, § 52(a), is used "to ensure that the public purpose is accomplished and to protect the public's investment," *Tex. Mun. League*, 74 S.W.3d at 384. To honor the Gift Clauses, *see, e.g.*, *Byrd v. City of Dallas*, 6 S.W.2d 738, 740 (Tex. [Comm'n Op.] 1928), controls should be "specifically tailored" to ensure that the expenditures are directed to accomplish the public purpose to which the public dedicates them, Tex. Att'y Gen. Op. No. MW-89, at *2 (1979); *Tex. Mun. League*, 74. S.W.3d at 384.

The Uplift Harris iteration of the Program had problems with controls—indeed, the Texas Supreme Court ruled against it on that basis. Specifically, that Court held that Uplift Harris was a "'no strings attached' stipend to those lucky enough to win its lottery.' *In re State*, 2024 WL 2983176, at *4. That was so because "there will be no monitoring of the recipients' day-to-day purchases, so it is unlikely the County

will know how recipients spend the money and whether any legitimate public purpose was achieved thereby." *Id*. Indeed, though the application for Uplift Harris placed restrictions on the use of the funds, there was "no indication that the County intend[ed] to, or even could, meaningfully enforce those restrictions or truly monitor the recipients' expenditures." *Id*.

The new Program is insufficient for many of the same reasons. The only material changes for controls purposes that the County has made since Uplift Harris are minor. While the County limits where funds recipients may shop via MCCs, it is unable to see what the recipients purchase at an acceptable store. A recipient presumably could not use his or her Program debit card at, say, a liquor store—but the Program would apparently not prevent the recipient from purchasing alcohol at a grocery store like HEB, CVS, or Walmart. App.L.19:22-25; App.L.55:22-24. Indeed, County officials have admitted that they will remain completely unaware of what may be purchased with the funds as long as the purchases are made at a vendor with an approved merchant category code. App.L.55:22-24. Rather, Harris County will only know where items were purchased based on the corresponding MCC. App.L.55:25-56:7. Recognizing that such lack of control may remain insufficient, Brandon Maddox of Harris County Public Health testified that audit controls are still being considered and are subject to change. App.L.65:21-66:25.

As with Uplift Harris, "it is unlikely the County will know how [Program] recipients spend the money and whether any legitimate public purpose was achieved thereby." *In re State*, 2024 WL 2983176, at *4. Indeed, the only other limit on the funds is HCPH's admonishment that recipients may not use the money to harm

others, to engage in criminal activity, or support terrorism. App.E.3-4. But such limits are hardly "specifically tailored" to the Program's purpose: After all, the Program is a welfare program, not an anti-harm, anti-crime, or anti-terrorism program. It is also unclear how the County intends to enforce its limits. In Uplift Harris, the County said that funds should not be used for "terrorism, fraud, or other nefarious activities," but the Court had "no indication that the County intends to, or even could, meaningfully enforce these restrictions or truly monitor the recipients' expenditures." *In re State*, 2024 WL 2983176, at *4. Nothing has materially changed.

### 4. Comparisons to constitutionally authorized forms of welfare do not save the Program.

To be clear, the State does not dispute that providing assistance to the less fortunate is an important public purpose. But, as *Linden* recognized, the State may provide only the welfare that the Constitution itself authorizes, *id.*, which it does through a number of means. The Program far exceeds the limits of what the Constitution permits.

In our Constitution, the people of Texas specifically empowered the Legislature to provide directly for the less fortunate in a number of ways. Under article III, section 51-a(a), the Legislature has the power to provide "for assistance grants to needy dependent children and the caretakers of such children, needy persons who are totally and permanently disabled because of a mental or physical handicap, [and] needy aged persons and needy blind persons." Tex. Const. art. III, § 51-a(a). And per article III, section 51-a(b), the Legislature may provide "for medical care,

15

rehabilitation and other similar services for needy persons" and "may prescribe such other eligibility requirements for participation in these programs as it deems appropriate and may make appropriations out of state funds for such purposes." *Id.* art. III, § 52-a(b).[3]

Because such programs are funded by other Texans, however, those authorizations are limited. For example, "[t]he maximum amount paid out of state funds for assistance grants, to or on behalf of needy dependent children and their caretakers shall not exceed one percent of the state budget." Tex. Const. art. III, § 52-a(b). And as relevant here, article III, section 51 absolutely prohibits the Legislature from "mak[ing] any grant or authoriz[ing] the making of any grant of public moneys to any individual." *Id.* art. III, § 51. Tellingly, an earlier version of that provision made an exception to the general rule for "soldiers and sailors of the Confederacy, their wives and widows, and women who aided in the Confederacy." *Linden*, 220 S.W. at 762. To give meaning to that former exception, the Texas Supreme Court determined that the Gift Clauses' "evident purpose is to deny to the Legislature any power to grant or to authorize the grant of public money to all others" beyond those expressly within the Constitution "absolutely." *Id.*

---

[3] Although the State is unaware of any case addressing the issue, these provisions likely form the basis for vital public-welfare programs like the Health and Human Services Commission's Temporary Assistance for Needy Families. Moreover, because those programs are often funded through cooperative federalism, meeting federal statutory requirements to access those funds would satisfy the existing test for what constitutes a public purpose. *See Tex. Mun. League*, 74 S.W.3d at 384.

The Program far exceeds the boundaries the Constitution authorizes. After all, the "cohorts" who were eligible for the lottery extend far beyond "needy dependent children and the caretakers of such children, needy persons who are totally and permanently disabled because of a mental or physical handicap, [and] needy aged persons and needy blind persons." Tex. Const. art. III, § 51-a(a). Instead, the lottery was necessary precisely because Harris County made the funds available to everyone under 200% of the federal poverty line living in certain geographic areas or participating in certain programs.

To approve such a program would effectively require the Court to read a broad, all-purpose welfare exception into the text of the Gift Clauses. That is not only counter to precedent and constitutional text—it would also violate the "elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative." *See Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915). After all, if a municipality could grant public funds to any group it deemed worthy— whether to the widows of Confederate war veterans or residents of certain zip codes—the detailed requirements of article III, section 51-a and any similar constitutional exceptions would be entirely superfluous. *See Spence*, 180 S.W. at 601.

## B. The Program's arbitrariness violates Texas's Equal Protection Clause.

The Program's violation of the Gift Clauses is particularly concerning because it also provides a "set of men"—namely, those randomly selected in a lottery—with an "exclusive separate public emolument[]" in direct violation of Texas's

equal-protection guarantee. Tex. Const. art. I, § 3. It is generally accepted that under the state Equal Protection Clause, classifications "must not be arbitrary or unreasonable but rather must be based on a real and substantial difference having a relation to the subject of the particular enactment." *Crawford Chevrolet, Inc. v. McLarty*, 519 S.W.2d 656, 661 (Tex. App.—Amarillo 1975, no writ); *see City of Brookside Village. v. Comeau*, 633 S.W.2d 790, 795-96 (Tex. 1982). A classification is invalid if "it appears that the basis therefor is purely arbitrary," *Inman v. R.R. Comm'n*, 478 S.W.2d 124, 127 (Tex. App.—Austin 1972, writ ref'd n.r.e.), or that the basis has no rational connection to the putative justification for the law, *see Whitworth v. Bynum*, 699 S.W.2d 194, 195 (Tex. 1985).

The Program violates the guarantee of equal protection primarily because nothing rationally connects the source of the funds, the eligibility criteria, and the putative purpose of the program. Harris County has attempted to justify this program partly by insisting that it is funded entirely from federal ARPA moneys. Leaving aside that the pandemic conditions that led to the receipt of those funds ended years ago, Harris County has pointed to no connection between COVID and its proposed payouts. And it fares little better in comparing the distribution to Harris County's own self-described goals. After all, if the purpose were truly to improve "financial or health outcomes," App.D.2, one would expect the classifications to focus on the poorest and the sickest within Harris County as opposed to arbitrarily limiting the geographic reach. But there are still no health-related criteria for the payouts. App.H.4. And the wealth-based criteria are drawn so broadly that the County had no choice but to choose randomly who receives the windfall.

The randomness of the beneficiaries and the *sui generis* nature of the payments show that Harris County cannot justify these payouts as some form of pilot program. For example, as Texas has transitioned from a fee-for-service model of Medicaid to one based on managed-care organizations similar to private insurance, it began that transition with classes with unique characteristics. Waiver Overview and Background Resources, HHSC, https://www.hhs. texas.gov/regulations/policies-rules/waivers/medicaid-1115-waiver/waiver-overview-background-resources (last visited Nov. 7, 2024). Generally, when government entities have used random selection, no "exclusive separate public emolument[]" has been at issue, Tex. Const. art. I, § 3, because the question is typically *how* a public benefit will be provided—not *if*.[4] Here, by contrast, the Program is handing a one-time series of payments to some people, but not others, from within the class it defined with no concrete plans on how to provide similar benefits to other similarly situated individuals. Such payments violate the Gift Clauses, and the random selection in the distribution of those payments violates the State's equal-protection guarantee.

## II.  The State Has Standing to Bring *Ultra Vires* Claims.

Although the County only raised the issue of standing below to preserve it for further review, App.C.35, the State undeniably has standing to bring this case. Notwithstanding the minor factual differences between Uplift Harris and the new Program, the State's injuries and requested relief remain identical, and the Supreme

---

[4] For example, lottery selection has been used to effectuate school choice in Houston I.S.D. Houston ISD, School Choice, https://www.houstonisd.org/schoolchoice (last visited Nov. 7, 2024). But those who lost out still had an opportunity to go to school.

Court has previously indicated "[t]o the extent the County challenges the State's standing to bring this suit, our recognition in *Hollins* and elsewhere that the State has a justiciable interest in assuring that its political subdivisions comply with Texas law sufficiently establishes the State's standing at this juncture." *In re The State of Texas,* 2024 WL 2983176, at *4 n.4 (Tex. June 14, 2024).

More specifically, the Supreme Court recognized that "'*ultra vires* conduct' by local officials 'automatically results in harm to the sovereign as a matter of law.'" *Hollins,* 620 S.W.3d at 410. Violation of state law by local government officials "clearly inflicts irreparable harm on the State." *Tex. Ass'n of Bus. v. City of Austin,* 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet denied) (quoting *Abbott v. Perez,* 585 U.S. 579, 602 n.17 (2018). And the State has a "justiciable interest" and "intrinsic right . . . to enforce its own laws." *Hollins,* 620 S.W.3d at 410 (first quoting *Yett,* 281 S.W. at 842; and then quoting *Naylor,* 466 S.W.3d at 790).

## III. The Attorney General has Authority to Represent the State.

The County has argued that the Attorney General lacks authority to represent the State in Harris County—in its view, that is the county attorney's job. As an initial matter, the County raised this argument below in its plea to the jurisdiction. That was improper. Whether the Attorney General may bring this case would have been properly raised in a motion under Texas Rule of Civil Procedure 12, not a plea to the jurisdiction. App.C.36. Indeed, the County appears to recognize the impropriety of this action because it has since filed an independent motion to show authority—but only *after* the trial court granted the County's own plea to the jurisdiction. Because the latter order is a final judgment, the County's independent Rule 12 is likewise

improper, though, to be sure, it was filed after final judgment and is not part of this appeal.

In any event, the County is wrong to suggest that the Attorney General may not represent the State in this case. As the Supreme Court has recently explained, "[t]he Texas Constitution authorizes the attorney general, county attorneys, and district attorneys to represent the state in various cases." *State ex rel. Durden v. Shahan,* 658 S.W.3d 300, 303 (Tex. 2022). This authority to *represent* the [S]tate," the Court elaborated, "does not necessarily include the authority to independently decide whether to *institute* a suit on the [S]tate's behalf." *Id.* Unless the Constitution conveys the authority directly, "[t]he Legislature must provide that authority by statute." *Id.* (citing, *inter alia,* Tex. Att'y Gen. Op. No. GA-507 (2007) (examining both constitutional and statutory grants of authority)). The Attorney General has general authority to pursue civil claims on behalf of the State; county attorneys do not.

"The office of attorney general is older than the United States and older than" the State of Texas. *State of Fla. ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 268 & n.4 (5th Cir. 1976); *Saldano v. State,* 70 S.W.3d 873, 878-79 (Tex. Crim. App. 2002). With its roots in the "earliest period of English legal history," by the sixteenth century, the Attorney General could be considered "the chief representative of the [sovereign] in the courts." *Shevin,* 526 F.2d at 268 n.4 (quoting VI W. Holdsworth, A History of English Law 457-61 (2d ed. 1971)).

Consistent with this history, the Texas Supreme Court has recognized that the Attorney General's "primary duties are," among other things, "to *represent the State*

21

*in civil litigation.*" *Perry v. Del Rio,* 67 S.W.3d 85, 92 (Tex. 2001) (first citing Tex. Const. art. IV, §§1, 22; and then citing Tex. Gov't Code § 402.021). Indeed, according to the Court, the Constitution assigns the Attorney General "exclusive" control over representing the State in civil appellate litigation. *E.g., Maud v. Terrell,* 200 S.W. 375, 376 (Tex. 1918) (orig. proceeding). In discharging that duty, the Attorney General has broad discretion over the selection of legal arguments, the assessment of the available facts and evidence, and the ultimate decision about whether to institute suit. *Perry,* 67 S.W.3d at 92; *Agey v. Am. Liberty Pipe Line Co.,* 172 S.W.2d 972, 974-75 (Tex. 1943); *Charles Scribner's Sons v. Marrs,* 262 S.W. 722, 727-28 (Tex. 1924) (orig. proceeding); *Lewright v. Bell,* 63 S.W. 623, 623-24 (Tex. 1901) (orig. proceeding). By contrast, consistent with how it treats all issues relating to county authority,[5] the Court has recognized that county attorneys have *no* power to initiate civil suits on behalf of the State unless a statute expressly says so. *Durden,* 658 S.W.3d at 303.

Applying these principles, the Court has recently upheld the Attorney General's prosecution of *ultra vires* suits on behalf of the State which seek to bring local authorities into compliance with state law. *In re State,* 2024 WL 2983176, at *4; *Hollins,* 620 S.W.3d at 410. Notably, it has agreed with precedents from the courts of appeals dating back to at least 1922 that generalized statutes like those on which

---

[5] Because counties "represent no sovereignty distinct from the [S]tate," county officers' authority "is limited" no matter the department of government: They "possess only such powers and privileges as have been expressly or impliedly conferred upon them." *Hollins,* 620 S.W.3d at 406 (quoting *Wasson Ints., Ltd. v. City of Jacksonville,* 489 S.W.3d 427, 429-30 (Tex. 2016)).

the County relies here do *not* authorize county attorneys to enforce state civil laws. *Durden,* 658 S.W.3d at 303 n.1.

In arguing to the contrary, the County has pointed to article 5, section 21 of the Texas Constitution which it insists "is the express duty of county attorneys to 'represent the State in all cases in the District and inferior courts in their respective counties." App.C.36 (quoting Tex. Const. art. V, § 21). Because "[Government Code section 45.201] makes it the exclusive duty of the Harris County Attorney to represent the State in all civil matters pending before the courts of Harris County and any other courts," the County argues that the County Attorney is the proper representative of the state in this action. App.C.38. But the Supreme Court has already rejected the notion that such general language granting "authority to *represent* the [S]tate . . . necessarily include[s] the authority to independently decide whether to *institute* a suit on the state's behalf." *Durden,* 658 S.W.3d at 303. Consistent with that authority, the Attorney General and *only* the Attorney General has the authority to institute a civil *ultra vires* suit to enforce the Texas Constitution. Further, though section 45.201 has been law since September 1, 1985, Harris County failed to raise this argument in *State v. Hollins,* 620 S.W.3d 400, 406 (Tex. 2020), or *State v. Harris County,* No. 15-24-00061-CV, currently pending before this Court. That is because Harris County is clearly wrong. Section 45.201 uses the words "primary duty," not "exclusive," as the County argues. Accepting the County's argument would necessarily mean the State could never bring *ultra vires* claims against the County for anything—despite Texas courts' clear understanding to the contrary. *Supra* p. 19. "Primary" duty does not, and cannot, mean "exclusive" duty.

*Primary,* Merriam-Webster Online Dictionary, https://merriam-webster.com/dictionary/primary (last visited Nov. 12, 2024).

Critically, if the Attorney General cannot represent the State in Harris County, the State would be unable to vindicate its rights if the county attorney was unwilling to do so. After all, "*ultra vires* conduct harms the sovereign as a matter of law." *Hollins*, 620 S.W.3d at 410. But if the County has its way, the sovereign would be unable to seek redress for that injury—or any injury—in Harris County. That can't be right.

## IV. Temporary Relief Is Necessary to Prevent Multiple Irreparable Harms.

Temporary relief against Defendants' unlawful actions is necessary to prevent at least three irreparable harms: harm to the State's sovereign interest in the enforcement of the Texas Constitution, the inability to recover the funds once the County has disbursed them, and harm to this Court's and the Texas Supreme Court's jurisdiction to assess the legality of this short-duration program.

### A. Absent temporary relief, Texas will suffer a sovereign injury.

Most fundamentally, relief is necessary to prevent a harm to the State that will result from the violation of constitutional provisions that have served to protect Texans from misuse of public funds for nearly 150 years. "As a sovereign entity, the State has an intrinsic right to enact, interpret, and enforce its own laws." *Naylor*, 466 S.W.3d at 790. Further, when "the State files suit to enjoin *ultra vires* action by a local official, a showing of likely success on the merits is sufficient to satisfy the irreparable-injury requirement for a temporary injunction," *Hollins*, 620 S.W.3d at

24

410, as "the 'inability [of a State] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State,'" *Tex. Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet. denied) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018)). That is why, in the Uplift Harris litigation, the Supreme Court reaffirmed that "ultra vires conduct by local officials automatically results in harm to the sovereign as a matter of law." *In re State*, 2024 WL 2983176, at *4. For the reasons explained above, absent a temporary order, Harris County will violate the Texas Constitution and thereby inflict irreparable harm on the State. Such irreparable harm always counsels heavily in favor of a temporary order. *See, e.g.*, *Hollins*, 620 S.W.3d at 410.

## B. Temporary relief will prevent the funds from becoming permanently lost.

Temporary relief is also warranted to "preserv[e] the status quo based on the unique facts and circumstances presented." *In re Geomet Recycling LLC*, 578 S.W.3d 82, 89 (Tex. 2019). Here, that means that the funds remain in their current bank account. As the Supreme Court explained in the Uplift Harris case, the "harm here alleged" is "irreparable" because "once the funds are distributed to individuals, they cannot feasibly be recouped if it is later determined they were paid in violation of the Texas Constitution. The parties do not seem to disagree on this reality." *In re State*, 2024 WL 2983176, at *5. "Requiring the government to follow the law benefits everyone. Temporarily preventing expenditure of these funds while the State's appeal proceeds ensures public funds are not irrevocably spent in violation of the Texas Constitution." *Id.*

25

## C. Temporary relief will protect the Court's jurisdiction.

Finally, temporary relief is warranted to allow the Court ample time to consider the weighty constitutional issues involved here while simultaneously protecting its own jurisdiction. *See Geomet*, 578 S.W.3d at 90. For example, in *In re TEA*, 619 S.W.3d 679 (Tex. 2021) (orig. proceeding), the Texas Supreme Court held that it was appropriate to issue temporary orders to prevent the installation of a board of managers in the Houston Independent School District, *id.* at 681-82. Doing otherwise would have risked mooting the underlying dispute because the Court could never have reached the legal merits. *Id.* at 688-89, 692. Similarly, the Court forbade Harris County from mass-distributing unsolicited mail-in ballot applications to preserve its jurisdiction so it could resolve *Hollins.* Order, *In re State*, No. 20-0715 (Tex. Sept. 15, 2020). And of course, the Texas Supreme Court issued temporary relief under Rule 52.10 to prevent the County from making Uplift Harris payments during the currently-pending appeal. *In re State*, 2024 WL 2983176, at *5. Similar relief is appropriate here.

## V. Unless the Court Issues Temporary Relief, It Will Be Precluded from Issuing Adequate Prospective Injunctive Relief in the Future.

[T]he only remedies available in an *ultra vires* action" or challenges to the constitutionality of a local policy are "injunctive and declaratory relief." *Hollins*, 620 S.W.3d at 410; *see Rolling Plains Groundwater Conservation Dist. v. City of Aspermont*, 353 S.W.3d 756, 760 (Tex. 2011) (per curiam) ("Generally, however, only prospective relief is available; retroactive relief dictated by a court is not."); *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007). This principle applies at both a

micro and macro level. At the micro level, after January 2025, no injunctive relief can recoup the nearly $1,000,000 worth of illegal gifts that will be initially disbursed to recipients. App.L.51:18-52:13. Because a court will not be able to reach those funds, any possible relief as to the first series of payments will be moot. At a macro level, appeals—and particularly appeals like this one, presenting weighty constitutional issues—could take years.[6] Here, Harris County intends to make monthly payments out of a set pool of cash that will be exhausted in eighteen months. App.L.30:22-24. Temporary relief is therefore necessary to prevent subsequent monthly payments and to stop the entire case from becoming moot if eighteen months pass before the full appellate process concludes, including any potential appeal to the Texas Supreme Court.

## VI. Alternatively, the State Seeks an Expedited Appeal and an Administrative Stay in the Interim.

Alternatively, the State seeks an expedited appeal such that both this Court and, if necessary, the Texas Supreme Court will have time to decide this case by the end of December, before the County makes its first payment in January 2025. App.L.34:22-23. That way, any doubts about the constitutionality of the new Program will be resolved before payments are made. If the Court grants an expedited appeal, the State also seeks an administrative stay of the Program such that Harris County will be prevented from making any Program payments while this appeal proceeds through both this Court and, if necessary, the Texas Supreme Court. Given

---

[6] For example, the notice of appeal in *Borgelt*, the Gift Clause case that the Texas Supreme Court decided in June of this year, was filed on May 14, 2021.

the County's historic attempts to thwart review of this program by accelerating payments, *see* Rodney Ellis (@RodneyEllis), X (April 23, 2024, 1:39 PM), https://x.com/RodneyEllis/status/1782841748512817292 (County attempting to make payments under Uplift Harris while State's emergency motion was pending in Texas Supreme Court), an administrative stay is warranted.

## PRAYER

The Court should grant temporary relief prohibiting Defendants from making payments under the Program during the pendency of this appeal. Alternatively, the Court should (1) expedite this appeal such that both this Court and, if necessary, the Texas Supreme Court can decide it by the end of December and (2) issue an administrative stay preventing the County from making payments under the Program during the pendency of those appeals.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

KIMBERLY GDULA
Chief, General Litigation Division

WILLIAM D. WASSDORF
Deputy Chief, General Litigation
State Bar No. 24103022
Will.Wassdorf@oag.texas.gov

/s/ William H. Farrell
WILLIAM H. FARRELL
Assistant Attorney General
Texas State Bar No. 00796531
Biff.Farrell@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 463-2120
Fax: (512) 320-0667

**Counsel for Appellant**

28

## Certificate of Conference

I certify that on November 7, 2024, Appellant's counsel contacted Christopher Garza and Jonathan Fombonne, counsel for Appellees, and notified them that this emergency motion for a temporary order would be filed. Appellees are opposed.

/s/ William H. Farrell
WILLIAM H. FARRELL

## Certificate of Service

On November 12, 2024, this document was served electronically on Johnathon Fombonne, lead counsel for Appellees, via Jonathan.Fombonne@harriscountytx.gov, and Christopher Garza, co-counsel for Appellees, via Christopher.Garza@harriscountytx.gov.

/s/ William H. Farrell
WILLIAM H. FARRELL

## Certificate of Compliance

Microsoft Word reports that this document contains 5,144 words, excluding exempted text.

/s/ William H. Farrell
WILLIAM H. FARRELL

# TAB 4

ACCEPTED
15-24-00120-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/21/2024 6:03 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00120-CV

# In the Fifteenth Court of Appeals
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/21/2024 6:03:10 PM
CHRISTOPHER A. PRINE
Clerk

**State of Texas,**

*Appellant,*

*v.*

**Harris County, Texas, et al.,**

*Appellees.*

On Appeal from the 165th District Court, Harris County, Texas
Cause No. 2024-63919, Hon. Ursula Hall, Presiding Judge

## Appellees' Response to Motion for Temporary Order and Motion for Expedited Appeal

Of Counsel:

Grant B. Martinez
Justin P. Tschoepe
Lily E. Hann
**Yetter Coleman LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
Phone: (713) 632-8000

**Christian D. Menefee**
Harris County Attorney

**Jonathan G. C. Fombonne**
Deputy County Attorney & First Assistant
State Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov

**Office of the Harris County Attorney**
1019 Congress, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5101

**Attorneys for Appellees**

# TABLE OF CONTENTS

A Note on Uplift Harris ........................................................................................1

Introduction ....................................................................................................... 2

Statement of Facts ...............................................................................................5

Procedural History ............................................................................................12

Argument ...........................................................................................................12

I.     Harris County's Motion for Expedited Briefing and Submission. ...............12

II.    Texas Law Does Not Authorize the Injunction the State Seeks. ................ 13

     A.    Rule 29.3 does not apply following a final judgment. ......................... 15

     B.    The Court need not and should not grant an "administrative
         stay". ........................................................................................................ 17

         1.    "Administrative" relief only serves as a bridge to a ruling
             on a motion for relief pending appeal, not to the final
             conclusion of the entire appellate process. .............................18

         2.    An administrative injunction is unnecessary because the
             program will not make payments until May 2025. ................... 20

III.   The State Did Not Meet Its Burden to Establish the Trial Court's
     Jurisdiction. ........................................................................................... 22

     A.    The State did not show the trial court's jurisdiction over *any*
         defendant, so the trial court properly dismissed the action. ...............23

         1.    Harris County governmental entities have immunity from
             this lawsuit. ................................................................................23

         2.    The State has not pleaded or proved traceability. .................... 24

     B.    The Attorney General lacked authority to represent the State in
         the trial court. ........................................................................................ 28

         1.    Neither the Texas Constitution nor any statute
             authorized the Attorney General to represent the State in
             the trial court. ...........................................................................29

         2.    The Attorney General's other arguments are meritless...........32

IV.     The Community Prosperity Program Is Constitutional. ...............................36

     A.     The Program is presumptively constitutional. ...................................38

     B.     The Gift Clauses do not apply to relief for the poor. .........................39

         1.     In 1876, care for the poor was understood to be the exercise of a local government duty to the community, not a gift to those helped. .......................................................... 40

         2.     In 1876, Texans ratified the gift clauses to stop corporate welfare to railroads and similar commercial enterprises. ........ 44

         3.     Section 52(a)'s text does not support extending a ban on corporate welfare to local assistance for the needy. ................ 44

     C.     Even if the Gift Clauses apply, the Community Prosperity Program satisfies the Supreme Court's test. .....................................47

         1.     Harris County received return consideration. ........................ 48

         2.     The Community Prosperity Program serves many public purposes ...............................................................................50

         3.     Harris County retains control over the funds. .........................54

         4.     The State's new arguments about other constitutional provisions are waived. ...........................................................58

     D.     The Community Prosperity Program is authorized by § 52-a. ...........58

     E.     The Community Prosperity Program does not violate the Equal Protection Clause ............................................................................. 61

V.     The Balance of Equities Favors Denying the State's Requested Injunction. ..................................................................................................63

Conclusion and Prayer .................................................................................65

Certificate of Service ....................................................................................68

Appendix

## A Note on Uplift Harris

This Court is submitting the appeal in the Uplift Harris litigation today. *See State of Texas v. Harris County*, No. 15-24-00061-CV. While Harris County has pivoted to the Community Prosperity Program, it remains interested in implementing Uplift Harris if the Supreme Court ultimately and timely permits it to do so. Nothing in this litigation regarding the Community Prosperity Program should be construed to moot the Uplift Harris litigation in any way.

## INTRODUCTION

This case is the next chapter in the Attorney General's relentless quest to block Harris County from helping needy residents dig themselves out of poverty.

Earlier this year, the State sued Harris County to block Uplift Harris, a guaranteed basic income pilot program under which needy residents would have received a small cash payment to provide a secure floor from which they could raise themselves out of poverty. The Supreme Court granted an emergency stay of that program; so, Harris County created a new program carefully and intentionally designed to address the Supreme Court's concerns, specifically a perceived lack of "public control over the funds." *In re State*, 2024 WL 2983176, at *3 (Tex. June 14, 2024) (orig. proceeding). Unlike Uplift Harris, which offered participants a "no strings attached" guaranteed basic income, the new Community Prosperity Program is more like a traditional public benefits program—in the vein of SNAP or TANF— that includes additional controls at every step. It tightly restricts where and how participants may spend the funds.

Not content with blocking Uplift Harris, Attorney General Paxton sued to block the Community Prosperity Program. The trial court properly denied an injunction, granted a plea to the jurisdiction, and entered a final judgment. The State has now filed a meritless motion for temporary relief in this Court.

2

There are myriad reasons for denying the State's motion. As an easy threshold matter, the State bases it motion on Rule 29.3, but that rule only applies in interlocutory appeals, not appeals from final judgments.

The State also requests an "administrative stay" preventing "payments while this appeal proceeds through both this Court and, if necessary, the Texas Supreme Court," but Texas law limits administrative stays to the short period before an appellate court can rule on a motion for temporary relief pending appeal. Nothing authorizes "administrative" orders that continue until *the entire appellate process* concludes. Nor is such relief necessary: payments will not start under the Community Prosperity Program until May 2025, giving this Court plenty of time to decide both this motion and the underlying appeal. To that end, Harris County moves for expedited briefing and submission.

What's more, the Attorney General lacked the authority to start this lawsuit in the first place. His constitutional and statutory authority to initiate civil suits on behalf of the State in district courts is limited. It does not extend to *ultra vires* actions.

Should the Court reach the merits of the State's constitutional claims, it will find them meritless. From Texas's earliest days, caring for the needy has been a special responsibility of counties, and Harris County's Community Prosperity Program complies with the Constitution. As noted above, Harris County is

implementing numerous additional controls to address the Supreme Court's concerns. Separately, the State's equal-protection arguments border on frivolous, ignoring entirely the framework for the analysis.

In short, the Court should deny the requested injunctive relief, which is not authorized by Texas law, and order expedited briefing and submission of this appeal.

The State glosses over or omits entirely facts not conducive to its narrative. To make this fact section more concise, Harris County's brief from the Uplift Harris litigation is attached as Appendix Tab 3. It covers the federal statutory framework, the Uplift Harris program, and procedural history of the Uplift Harris litigation in greater detail.

### *State and Local Fiscal Recovery Funds*

The federal government has directly provided Harris County with nearly $1 billion in pandemic-relief funds. Harris County may use the money from these State and Local Recovery Funds (SLFRF) to cover commitments incurred by December 31, 2024, and must spend the funds by September 30, 2026. 42 U.S.C. § 803(c)(6)(D).

Federal regulations expressly allow Harris County to use SLFRF funds for "cash assistance" to "households and individuals" at or below 300% of the poverty limit as part of "[r]esponding to the negative economic impacts" of the pandemic. *Id.* § 35.6(b)(3)(ii)(A)(1).

### *Uplift Harris*

In June 2023, Harris County Commissioners Court approved the Uplift Harris program. App. 4 (summary proposal); App. 6 (describing program); *see also*

*In re State*, 2024 WL 2983176, at * 1 (discussing program). Under Uplift Harris, selected Harris County residents would receive "no-strings-attached $500 monthly cash payments" for 18 months. *In re State*, 2024 WL 2983176, at *1. "Recipients would be chosen by lottery from among applicants with income below 200% of the federal poverty line who live in" the ten poorest zip codes. *Id.*; App. 2 at 11, 40 (discussing lottery).

Throughout fall 2023, Harris County and its contractors worked to implement Uplift Harris. Participants expected the first round of assistance in April 2024.

### *The Attorney General Sues*

The participants never received the expected funds. In April 2024, the Attorney General sued. He alleged that the program was unconstitutional and sought a temporary injunction. The County opposed the injunction and filed a plea to the jurisdiction. The trial court denied the injunction and the plea to the jurisdiction.

The State filed an interlocutory appeal and also sought emergency relief under Rule 29.3. The Fourteenth Court denied the Rule 29.3 motion. The appeal remains pending, now submitted in this Court (No. 15-24-00061-CV).

The State petitioned the Supreme Court for a writ of mandamus and writ of injunction, and it filed an emergency motion for temporary relief. Pet. for Writ of

6

Mandamus, *In re State*, No. 24-0325 (Tex. Apr. 22, 2024); Emergency Mot. For Temporary Relief, *In re State*, No. 24-0325 (Tex. Apr. 22, 2024).

### *The Supreme Court Weighs in on Uplift Harris*

The Supreme Court, exercising its authority under Rule 52.10, granted the motion for temporary relief and prohibited all Uplift Harris payments until further order of that Court. *In re State*, 2024 WL 2983176, at *1. The mandamus petition remains pending while the State's appeal proceeds in this Court. *Id.*

The Supreme Court's order granting a stay offered a "preliminary" assessment of the merits but conspicuously focused on one issue. *Id.* at *3. The Court reasoned that the State "raised serious doubt that the Uplift Harris program can satisfy the 'public control' requirement of this Court's Gift Clause precedent." *Id.* at *4. That precedent requires that "a government in Texas that desires to dole out public funds must, among other things, 'retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment.'" *Id.* at *3 (relying on *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 384 (Tex. 2002)); *see id.* at *4 ("It appears there will be no public control over the funds after they are disbursed.").

### *Harris County Creates the Community Prosperity Program*

Harris County was eager to ensure its poor residents received relief, so, instead of awaiting a final resolution of the Uplift Harris litigation, it developed a "completely different program" to address the Supreme Court's concerns: the Community Prosperity Program (the "Program"). App. 2 at 10; *see* App. 8; App. 9. The Program is modeled on public benefits programs such as TANF and SNAP.[1] It uses federal funds to deliver $500 a month, for 18 months, to 1,850 participants, under tight controls. App. 2 at 11, 21-22, 30; *see* App. 9.[2]

The Community Prosperity Program achieves the same goals as Uplift Harris, and the participants remain the same, but it uses a different "intervention and implementation." App. 2 at 9-10. Unlike Uplift Harris, it is a public benefit program, not a guaranteed-income program. App. 2 at 22. And it has three new, strict controls. These controls differentiate the Program from Uplift Harris and assuage the Supreme Court's concerns.

---

[1] "TANF provides cash payments to help families pay for food, clothing, housing and other essentials." Texas Health and Human Services, *TANF Cash Help*, available at https://www.hhs.texas.gov/services/financial/cash/tanf-cash-help; *see* App. 2 at 21. SNAP gives low-income households funds to buy food. Texas Health and Human Services, *SNAP Food Benefits*, available at https://www.hhs.texas.gov/services/food/snap-food-benefits; App. 2 at 21.

[2] Because of this litigation, Harris County has not yet informed the individuals selected for Uplift Harris that they are eligible to be enrolled in the Community Participation Program (assuming they continue to meet the criteria). App. 2 at 38; *see* App. 10 at 4-5.

*First*, participants contractually agree they may only use the funds for "basic needs." App. 2 at 20; App. 11. Each participant must sign an attestation agreeing to the "terms and restrictions" of the Program, including that the "financial assistance provided *must* be used for basic needs, including housing-related expenses, utilities, transportation, groceries, medical care, education, clothing, and other essential goods and services." App. 11 (emphasis added). The State ignores this binding promise, which limits how participants spend funds. Mot. 14-15.

*Second*, to enforce that contractual restriction, participants cannot make cash withdrawals. App. 2 at 19, 31. Instead, recipients will receive a "GiveCard" (a "reloadable direct debit card") loaded with $500 each month. App. 2 at 19-20; *see* App. 9 at Ex. B (updated scope of work). This card functions *only* at vendors covering "basic needs." App. 2 at 19-20; App. 9 at Ex. B; App. 10 at 3; App. 11.

For the card to work, the store must have a qualifying Merchant Category Code (MCC). App. 2 at 31, 64; App. 9 at Ex. B. An MCC is a four-digit number assigned by the payment processor based on the goods or services the business provides. App. 2 at 52; App. 9 at Ex. B. Harris County culled the nearly 1,000 existing MCCs to create a shortlist of those that map onto basic needs, such as housing, food, utilities, transportation, and healthcare. App. 2 at 32, 56; App. 12; App. 13. As part of this process, Harris County reviewed permissible purchases

under similar (constitutionally acceptable) programs like SNAP and TANF. App. 2 at 19-21, 56, 60, 61-62. A qualifying MCC is a prerequisite to use, if a merchant does *not* have one—e.g., its MCC is for jewelry, liquor, tobacco, etc.—the card simply will not work. App. 2 at 21, 64; App. 10 at 3. Harris County mandated these restrictions in its amended contract with GiveDirectly.[3] App. 2 at 24-26; App. 8; App. 9 at Ex. B.

*Third*, participants' account data is shared with GiveDirectly and the County, which have authority to audit by requesting additional documents from participants. App. 2 at 20, 31, 54; App. 9 at Ex. B ("Recipients will also consent to . . . [s]hare transaction-level spending data with GiveDirectly and Harris County Public Health."). Program participants consent to having their transactions "audited for compliance purposes" to "ensure that the funds are being used in alignment with the program's goals and requirements[.]" App. 11; App. 2 at 35-37.

Participants contractually agree they will "provid[e] necessary documentation if requested." App. 11. These audit procedures were designed "in response to the State of Texas concerns over a lack of controls in the previous program." App. 2 at 66. Harris County will further develop the audit process as the program is finalized. App. 2 at 37, 66, 93.

---

[3] GiveDirectly is the day-to-day administrator of the program but operates under the supervision of Harris County Public Health.

In addition, the Community Prosperity Program retains three important controls from Uplift Harris. It exercises control on the front end by setting and enforcing eligibility criteria. Harris County will invite the individuals previously selected to participate in Uplift Harris to join the Community Participation Program, provided they remain eligible. App. 2 at 35, 37-40; *see* 79-80; *see also* App. 11 (attestation).[4] Participants must have a household income below 200% of the federal poverty line and (1) be a member of the ACCESS Harris County Initiative[5] or (2) live in one of the top-10 poorest zip codes in Harris County. App. 2 at 10, 46, 49, 88-89; App. 4.

Additionally, Harris County releases funds to its vendor, GiveDirectly, in $5 million increments. App. 2 at 17-18, 28, 51-52; App. 9. By dispensing only a limited amount of money at a time, Harris County retains control to "ensure that the program is being implemented with fidelity." App. 2 at 18.

Finally, a participant who does not comply with the program's terms will be removed. App. 2 at 36, 81, 94; *see* App. 11.

---

[4] The County will invite those enrolled in Uplift Harris plus some individuals on the waitlist to apply for the Community Development Program. App. 2 at 40-42.

[5] ACCESS Harris is "a coordinated and client-centered safety net service delivery model administered by Harris County Public Health designed to promote participant self-sufficiency." App. 10.

Payments under the Program were originally expected to begin in January 2025. App. 2 at 36. Due to this litigation, the start date will be delayed until May 2025. App. 2 at 42-43; App. 14 (Decl. of B. Maddox).

## PROCEDURAL HISTORY

Although Harris County developed a new program to redress the Supreme Court's concerns with Uplift Harris, the Attorney General once again stepped in to prevent Harris County from helping the poor. The State filed a petition alleging that the new Community Prosperity Program runs afoul of the Gift Clauses (article III, § 52(a)) and the Equal Protection Clause. It requested injunctive relief. Harris County responded, opposing the request for injunctive relief and filing a plea to the jurisdiction. App. 1.

After a hearing, the trial court denied the State's application for a temporary injunction and granted the County's plea to the jurisdiction. Mot. App. A, I. The State appealed the final judgment. Soon after, it filed the instant motion for temporary order in this Court.

## ARGUMENT

### I. Harris County's Motion for Expedited Briefing and Submission.

Harris County agrees with the State's motion that this case would benefit from expedited briefing and submission, and it requests that the Court enter an appropriate order. The State's motion says: "Alternatively, the State seeks an

expedited appeal such that both this Court and, if necessary, the Texas Supreme Court will have time to decide this case by the end of December, before the County makes its first payment in January 2025. That way, any doubts about the constitutionality of the new Program will be resolved before payments are made." Mot. at 4, 27 (citation omitted). The County is prepared to brief the merits of the appeal on an expedited basis, so that this Court may issue a definitive ruling before any payments are made under the Program. The best way to resolve the parties' dispute while prejudicing neither is to expedite briefing and submission of this case.

When Harris County conferred with the State on an accelerated briefing schedule, the State surprisingly said it is "opposed to an accelerated appeal." Regardless of the State's current confusion on its own position, the State's motion was right: the Court should set an accelerated briefing and submission schedule to ensure this case can be decided before payments are set to go out.

## II. Texas Law Does Not Authorize the Injunction the State Seeks.

Texas law does not authorize this Court to grant the State's requested injunction. The "law generally does not permit prejudgment enforcement of a party's claims for relief," and a pre-judgment injunction is an "extraordinary remedy." *Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024). To obtain that extraordinary remedy, the State's motion seeks

temporary relief under Rule 29.3 and, alternatively, an "administrative stay."[6] Both fail for threshold reasons that do not require examination of the underlying merits.

*First*, Rule 29.3 simply does not apply. It permits temporary relief only in the context of interlocutory appeals—not appeals from a final judgment like this one.

*Second*, Texas law does not authorize the State's requested administrative stay pending final disposition of this appeal and any potential review in the Supreme Court. Administrative stays and injunctions exist to prevent harm *only* before a court can rule on a motion for temporary relief—not for the duration of the entire appellate process. Here, the State's alleged injury will not occur for months: Harris County will not begin making payments until at least May 2025. App. 14 (Decl. of B. Maddox). In the meantime, this Court will have plenty of time to decide both the State's motion and the merits of the appeal. Thus, the requested administrative stay is both unauthorized and unwarranted.

---

[6] Although the State refers to its requested order as an administrative "stay," it is really seeking an administrative injunction. It "is the character and function of an order that define its classification, not matters of form." *Harley*, 690 S.W.3d at 39 (quotation marks omitted). An order that "places restrictions on a party and is made effective immediately so that it operates during the pendency of the suit functions as a temporary injunction." *Id.* at 39 (cleaned up). Here, the requested administrative order would function as an injunction by "restrain[ing] a party from a course of conduct that is otherwise within its legal rights to pursue." *Id.* at 37. It would prohibit the County from continuing to implement its presumptively constitutional pilot program. The Supreme Court recognized this relief was injunctive in *In re State*, 2024 WL 2983176, at *2.

### A. Rule 29.3 does not apply following a final judgment.

The State makes a simple but sweeping mistake that dooms its motion: Rule 29.3, which supplies the entire framework of the motion, does not apply. By its plain text, the rule applies exclusively to an "appeal from an interlocutory order." Tex. R. App. P. 29.3. This appeal undisputedly follows a final judgment. *See* Mot. at 20-21; Mot. App. M (notice of appeal). Rule 29.3 therefore does not apply, and the Court should deny the motion.

The text of Rule 29.3 is straightforward. The rule pertains to appellate orders in an interlocutory appeal, not appeals following a final judgment:

> Rule 29. Orders Pending **Interlocutory Appeal** in Civil Cases
>
> . . .
>
> When **an appeal from an interlocutory order** is perfected, the appellate court may make any temporary orders necessary to preserve the parties' rights until disposition of the appeal . . . .

Tex. R. App. P. 29.3 (emphases added).

This plain text is dispositive. The Supreme Court has instructed that in "construing procedural rules, [courts] apply the same rules of construction that govern the interpretation of statutes." *In re Millwork*, 631 S.W.3d 706, 711 (Tex. 2021) (cleaned up). "When a rule of procedure is clear and unambiguous, [courts] construe the rule's language according to its plain or literal meaning." *Id.* (quotation

marks omitted). Here, that plain text means that the rule only applies in an "appeal from an interlocutory order." *Id.*

When an appeal is from a final judgment, it cannot be an appeal from an interlocutory order. An "interlocutory order is by definition an order made pending the cause, before a final disposition on the merits." *City of Corpus Christi v. Pub. Util. Comm'n*, 572 S.W.2d 290, 297 (Tex. 1978). An "interlocutory appeal" is an "appeal that occurs before the trial court's final ruling on the entire case." Appeal, *Black's Law Dictionary* (12th ed. 2024). Thus, "'[i]nterlocutory' and 'final' are mutually exclusive terms." *Interest of A.S.*, 2019 WL 5996981, at *3 n.1 (Tex. App.—Fort Worth 2019, no pet.).

The State does not dispute that the appeal here is from a final judgment, not an interlocutory order. *See* Mot. at 20-21. Nor could it. The trial court's order granting the plea to the jurisdiction expressly disposed of "all parties and all claims" and clearly and unequivocally stated that it was "Final and Appealable." Mot. App. I. This language satisfies the requirements for finality. *See Bella Palma, LLC v. Young*, 601 S.W.3d 799, 801-02 (Tex. 2020). Nor did any separate, interlocutory order exist when the State filed the notice of appeal: the trial court's order denying the temporary injunction had already become moot and merged into the final judgment. *See Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d

385, 390, 395 (Tex. 2020). Because there is no "appeal from an interlocutory order," Rule 29.3 does not apply.

Courts across the state agree and have enforced Rule 29's limited application only to interlocutory appeals. For example, the Dallas Court of Appeals held: "Rule 24 is a general rule that provides how appellants may supersede final judgments. In contrast, rule 29 is a specific rule applying only to the appeal of interlocutory orders." *City of Dallas v. N. by W. Entm't, Ltd.*, 24 S.W.3d 917, 919 (Tex. App.—Dallas 2000, no pet.); *see also Nwabuisi v. Mohammadi*, 2015 WL 4554332, at *3 (Tex. App.—San Antonio 2015, pet. denied) ("Rule 29.5, by its own language, applies only to appeals from *interlocutory* orders."); *Black v. Shor*, 443 S.W.3d 170, 179 (Tex. App.—Corpus Christi–Edinburg 2013, no pet.) ("Rule 29 [was] inapplicable to the instant case because" there was "a final, appealable judgment.").

This Court should reach the same conclusion: in this appeal from a final judgment, Rule 29.3 does not apply and therefore does not authorize the Court to grant any relief.

## B.     The Court need not and should not grant an "administrative stay".

The State's alternative request for an "administrative stay" is equally misguided. Mot. at 4, 27-28. Specifically, the State requests "an administrative stay

of the Program such that Harris County will be prevented from making any Program payments while this appeal proceeds through both this Court and, if necessary, the Texas Supreme Court." Mot. at 27. The State offers no support for such an injunction where, as here, it would not avoid harm and would endure through the end of the entire appellate process.

### 1. "Administrative" relief only serves as a bridge to a ruling on a motion for relief pending appeal, not to the final conclusion of the entire appellate process.

The Texas Supreme Court (in the Uplift Harris litigation) explained that administrative relief only bridges the gap until the court is ready to rule on the *motion for a stay pending appeal*, not until *final disposition* of an appeal:

> Administrative stays do not typically reflect the court's consideration of the merits of the stay application. Rather, they freeze legal proceedings *until the court can rule on a party's request for expedited relief*.

*In re State*, 2024 WL 2983176, at *1 n.2 (emphasis added) (quotation marks omitted) (quoting *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to vacate stay)). Thus, administrative stays should not function as a stay pending conclusion of the appellate process.

Justice Barrett's opinion, quoted by the Texas Supreme Court above, further demonstrates that an administrative order is unwarranted here. Joined by Justice Kavanaugh, Justice Barrett provided guidance and a framework for considering administrative stays. She explained that, in federal courts, a motion for a stay

pending appeal is "not always easy to evaluate in haste, and an administrative stay buys the court time to deliberate." *Texas*, 144 S. Ct. at 798-800 (Barrett, J., concurring in denial of application to vacate stay). Federal appellate courts "frequently issue[] an administrative stay to permit time for briefing and deliberation." *Id.* She then emphasized that the administrative stay is meant to "function[] as a flexible, short-term tool":

> When entered, an administrative stay is supposed to be a short-lived prelude to the main event: a ruling on the motion for a stay pending appeal.

*Id.* at 799. Justice Barrett then observed that the "real problem—and the one lurking in this case—is the risk that a court will avoid" a ruling on the merits of that stay motion "for too long." *Id.*

She provided a useful framework for addressing that problem: "An administrative stay should last no longer than necessary to make an intelligent decision on the motion for a stay pending appeal. Once the court is equipped to rule, its obligation to [rule on the merits of the stay motion] is triggered." *Id.*

Here, the State is not asking for an administrative stay until this Court can rule on the instant motion. Its requested relief—an administrative injunction preventing "payments while this appeal proceeds through both this Court and, if necessary, the

Texas Supreme Court"—is not authorized by Texas law. Mot. at 27. This Court should deny that request.

### 2. An administrative injunction is unnecessary because the program will not make payments until May 2025.

Any order enjoining payment at this juncture is unnecessary and inappropriate because the County is months away from making any Program payments. So, this Court will have plenty of time to decide this motion and the merits of the appeal.

Under the Program's "original time line," "payments would be distributed mid to late January of 2025." App. 2 at 34; *see* App. 2 at 42-43. But this litigation disrupted that plan, and payments by mid-January are "unlikely." App. 2 at 42-43. Indeed, the County has since confirmed that payments will not issue before May 2025—six months from now. App. 14 (Decl. of B. Maddox).

The motion indicates that this case can be fully briefed by the end of this year. Mot. at 27. And the County moves for expeditious briefing and submission. *See* Section I. So, there is no need to enjoin payments that will not be made—if at all— until long after this Court has the opportunity to dispose of this appeal. An administrative injunction is therefore unnecessary.

Here, there is no threat to the Court's jurisdiction from mootness. As the Supreme Court recently explained: "mootness is difficult to establish. The party asserting it must prove that intervening events make it impossible for a court to grant

20

any effectual relief whatever to the prevailing party." *In re Dallas County*, 697 S.W.3d 142, 151 (Tex. 2024) (orig. proceeding) (quotation marks omitted). Until the last of the 18 payments goes out in late 2026, it will not be impossible for this Court to "grant any effectual relief whatever," and this court will not lose jurisdiction. *Id.*[7]

To assuage any concern, Harris County will provide the Court 30-days' notice before any payments are made under the Community Prosperity Program (if the appeal is still pending in this Court). That notice should provide plenty of time to address impending payments and resolve any concern over "accelerated payments." Mot. at 27-28.

In sum, Texas law limits administrative stays to the short period before an appellate court can rule on a motion for temporary relief pending appeal. The State has offered no Texas authority for an administrative stay that continues until the entire appellate process concludes. So, this Court should deny the request for an administrative stay.

---

[7] The State cannot obtain a writ of injunction because it has not invoked this Court's original jurisdiction in any way and because writs of injunction may only issue to protect a court's jurisdiction, which is unnecessary here. *See Tex. Funding Corp. v. Harris County*, 2022 WL 1180072, at *1, 5 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *In re Miles*, 2019 WL 1064577, at *1 (Tex. App.—Houston [1st Dist.] 2019, orig. proceeding); *In re Place*, 2010 WL 1817780, at *1 (Tex. App.—San Antonio 2010, orig. proceeding).

## III. The State Did Not Meet Its Burden to Establish the Trial Court's Jurisdiction.

If the Court agrees that Texas law does not authorize the injunctive relief the State requests, then it can stop here. If the Court does proceed further, then it should consider whether the State met its burden to demonstrate the trial court's jurisdiction. "It is well settled that the jurisdiction of the appellate court as to the merits of a case extends no further than that of the court from which the appeal is taken." *Pearson v. State*, 315 S.W.2d 935, 938 (Tex. 1958). Multiple jurisdictional defects warranted the trial court's granting the plea to the jurisdiction. The State does not address several of them.

*First*, Harris County, its Commissioners Court, and its Public Health department are all entities that have governmental immunity, and the State identifies no legislative waiver of that immunity. *Second*, for the Harris County officials, the State has not met its burden to plead or prove traceability: that they are the particular officials responsible for implementing the challenged program or making the challenged payments. The State's motion addresses neither of these two bases for the trial court's final judgment. *Finally*, the Attorney General lacked authority to represent the State in the district court.

As a result of these jurisdictional defects, the trial court properly granted the plea to the jurisdiction, this Court should not grant an injunction.

## A. The State did not show the trial court's jurisdiction over *any* defendant, so the trial court properly dismissed the action.

The party seeking relief from a court "has the burden to affirmatively demonstrate the court's jurisdiction." *Gulf Coast Ctr. v. Curry*, 658 S.W.3d 281, 286 (Tex. 2022). And "the need for courts to mind their jurisdictional bounds is perhaps at its greatest in cases" like this, "involving questions of public importance." *Morath v. Lewis*, 601 S.W.3d 785, 789 (Tex. 2020). The State did not meet its burden.

### 1. Harris County governmental entities have immunity from this lawsuit.

Three governmental-entity appellees—Harris County, its Commissioners Court, and Harris County Public Health—have governmental immunity from suit. "Governmental immunity protects political subdivisions . . . from suits against them unless waived by the Legislature through 'clear and unambiguous language.'" *City of Conroe v. San Jacinto River Auth.*, 602 S.W.3d 444, 457 (Tex. 2020). Governmental immunity protects political subdivisions even from suits by the State. *See City of Galveston v. State*, 217 S.W.3d 466, 468-69, 474 (Tex. 2007).

The State points to no legislative waiver of immunity that would allow courts to enjoin the governmental entities here, and there is none. "When, as here, a claim falls within the realm of governmental immunity, courts have no jurisdiction to hear the case unless immunity has been waived." *Hillman v. Nueces County*, 579 S.W.3d

23

354, 358 (Tex. 2019). With no waiver, courts have no jurisdiction to enjoin Harris County, its Commissioners Court, or Harris County Public Health.[8]

### 2. The State has not pleaded or proved traceability.

With respect to the remaining appellees—all county officials—the trial court lacked jurisdiction for two reasons. *First*, as discussed below in Section IV, the officials' governmental immunity is waived on an *ultra vires* claim only when a party has pleaded a valid constitutional claim, which the State has not. *Second*, the State has failed to establish, in pleadings or proof, the traceability element of standing by tying the challenged action to any particular government official.

"Without standing, the courts cannot proceed at all, and the party who invokes the courts' jurisdiction bears the burden of establishing these elements of standing; it is not the duty of the other side, or of the courts, to negate them." *Abbott v. Mex. Am. Legislative Caucus*, 647 S.W.3d 681, 693 (Tex. 2022) (quotation marks omitted). "To establish standing, . . . a plaintiff must show (1) an injury in fact that is (2) fairly traceable to the defendant's challenged action and (3) redressable by a favorable decision." *Id.* at 690 (quotation marks omitted).

---

[8] In the Uplift Harris decision in *In re State*, the Supreme Court did not address governmental immunity at all.

So, standing requires "that the plaintiff's alleged injury be fairly traceable to the defendant's conduct because a court can act only to redress injury that fairly can be traced to the challenged action of the defendant." *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 485 (Tex. 2018) (quotation marks omitted).

To establish traceability in an *ultra vires* suit, the plaintiff must plead and prove that the *particular* government official is responsible for the prospective conduct the plaintiff seeks to prevent. *See Mex. Am. Legislative Caucus*, 647 S.W.3d at 697-98 (citing, *e.g.*, *Paxton v. Simmons*, 640 S.W.3d 588, 602-03 (Tex. App.—Dallas 2022, no pet.)); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 43-44 (2021) (concluding claim against Attorney General Paxton should be dismissed because "petitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with S. B. 8"). Thus, "plaintiffs who want the courts to pass judgment on the legality of government action must seek relief against the particular government official or agency responsible for the challenged action." *In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022).

The Attorney General is adamant that courts must enforce this traceability requirement—including in litigation involving Harris County. *See, e.g.*, State's Resp. to Motion for Temporary Relief at 8-16, *State of Texas v. Harris County*, No. 23-0656 (Tex. Aug. 18, 2023). "[S]tanding is not dispensed 'in gross' and must be established

25

for each defendant for each claim." *Id.* at 9 (quoting *In re Gee*, 941 F.3d 153, 161-62 (5th Cir. 2019)).

Here, the State's petition lacks any allegations that any particular official is responsible for implementing the Community Prosperity Program or making payments under it. It presented no such proof at the hearing. This failure means the State has not satisfied the traceability requirement of standing. It disposes of the State's claims against the various county officials.

The State's petition and proof suffer the same flaw that was dispositive in *Simmons*. There, the plaintiff "joined all three possible government defendants and [took] no categorical position on which must remain but only that at least one must." 640 S.W.3d at 603-04 (quotation marks omitted). The plaintiff had not demonstrated the required connection between the challenged law and the defendants, so she had not "alleged sufficient facts to show the necessary standing element of traceability." *Id.* Here, the State's inability to differentiate among the defendants or identify which particular defendant is responsible for the challenged program means the State has not established the requisite traceability element. That deprived the trial court of jurisdiction.

*In re State* does not save the State from its failure to satisfy the basic requirement of traceability. There, the Supreme Court did not address traceability.

Rather, it briefly touched on the injury-in-fact component of standing: "the State has a justiciable interest in assuring that its political subdivisions comply with Texas law." *In re State*, 2024 WL 2983176, at \*4 & n.4 (citing *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020)). The Supreme Court equates the phrase "justiciable interest" with "injury." *See Hollins*, 620 S.W.3d at 409-10 (discussing State's "justiciable interest" in enforcing its laws in context of "injury" analysis); *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005). So, when *In re State* briefly touched on a "justiciable interest," it was addressing the injury component of standing, not the separate traceability requirement.

\* \* \*

Because the State has neither pleaded nor proved the traceability requirement, the district court lacked subject-matter jurisdiction over the claims against the government officials. Together with the governmental entities' immunity, the State has not met its burden to affirmatively demonstrate that the trial court had jurisdiction for its claims against any defendant, and the trial court had to dismiss the whole action for want of jurisdiction. *See Heckman v. Williamson County*, 369 S.W.3d 137, 150-51 (Tex. 2012).

**B.     The Attorney General lacked authority to represent the State in the trial court.**

The trial court also lacked jurisdiction because neither the Texas Constitution nor any statute authorized the Attorney General or attorneys working for his office to represent the State in this case. The trial court therefore properly granted Appellees' plea to the jurisdiction on this basis. *E.g.*, *Garcia v. Laughlin*, 285 S.W.2d 191, 194-95 (Tex. 1955) (holding that the Attorney General did not have authority to institute removal proceedings on behalf of the State against a county official); *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993) (holding separation of powers is limit on court's jurisdiction).[9]

In the motion, the State cites no constitutional or statutory provision authorizing him to represent the State in the trial court. Instead, it relies on out-of-context quotes taken from cases that, properly read, are either inapposite or refute the State's argument.

---

[9] The Attorney General urges that the County improperly raised this argument in its plea to the jurisdiction and somehow conceded the impropriety by filing a motion under Texas Rule of Civil Procedure 12. Mot. at 20. This is doubly wrong. The Attorney General's lack of authority is jurisdictional and was therefore properly raised in a plea to the jurisdiction. *See Garcia*, 285 S.W.2d at 194 (indicating lack of authority to institute suit would deprive trial court of jurisdiction); *State ex rel. Downs v. Harney*, 164 S.W.2d 55, 56-59 (Tex. App.—San Antonio 1942, writ ref'd w.o.m.) (dismissing cause due to Attorney General's lack of authority to institute suit). Regardless, the trial court retains authority to rule on the Rule 12 motion at any time before its plenary jurisdiction expires. *See, e.g.*, *Ford v. Ford*, 2022 WL 16845171, at *3 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *In re Baylor Med. Ctr. at Garland*, 280 S.W.3d 227, 231 (Tex. 2008) (orig. proceeding).

### 1. Neither the Texas Constitution nor any statute authorized the Attorney General to represent the State in the trial court.

When it comes to representing the State in court, the Texas Constitution expressly limits the Attorney General's powers and creates a clear division of authority between the Attorney General and county attorneys.

The Attorney General is charged with "represent[ing] the State in all suits and pleas in the Supreme Court of the State in which the State may be a party." Tex. Const. art. IV, § 22. He is given no authority to represent the State in the district courts, save for one narrow exception not applicable to this case: he may "take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law." *Id.*

By contrast, the Constitution makes it the express duty of county attorneys to "represent the State in all cases in the District and inferior courts in their respective counties." Tex. Const. art. V, § 21; *see also El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 438 (Tex. 1996) (recognizing this constitutional division of authority); *State v. Stephens*, 663 S.W.3d 45, 49–51 (Tex. Crim. App. 2021) (same).

Nor is there any "general statute authorizing the Attorney General to represent the State and its agencies in district court." *El Paso Elec.*, 937 S.W.2d at 438. Although "the Legislature has provided for such representation in particular

types of cases," *id.*, it has not given the Attorney General that power in *ultra vires* suits against counties and county officials. Section 402.021 of the Government Code authorizes the Attorney General to "prosecute and defend all actions in which the state is interested before the supreme court and courts of appeals." Tex. Gov't Code § 402.021. But, notably, it does not mention the district courts. This omission confirms that the Attorney General lacked authority to act on behalf of the State in the trial court.

The motion fails to cite any constitutional or statutory provision authorizing the Attorney General to represent the State in the trial court. The motion relies heavily on *State ex rel. Durden v. Shahan*, 658 S.W.3d 300 (Tex. 2022). That case not only recognizes the authority of "county attorneys . . . to represent the [S]tate" in the district courts but also refutes any claim that the Attorney General had the authority to "independently decide whether to *institute* a suit on the state's behalf." *Id.* at 303 (citing Tex. Const. art. V, § 21; *El Paso Elec.*, 937 S.W.2d at 438). "The Legislature must provide that authority by statute." *Id.* It did not do so in this case.

The Attorney General has successfully argued these exact points before, and he is therefore judicially estopped from contending otherwise. Before the Fifth Circuit and the Texas Supreme Court, he argued: "Under the Texas Constitution, the Attorney General requires legislative authorization to represent the State in a

trial court." Br. for Atty. Gen. of Tex. 37-42, *Paxton v. Longoria*, No. 22-0224 (Tex. Apr. 7, 2022). The Attorney General presented a thoroughly developed argument relying on many of the same authorities, reaching the same conclusion:

> Under this precedent, when the Legislature wants the Attorney General to be able bring a cause of action on behalf of the State, it typically must explicitly authorize the Attorney General to do so. . . . [The Supreme] Court has generally required a clear statement that expressly authorize the Attorney General . . . to institute and prosecute [a suit]. . . .
>
> The Attorney General is unaware of any cases where [the Supreme] Court has explained when (if ever) statutory context can authorize the Attorney General to bring suit in state trial court absent an express grant of authority. . . .
>
> Absent such clear evidence of legislative authorization, [the Supreme] Court has typically found that such authorization was lacking. . . .
>
> This silence is telling as the Legislature has demonstrated that it is well aware of how to assign a duty to the Attorney General.

*Id.* (quotation marks omitted). The parties eventually agreed on this point, the Texas Supreme Court relied on their agreement to answer a certified question, and the Fifth Circuit ultimately held that the plaintiff's claims were barred by sovereign immunity because of it. *Paxton v. Longoria*, 646 S.W.3d 532, 541-42 (Tex. 2022); *Longoria v. Paxton*, 2022 WL 2208519, at *1 (5th Cir. 2022). By having prevailed on this clear, deliberate position in prior litigation, the Attorney General is judicially

estopped from adopting an inconsistent position now. *See George Fleming & Fleming & Associates, L.L.P. v. Wilson*, 694 S.W.3d 186, 191-93 (Tex. 2024).

The Attorney General confuses the actual issue—his own lack of authority to represent the State—by arguing that the Harris County Attorney did not have the authority to independently "institute" this suit. But the Harris County Attorney did not file this suit, and his authority *is not* at issue here; the Attorney General's lack of authority *is*.

Indeed, it is "possible" that the present suit could not have been brought "by any public official, attorney, or agency" because the Legislature did not unmistakably specify who could "institute" such a suit. *See Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004). But any omission by the Legislature "does not give [this Court] the power . . . to legislate . . . to fill any hiatus [the Legislature] has left." *Brown*, 156 S.W.3d at 566 (citation omitted). What is certain is that the Legislature did not authorize the Attorney General to institute this suit on behalf of the State.

### 2. The Attorney General's other arguments are meritless.

Despite his clear lack of constitutional and statutory authority to represent the State in the district court, the Attorney General of Texas maintains that he had such authority pursuant to some vague, inherent, extra-constitutional power purportedly derived from the sixteenth-century attorney general of England's power to represent

the king in the courts of that country. Mot. at 21. This Court should reject this unfounded assertion.

*First*, the constitutional and statutory provisions reviewed above, and the precedent applying them, preclude the conclusion that the Attorney General possesses inherent authority to represent the State in the district court in this matter. Texas courts long ago rejected medieval English practice as a guide, where, as here, the practice is based on the prerogatives of the Crown and would centralize state authority. *State v. Moore*, 57 Tex. 307, 311 (1882) ("In England the king could direct and control the bringing of suits," but "[i]n this state such direct control as a legal power is cut off by the independence of the law officers of the state." (quoting *State v. S. Pac. R. Co.*, 24 Tex. 80, 117 (1859))). Indeed, one of the primary goals of the Constitution of 1876 was to decentralize this state's government and prevent it from becoming dominated by individual members of the executive department. *See Saldano v. State*, 70 S.W.3d 873, 876 (Tex. Crim. App. 2002); Tex. Const. art. II, § 1 (mandating separation of powers); *Stephens*, 663 S.W.3d at 49-51 (explaining that the Constitution assigns the Attorney General to the executive department and county attorneys to the judicial department).

*Second*, the Attorney General cites no cases holding that he has the inherent power to represent the State in district court in this or any similar case. For at least

a century and a half, Texas courts have rejected the notion that the Attorney General has the power to bring suit on behalf of the State without an express constitutional or statutory basis for doing so.[10]

The cases that the Attorney General cites in his motion consist of quotes taken out of context;[11] involve suits brought by the Attorney General pursuant to his

---

[10] *E.g.*, *Day Land & Cattle Co. v. State*, 4 S.W. 865 (Tex. 1887) ("Finding no express law which authorized [the attorney general] to institute and maintain the suit, it would be difficult to hold that [he] had the implied power resulting from the general grants of power or imposition of duties" because "in a government in which the duties of all officers, as well as their powers, are defined by written law, no power ought to be exercised for which warrant is not there found."); *State v. Moore*, 57 Tex. 307, 315–16 (1882) (concluding that "it was the right and duty of the county attorney," not of the attorney general, "to represent the state" in suits against defaulting tax collectors and observing that "[t]he powers granted to county attorneys in reference to representing the state *in all cases in the district and inferior courts* in their respective counties, is broad, and comprehends alike cases civil and criminal, except so far as the constitution itself confers power upon the attorney general to represent the state in those cases" (emphasis in original)); *Garcia*, 285 S.W.2d at 194–95 (holding that the attorney general did "not possess the power" to bring removal proceedings against a county official because neither the constitution nor any statute gave him that authority, and observing that "[t]he powers conferred by the Constitution upon the state officials are generally held to be exclusive, and except in the manner authorized by the Constitution, these powers cannot be enlarged or restricted"); *Harney*, 164 S.W.2d at 56-59 (holding that the attorney general did not have authority to bring ouster proceedings against a county sheriff because "there is no constitutional or statutory provision which vests in the Attorney General the power, or makes it his duty, to institute actions for the removal of county officer" and recognizing that the power rested with the county attorney under the Constitution).

[11] *E.g.*, *State of Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir. 1976) (dealing with the powers of the Florida attorney general in federal court, not the powers of the Texas attorney general in Texas courts under the Texas Constitution); *Perry v. Del Rio*, 67 S.W.3d 85, 93 (Tex. 2001) (holding in relevant part that "the Attorney General does not have the authority to act in the Legislature's stead and dictate the remedy in a congressional redistricting case," that his only authority in such cases is "to *propose* and *suggest* remedies and settle redistricting cases," and emphasizing that "[b]ecause neither the Constitution nor a statute expressly gives the Attorney General legislative authority in redistricting cases, his claim that it exists is without merit.").

express constitutional power to bring suits against unlawful actions of "private corporations"[12]; or are otherwise inapposite.[13] Of particular note, the Attorney General cites *Saldano*, but *Saldano* recognizes that the Attorney General has no authority over criminal cases—in the district courts or at the appellate level. 70 S.W.3d at 880-83. Like criminal cases, *ultra vires* cases by the State allege injury to the sovereign through a violation of state law; and in both types of cases, the Attorney General is not authorized to initiate a suit in the district court.

Finally, the Attorney General erroneously suggests that he had the authority to represent the State in this case because the authority of county attorneys is limited in the same manner as are the powers of counties themselves. Mot. at 22 & n.5.

---

[12] *Lewright v. Bell*, 63 S.W. 623 (Tex. 1901), involved "a motion for leave to file a petition for a writ of mandamus to the attorney general of the state of Texas, commanding him to institute a suit in the name of the state to forfeit the charter of a certain private corporation organized under the laws of the state . . . ." *Lewright* therefore involved the Attorney General's express constitutional power, provided in article IV section 22, to take action in the courts with respect to the charters of "private corporations" and to "seek a judicial forfeiture of such charters"—a power not at issue in this case. Moreover, the decision noted that the county attorney also had the power to institute such a suit.

[13] *Charles Scribner's Sons v. Marrs*, 262 S.W. 722 (Tex. 1924), involved a state textbook contract and is far afield from the issue presented here. Moreover, the pages cited by the Attorney General in his motion were not part of the modified opinion on rehearing, where the court specifically wrote: "Some of the language in the original opinion would bear the construction that this authority might be lodged with the Attorney General of the state. It was not our purpose to so hold." *Id.* at 729. In *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972 (Tex. 1943), "[t]he controlling question presented" was "whether under the terms of Section 11 . . . a private individual, without being joined by the Attorney General, or some county or district attorney authorized by law to do so, could maintain his cause of action against a pipe line company for the penalties described in said Section 11." The court held that, under those circumstances, a private individual could not bring such a suit on behalf of the State.

Again, the issue here is the Attorney General's lack of authority, not the authority of county attorneys.

*     *     *

Because the Attorney General's purported representation of the State in the district court was not authorized by the Constitution or by statute, the trial court properly granted Appellees' plea to the jurisdiction.

## IV. The Community Prosperity Program Is Constitutional.

Again, if the Court agrees that the trial court lacked jurisdiction for the reasons stated above, then it can stop here without having to reach the merits of the constitutionality of the Community Prosperity Program.

If the Court proceeds, governmental immunity is waived on an *ultra vires* claim only to the extent a party "has pleaded a viable or valid constitutional claim." *Hou. Firefighters' Relief & Ret. Fund v. City of Houston*, 579 S.W.3d 792, 800 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *accord Klumb v. Hou. Mun. Employees Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015). Because the State has not pleaded a valid constitutional claim, the trial court properly granted the plea to the jurisdiction.

The Program is presumptively constitutional, and the State has not displaced that presumption via pleading or proof. The State ignores facts and arguments inconvenient to its narrative, and it will not succeed on the merits of its claims.

36

All while conceding that helping the poor serves an important public purpose, Mot. at 15, the State claims that the Community Prosperity Program violates article III § 52(a) under a tortured reading of the provision's text and the test articulated in *Borgelt v. Austin Firefighters Ass'n*, 692 S.W.3d 288, 301 (Tex. 2024) (restating the *Texas Municipal League* test). Mot. at 10-17. The State is wrong.

The State's constitutional arguments fail on the merits for at least three reasons. *First*, Article III, § 52(a) does not apply to local governments' support for the poor at all: those who framed and ratified the 1876 Constitution did not consider poor relief to be "grant[ing] public money or thing of value in aid of, or to any individual" any more than constructing a highway or courthouse would be.[14] Although Harris County raised this argument in the trial court, the motion does not address it at all. *See* App. 2 at 99-100; App. 1 at 16-20.

*Second*, even if article III, § 52(a) does apply generally to aid to the poor, the Community Prosperity Program satisfies the *Borgelt* test and passes constitutional muster: it is not gratuitous in any constitutional sense and predominately serves several public purposes—including the poverty alleviation purpose acknowledged as

---

[14] This argument was not presented to the Supreme Court in the Uplift Harris 52.10 proceedings because the briefing occurred at breakneck speed. Accordingly, the Court did not address it. Appellees' briefs here and in the Uplift Harris litigation offer the requisite analysis and show that the Gift Clauses do not reach support for the poor.

legitimate by the State. *See* App. 2 at 102-03, 105; App. 1 at 22-23; *see also* Mot. 15. The evidence at the hearing and throughout the record shows that there are sufficient controls to achieve the stated public purpose of the program. *See* App. 2 at 105-115; App. 1 at 20-23.

*Third*, notwithstanding the Gift Clauses, the Community Prosperity Program is a program expressly authorized by article III, § 52-a. *See* App. 2 at 105, 115; App. 1 at 24-25.

### A. The Program is presumptively constitutional.

Because this case involves a judgment made by Commissioners Court, this Court should conduct any merits review deferentially. "A party can invoke the district court's constitutional supervisory control over a Commissioners Court judgment only when the Commissioners Court acts beyond its jurisdiction or clearly abuses the discretion conferred upon the Commissioners Court by law." *Commissioners Ct. of Titus Cnty. v. Agan*, 940 S.W.2d 77, 80 (Tex. 1997). "If the Commissioners Court acts illegally, unreasonably, or arbitrarily, a district court may so adjudge." *Id.* But "reviewing a Commissioners Court judgment for abuse of discretion, the district court has no right to substitute its judgment and discretion for that of the Commissioners Court." *Id.*

Accordingly, the Court must presume that the Commissioners Court's action is constitutional. *Borgelt*, 692 S.W.3d at 301. "The burden is on the party attacking [the expenditure] to show that it is unconstitutional." *Id.* So, the State "must show, and not ask the judiciary to assume," that the program is unconstitutional. *Id.* at 304.

## B.   The Gift Clauses do not apply to relief for the poor.

On appeal, the State does not dispute that the Gift Clauses *do not apply* to relief for the poor. Accordingly, the State's briefing of the Constitution's gift clauses is most notable for what it fails to show—*any* court applying § 52(a) to strike a local government program assisting the poor. As far as Appellees can tell, no court ever has. And this Court should not be the first. Relief to the needy is not "grant[ing] public money or thing of value in aid of, or to" as those terms were used by the Constitution's framers and understood by the Texans who ratified it.[15]

In constitutional interpretation, courts' "bottom-line task is to identify what the constitutional provision would have meant to those who ratified [and framed] it." *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 857-59 (Tex. 2024). Courts therefore "read the constitutional text not in a vacuum but also through the lenses of history and precedent." *Borgelt*, 692 S.W.3d at 299.

---

[15] Harris County developed this argument in greater detail in its appellees' brief in the pending Uplift Harris appeal. *See* Appellees' Br. 44-57, *State of Texas v. Harris County*, No. 15-24-00061-CV (July 8, 2024). The sources cited here are included in the appendix to that brief.

In *Borgelt*, the Supreme Court recited some of that history and precedent but noted that "further analysis of the Gift Clauses' original public meaning . . . could assist the courts and the public in understanding their contours." *Id.* at 300. This brief offers that additional analysis.

The historical context in which the constitutional provision was written and ratified informs the original understanding of the terms being applied today. *See Hogan*, 688 S.W.3d at 857-59. So Harris County starts with historical context, and then turns to text. Both reinforce the presumption that the Community Prosperity Program is constitutional. *See Borgelt*, 692 S.W.3d at 301, 303 (emphasizing presumption).

1.  **In 1876, care for the poor was understood to be the exercise of a local government duty to the community, not a gift to those helped.**

Since the Elizabethan Poor Law of 1601, the Anglo-American legal tradition has included government responsibility for the indigent.[16] And that government responsibility was traditionally carried out through local institutions: "The hallmark of the poor law was local autonomy." Jill S. Quadagno, *From Poor Laws to Pensions: The Evolution of Economic Support for the Aged in England and America*, 62 Milbank Mem'l Fund Q./Health & Soc'y 417, 419 (1984).

---

[16] 43 Eliz. 1. c. 2.

In a deeply researched opinion tracing the original meaning of "public charge," now-Justice Barrett showed that "state 'poor laws' . . . were in turn modeled on their English counterparts." *Cook County v. Wolf*, 962 F.3d 208, 239 (7th Cir. 2020) (Barrett, J., dissenting).[17] Thus, "[f]rom the earliest colonial times, local villages and towns recognized an obligation" to care for the needy. Social Security Admin., *Historical Development*, https://www.ssa.gov/history/pdf/histdev.pdf.

Whatever form the relief took, however, providing it was universally acknowledged to be a government function serving public purpose, and not a private gift. "Thus, when someone sought assistance from a city or county overseer of the poor, the cost of the relief provided was entered on the overseer's books as a public charge—that is, *an expense properly chargeable to, and therefore funded by, the public.*" *Cook County*, 962 F.3d at 239 (emphasis added).

As in the rest of the country, care for the Texas needy has been a local government function no different from any other. In the first year of the Republic of Texas, its Congress enacted a law providing for: "[A] board of commissioners for their respective counties; which board shall have the entire superintendence and control of roads, highways, ferries, and bridges, *and of the poor* within said counties."

---

[17] All *Cook County* cites are to then-Judge Barrett's dissent.

Act of Dec. 20, 1836, § 25, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822-1897* at 1201, 1205-06 (Austin, Gammel Book Co. 1898) (emphasis added). That same law imposed "the duty of said board of commissioners to provide, at the expense of the county, for the support of indigent, lame, and blind persons, who are unable to support themselves." *Id.* at 1206, § 28.

The "Gift Clause was adopted in 1876 and its text has not been materially modified since then." *Borgelt*, 692 S.W.3d at 299. It enshrined care for the needy as a traditional local government function for the public—not some private gratuity. Thus, the same Constitution that prohibited the Legislature from "authoriz[ing] any county . . . to lend its credit or to grant public money or thing of value in aid of, or to any individual," Tex. Const. art. III, § 52, was without contradiction able to also provide that the "construction of jails, court-houses and bridges, *and the establishment of county poor houses and farms*, and the laying out, construction and repairing of county roads *shall be provided for by general laws*," *id.* art. XI, § 2 (emphases added); *id.* art. XVI, § 8. Care for the poor is a general government service like building courthouses, roads, and bridges.

Confirming this local government function, just a few months after ratification, the Legislature provided that county commissioners "shall have power, and it shall be their duty . . . To provide for the support of paupers." Act of July 22,

1876, 15th Leg., R.S., ch. 55 § 4, 1876 Tex. Gen. Laws 51, 51-52, *codified as amended*, Tex. Loc. Gov't Code § 81.027. That statute has long been interpreted "as a directive to counties to take some action to provide for indigents," but "it is left to the discretion of each county to determine how to meet its obligation to the poor." Tex. Att'y Gen. Op. No. JM-815 (1987); *see also id.* (recounting "the 100-year-old practice of allowing counties to define the nature and extent of their obligations under" this statute).

Indeed, the future Chief Justice of the Supreme Court, C.M. Cureton (on behalf of the Attorney General), validated the constitutionality of a drought relief bill supporting county loans to farmers for the purchase of seed and feed. Att'y Gen. Op. No. 1893 (Mar. 4, 1918), *in 1916-18 Tex. Att'y Gen. Biennial Report* 851, 851-52. At the time, it was "entirely clear that the fundamental law regards the relief of the poor as a public purpose, for which public money may be expended," and "common sense" "that merely because the impoverished class were not yet in the poorhouse, did not render aid to them a private, as distinguished from a public purpose." *Id.* at 852 (discussing *State v. Nelson County*, N.W. 33, 34 (N.D. 1890)); *accord, e.g.*, Tex. Att'y Gen. Op. No. GM-2474 (1940).

**2.** **In 1876, Texans ratified the gift clauses to stop corporate welfare to railroads and similar commercial enterprises.**

"Opinion is unanimous that the impetus for the adoption of both state and local constitutional aid limitation provisions was the untrammeled and indiscriminate borrowing by governmental entities and the ruthless profiteering by private corporations and individuals." Dale F. Rubin, *Constitutional Aid Limitation Provisions and the Public Purpose Doctrine*, 12 St. Louis U. Pub. L. Rev. 143, 156 (1993).

"The basic reason" for the gift clauses in the 1876 Constitution was the same: "[T]o prevent the government from aiding private parties in their grandiose schemes to build railroads and other internal improvements." George D. Braden, et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 226 (1977); *see generally Borgelt*, 692 S.W.3d at 299 (discussing "financial and political troubles" that motivated the gift clauses).

**3.** **Section 52(a)'s text does not support extending a ban on corporate welfare to local assistance for the needy.**

The language for § 52(a) that the 1876 framers chose, and ratifying Texans endorsed, tracks the widespread concern about corporate welfare; it does not reject centuries' worth of precedent that care for the poor was a standard local government function. *See Borgelt*, 692 S.W.3d at 299. Section 52(a)'s text aims at commercial undertakings; not care for the poor.

That commercial aim is made clear in § 52(a)'s last clause: prohibiting local governments from "becom[ing] a stockholder in such corporation, association or company" reveals a focus on commercial and monied interests, not the poor.

The framers' use of "grant" and "aid" is not to the contrary. At the time of the 1876 Constitution, neither the Constitution's framers nor its ratifiers would likely have understood the verb "grant" to include providing assistance to the poor. At the time, the verb *grant* was commonly employed to describe the act of a government bestowing benefits in response to a formal request, usually from an enterprise or individual engaged in commerce. *See, e.g.*, *Downs v. United States*, 113 F. 144, 147 (4th Cir. 1902) ("The word 'grant' . . . implies the conferring by the sovereign power of some valuable privilege, franchise, or other right of like character, upon a corporation, person, or class of persons."), *aff'd*, 187 U.S. 496 (1903); *Grant*, *Oxford English Dictionary* (2d ed. 1989) (noting long use of "grant" as "To bestow or confer (a possession, right, etc.) by a formal act").

Providing assistance to the poor would not have been understood to be *granting* anything because that assistance was a government *duty*, not some privilege bestowed on the poor. *See supra* Section IV.B.I. Thus, "grant" fits more naturally with an interpretation that does not reach assistance for the needy.

Similarly, when it comes to money, "aid" has long been associated with subsidies to those who are already well off. *See Aid*, *Webster's 1864* at 32 ("(*Eng. Law.*) An extraordinary grant of a subsidy or tax to the king by Parliament."); *Aid*, *Oxford English Dictionary* (noting historical use a subsidy to the crown and monetary contribution from feudal vassal to lord). And "aid" in that sense tracks perfectly the scourge of "aid bonds" to railroads that Texans sought to stamp out with § 52(a).

For nineteenth century Texans, on the other hand, government assistance to the poor was not generally referred as "aid," but as "*relief*," a term of art in use since at least 1601,[18] meaning the "assistance or support, pecuniary or otherwise, granted to indigent persons by the proper administrators of the poor-laws." *Relief*, *Black's Law Dictionary* (1st ed. 1891); *see Cook County*, 962 F.3d at 241.

Interpreting § 52(a) as the 1876 framers and ratifiers would have understood it—as not reaching poor relief—has the additional benefit of reconciling otherwise contradictory provisions framed and ratified at the same time. If § 52(a) prohibited counties from using public resources to help *any individual* without limitation, including the poor, it would contradict the original article XI, § 2 and article XVI, § 8. Each of the latter calls for the provision of local courthouses, bridges, poor

---

[18] 43 Eliz. 1. c. 2.

houses, and farms, etc. Establishing county poor houses and farms is literally a thing of value supporting the poor. The provisions can (and so must) be harmonized by reading § 52(a) not to apply to the traditional local government functions enumerated in the other amendments. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 164 (2012).

*　　*　　*

For all these reasons, the Gift Clauses do not apply to Harris County's support of the poor.

## C. Even if the Gift Clauses apply, the Community Prosperity Program satisfies the Supreme Court's test.

If article III, § 52(a) applies, the Community Prosperity Program satisfies its requirements. The program clears the test set forth in *Borgelt*: (1) the assistance under the Community Prosperity Program "is not gratuitous but instead brings a public benefit"; (2) the program's "predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party"; and (3) "the government retains control over the funds to ensure that the public purpose is in fact accomplished." *Borgelt*, 692 S.W.3d at 301; *see Tex. Mun. League*, 74 S.W.3d at 383-84; *see* App. 1 at 10-11, 19-23; App. 2 at 103-15. In analyzing each element, this Court must "presume that legislative bodies intend their acts to comply with the United States and Texas Constitutions, to achieve a just and reasonable result, and to

advance a public rather than a private interest." *Borgelt*, 692 S.W.3d at 301 (quotation marks omitted).

### 1. Harris County received return consideration.

A "political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Id.* "There need be only sufficient—not equal—return consideration to render a political subdivision's paying public funds constitutional." *Id.* (quotation marks and citation omitted); *Tex. Mun. League*, 74 S.W.3d at 384 (same). Here, the program provides two primary return benefits to the County. Together, this consideration is "presumably proper and provide[s] sufficient return consideration" for Harris County. *Borgelt*, 692 S.W.3d at 302.

Most notably, Brandon Maddox, the Director of Planning and Innovation for Harris County Public Health, testified repeatedly that the program "of course" benefits the County by "reducing poverty." App. 2 at 10-12.

Additionally, the Community Prosperity Program payments are not gratuitous because participants give the County illuminating financial data in return. Participants are *required* to share their account data directly with GiveDirectly and with the County. App. 2 at 20, 31, 37; App. 9. They are also encouraged to participate in a survey of their financial status and spending habits. App. 9 at Ex. B; App. 5. This

corpus of detailed information is valuable. It allows Harris County to further refine the best way for the County to spend money on economic development and poverty alleviation in the future. Indeed, based on this information, the County has hired a contractor to assess the impact of the program on participants and develop a model for scaling it if additional funding becomes available. App. 1 at 29; App. 7.

The State makes an unsupported argument that the County receives no benefit because "Harris County cannot identify a single statutory mandate that its program fulfills." Mot. at 11. But that is simply not the test—the State has pointed to no authority that requires that the return benefit relate to fulfilling a *statutory requirement*. And the State has no substantive answer to the County's list of return consideration. The State merely asserts baldly and without explanation, "It is no answer to simply say the program reduces poverty or 'may' improve self-sufficiency." But why not? The State does not say.

The County studied the issue and determined that poverty reduction returned a meaningful benefit. *See* App. 4; App. 10 at 2 ("Economic inequity negatively impacts families and undermines our region's overall well-being and financial health."). That is a classic legislative determination warranting deference. It is not for the courts to second guess that reasoned determination.

## 2. The Community Prosperity Program serves many public purposes

The Community Prosperity Program's predominant objective is to accomplish multiple public purposes. Mr. Maddox testified that the Community Prosperity Program will: "reduce unemployment, reduce poverty, boost self-sufficiency and improve general health and educational outcomes for those participating in the program." App. 2 at 10, 15 (same); *see* App. 2 at 17 ("[P]articipation in the project serves a public purpose."); *see also* App. 2 at 103, 105. The Program thus satisfies this element of the *Borgelt* test.

"A transfer of funds for a public purpose, with a clear public benefit received in return, does not amount to a lending of credit or grant of public funds in violation" of article III, § 52(a). *Borgelt*, 692 S.W.3d at 304. In assessing the merits, the Court must "presume that" the Community Prosperity Program's "predominant purpose is to accomplish a legitimate public purpose unless" the State shows "that it clearly is not." *Id.* Accordingly, "if an object is beneficial to the inhabitants and directly connected with the local government it will be considered a public purpose." *Id.* (quoting *Davis v. City of Taylor*, 67 S.W.2d 1033, 1034 (Tex. 1934)). So "unless a court can say that the purposes for which public funds are expended are *clearly not* public purposes, it would not be justified in holding invalid a legislative act providing

funds for such purposes." *Id.* (alteration omitted) (quoting *Davis v. City of Lubbock,* 326 S.W.2d 699, 709 (Tex. 1959)).

The State wishes that Harris County had invested the funds in a different program and quibbles over the level of control the County retains, Mot. at 12-13, but it does not meaningfully dispute that the purposes identified by Mr. Maddox are valid public purposes. Mot. 15 ("To be clear, the State does not dispute that providing assistance to the less fortunate is an important public purpose."). Therefore, "the presumption that [the Community Prosperity Program] serves a predominantly public purpose stands unrebutted." *Id.* at 308; *see* App. 2 at 10.

Three public purposes bear special mention.

***Reducing poverty.*** Providing assistance to the needy has been an established public purpose for centuries. *See supra* Section IV.B. The State does not dispute that assistance to the poor is a predominant purpose of the Community Prosperity Program. And although the Attorney General thinks assistance to the needy confers only a private benefit, Mot. at 12, the Supreme Court disagrees, having long recognized that assisting the poor provides a clear benefit to "the entire community." *See Hous. Auth. of City of Dallas v. Higginbotham*, 143 S.W.2d 79, 85 (Tex. 1940) (low-income housing); *see also Bexar County. v. Linden*, 220 S.W. 761, 76. (Tex. 1920) ("[T]he care of the poor . . . intimately affect[s] all the people."). In

51

fact, assisting the poor has been "directly connected with the local government" for 400 years. *See supra* Section IV.B.

*Economic development and boosting employment*. The Community Prosperity Program serves another indisputably public purpose with a clear public benefit by encouraging economic development and employment. *See* Tex. Const. art III, § 52-a; App. 1 at 3, 12, 24-25. Undisputed testimony explained that the program was "expected" to achieve a number of goals associated with economic development, including reducing poverty and unemployment, and offering incentives to work. App. 2 at 15.

*Recovery from a public calamity.* Assisting those disproportionately impacted by a public calamity (here, the COVID pandemic) is yet another public purpose. Article III, § 51 (the Gift Clause applying to the Legislature) carves out disaster-relief spending from the prohibition on gifts: "[T]he provisions of this Section shall not be construed so as to prevent the grant of aid in cases of *public calamity*." Thus, addressing "a state-wide calamity" is "a proper function of state government." *City of Aransas Pass v. Keeling*, 247 S.W. 818, 820 (Tex. 1923). Likewise, "[t]he use of . . . counties as agents of the state in the discharge of the state's duty is in no wise inhibited by the Constitution." *City of Aransas Pass*, 247 S.W. at 820. A county program granting aid in response to a public calamity serves a proper public purpose.

The pandemic qualifies as a "public calamity." Governor Abbott issued a disaster proclamation on March 13, 2020, certifying that COVID-19 poses an imminent threat of disaster for all counties in the State of Texas, and renewed that declaration monthly through June 2023. *See* Governor of the State of Tex., COVID19 Disaster Declaration May 2023, 48 Tex. Reg. 2639, 2645-46 (2023). "Disaster" is synonymous with "public calamity." Tex. Gov't Code § 418.004(1). Governor Abbott has also expressly connected the "economic recovery from COVID-19" to the state of disaster. 48 Tex. Reg. at 2646.

* * *

The fact that the recipients receive some private benefit does not defeat the overwhelming public purposes of the Community Prosperity Program. "*Some private benefit will almost inevitably arise from government payments to non-government entities or individuals; the Gift Clause does not treat such an inevitability as a poison pill that dooms a much larger public objective.*" *Borgelt*, 692 S.W.3d at 304. Thus, because the Community Prosperity Program advances "important public purposes," it is no matter that "accomplishing those purposes also leads to some collateral private benefit." *Id.* at 304. This is especially true for poor relief—Harris County inevitably must assist *a* poor person to assist *the* poor; assisting the poor *is* the public benefit. And the Community Prosperity Program

53

ensures that the program's clear public benefits predominate by exercising the controls described in the next section.

### 3. Harris County retains control over the funds.

The Community Prosperity Program employs controls "to ensure that the public purpose" of providing relief to the poor is "accomplished." *Borgelt*, 2024 WL 3210046, at *8, 14-15; *Tex. Mun. League*, 74 S.W.3d at 384. Indeed, among the most significant differences between Uplift Harris and the Community Prosperity Program is the County's heightened level of control over the funds.

The County tightly controls where, how, and on what participants may spend their funds. *See* App. 10 at 3; App. 9 at Ex. B. These controls "ensure that funds are used responsibly and align with the program's focus on supporting basic needs." App. 10. There are six principal controls.

*First*, pursuant to their contract with the County, participants "must" use the financial assistance "for basic needs, including housing-related expenses, utilities, transportation, groceries, medical care, education, clothing, and other goods and services." App. 11. The State does not acknowledge this strict control. Mot. at 13-14. Instead, it incorrectly contends that the only limit on what participants may purchase is a prohibition on harm to others, criminal activity, and supporting terrorism. Mot. at 14-15. Not so. The Program requires the funds be used for basic

54

needs. Courts must assume that recipients will "comply with these requirements." *Borgelt*, 692 S.W.3d at 310.

*Second*, to make purchases, participants must use the GiveCard—they may not withdraw funds and spend them as cash. App. 2 at 19-20, 31, 64. The GiveCard is restricted. It can only be used at a vendor with a qualifying MCC, one that supports basic needs. App. 2 at 19-20, 31, 64; App. 9 at Ex. B; App. 12; App. 13. Harris County carefully generated the list of acceptable MCCs. It referred to constitutionally sound programs such as TANF and SNAP to determine the type of purchases that are necessary to support basic needs, and it approved only a limited subset focused on food, shelter, transportation, healthcare, and education. App. 2 at 19-21, 56, 60, 61-62. A vendor *must* have qualifying MCC for the card to function. App. 2 at 21, 64. The State does not dispute that the GiveCard functions only at qualifying vendors. Mot. at 14.

*Third*, participants' account data is shared with GiveDirectly and the County, which have authority to audit by requesting additional documents from participants. App. 2 at 54. As a prerequisite to receiving funds, participants consent to having their transactions "audited for compliance purposes" to "ensure that the funds are being used in alignment with the program's goals and requirements." App. 11; App. 2 at

35-37. To that end, participants automatically share their account data with GiveDirectly and the County. App. 2 at 20, 31; App. 9 at Ex. B.

Participants are also contractually required to provide additional "documentation" if requested. App. 11. Harris County will further enhance the audit process as the program is finalized. App. 2 at 37, 66.

*Fourth*, the Community Prosperity Program exercises control on the front end: it restricts who may participate to ensure it is effective at achieving its stated goals. Each participant must have a household income below 200% of the federal poverty line and either be a member of the ACCESS Harris County Initiative or, alternatively, live in one of the top-10 poorest zip codes in Harris County. App. 2 at 10, 46, 49, 88-89. Applicants went through two rounds of screening to ensure they met the eligibility criteria, including providing documentation about their identities and income. App. 3 at 69-70; App. 2 at 10-11, 37-40. When enrolling in the Community Prosperity Program, participants must sign an attestation confirming that they still meet the eligibility requirements. App. 2 at 38; App. 11; *see* App 10 at 5. The State does not explain how this control is insufficient. Mot. at 14-15.

*Fifth*, Harris County releases funds to GiveDirectly in $5 million increments. App. 2 at 17-18, 28, 51-52; App. 9. By dispensing only a limited amount of money at

a time, Harris County "ensure[s] that the program is being implemented with fidelity." App. 2 at 18.

*Finally*, if a participant somehow evades these controls and does not qualify or misspends funds, he or she will be removed from the program for non-compliance. App. 2 at 36, 81, 94; App. 10 at 5; *see* App. 11. As part of its contract with the County, GiveDirectly is required to "take appropriate actions" if it becomes aware of "any violations of the program's restrictions." App. 9 at Ex. B.

The Community Prosperity Program's controls satisfy the deferential review applicable here.

The Attorney General thinks more controls are needed and that Harris County should monitor each item that participants purchase. But that judgment is not his to make. *See Agan*, 940 S.W.2d at 80. Mr. Maddox testified that item-level control "just isn't feasible for this type of program." App. 2 at 55 "If the legislature concludes that greater restraints are necessary to ensure obedience to the Gift Clause, it can create new mechanisms to hold local governments accountable." *Borgelt*, 692 S.W.3d at 310. But making that policy decision is beyond the scope of this Court's authority.

### 4. The State's new arguments about other constitutional provisions are waived.

The State's new arguments on appeal about other constitutional provisions, Mot. at 15-17, are unpreserved and waived. *See In re Eagleridge*, 642 S.W.3d 518, 525 (Tex. 2022) (orig. proceeding); *see also Sklar v. Sklar*, 598 S.W.3d 810, 825-26 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Regardless, section 51 limits *State* spending, not counties'—otherwise § 52(a) would be wholly superfluous—so its prohibitions are entirely irrelevant here.

### D. The Community Prosperity Program is authorized by § 52-a.

Notwithstanding § 52(a), the Constitution expressly authorizes the Program in article III, § 52-a. *Contra* Mot. at 12. Article III, § 52-a states:

> Notwithstanding any other provision of this constitution, the legislature may provide for the creation of programs and the making of loans and grants of public money . . . for the public purposes of development and diversification of the economy of the state" and "the elimination of unemployment or underemployment in the state.

By its plain text, § 52-a thus authorizes economic-development programs like this one that focus on the elimination of unemployment or underemployment.

Section 52-a is an express exception to other constitutional restrictions on spending public funds. *See Ex parte City of Irving*, 343 S.W.3d 850, 855 (Tex. App.—Dallas 2011, judgment vacated w.r.m.); *see also* Tex. Legis. Council, *Analyses of Proposed Constitutional Amendments and Referenda* 14 (Sept. 1987) (naming article III,

§§ 51-52 as constitutional impediments that § 52–a was intended to overcome). Sections 51 and 52 (and the *Borgelt* test) do not apply to economic development programs authorized by § 52-a: the authority under § 52-a exists "[n]otwithstanding any other provision of this constitution." Tex. Const. art. III, § 52-a.

In turn, Local Government Code § 381.003(a) grants counties the authority to administer community and economic development projects authorized by federal law. *See also* Tex. Loc. Gov't Code § 381.004 (authorizing counties' "making . . . grants of public money" in economic development programs not tied to federal law).

The Community Prosperity Program is a federally authorized program aimed at improving the economy and reducing unemployment and underemployment. App. 2 at 10, 15. [19]

A program under § 52-a need not satisfy § 52(a). "Notwithstanding any other provision of this constitution" has a clear meaning. "*Notwithstanding . . .* indicates that the main clause that it introduces or follows derogates from the provision to which it refers." Scalia & Garner, *supra*, at 119; *accord Univ. of Tex. v. Garner*, 595 S.W.3d 645, 650 (Tex. 2019) (per curiam); *In re Lee*, 411 S.W.3d 445, 454 (Tex.

---

[19] The State's motion abandons its claim in the trial court that the County lacks statutory authority for the program. As explained in the County's response and supplemental response, multiple statutes authorize this program.

2013). Section 52-a thus plainly derogates from the other provisions in the Constitution. *See City of Irving*, 343 S.W.3d at 855-57. And § 52-a's permissive language—"the legislature may provide for the . . . making of loans and grants of public money"—parallels §§ 51 & 52(a)'s prohibitions. Applying those prohibitions would reverse the superordinating function of "notwithstanding" § 52-a. On the State's tortured reading, it is the gift clauses, not § 52-a, that apply "notwithstanding any other provision of this constitution." The State may not rewrite the Constitution in this manner.

In the Uplift Harris case, the Supreme Court said nothing about the underemployment and unemployment aspects of § 52-a. *See In re State*, 2024 WL 2983176, at *3-4; Mot. at 12. Moreover, a new program is before this Court, and Harris County's arguments on this provision are more fulsome than what they provided to the Supreme Court. Therefore, the Supreme Court's preliminary assessment of the merits of the State's arguments regarding article III, § 52-a in the context of the Uplift Harris program do not control here.

\* \* \*

The method for advancing valid public purposes is a policy decision for Harris County. The Court need not "endorse" the Community Prosperity Program, nor conclude that it is "wise or foolish." *Borgelt*, 692 S.W.3d at 294, 307. It is enough to

decide that Harris County likely did not abuse its discretion in determining how best to spend a limited amount of funds to help poor residents and, accordingly, that the State has not carried its burden to show that the Program is likely unconstitutional.

### E. The Community Prosperity Program does not violate the Equal Protection Clause.

The State's second constitutional claim is frivolous.[20] The State contends that the Program's "arbitrariness violates Texas's Equal Protection Clause." Mot. at 17-19. It argues that "nothing rationally connects the source of the funds, the eligibility criteria, and the putative purpose of the program." *Id.* at 18.

The State notably does not even recite the deferential standard that governs equal-protection claims. The equal protection analysis only "requires that the classification be rationally related to a legitimate state interest." *Sullivan v. Univ. Interscholastic League*, 616 S.W.2d 170, 172 (Tex. 1981). "The party challenging the rationality of the legislative classification has the burden of negating every conceivable basis that might support it." *Gardner v. Children's Med. Ctr. of Dall.*, 402 S.W.3d 888, 892 (Tex. App.—Dallas 2013, no pet.) (citing *Heller v. Doe ex rel Doe*, 509 U.S. 312, 320 (1993)). "It is not [the court's] place to question the [government's] policy decisions when conducting a rational basis review" of a

---

[20] In *In re State*, the Supreme Court did not address the State's equal-protection argument at all, probably because it is patently meritless.

program challenged on equal protection grounds. *Hebert v. Hopkins*, 395 S.W.3d 884, 900 (Tex. App.—Austin 2013, no pet.). The rational basis test thus places the burden on the State, not Harris County. If the State is asking the Court to completely rewrite the test for equal protection cases, it should at least say so.

Applying the proper standard, the analysis is simple. The State does not dispute that the Program's aim of helping the poor is a legitimate state interest. So, the only question is whether the classification is "rationally related" to that interest. It is. The State's principal problem seems to be that the classifications "arbitrarily limit the geographic reach." Mot. at 18. But Mr. Maddox explained why the County opted to open the Program to residents of the ten poorest zip codes.

> The ten zip codes were chosen because they have the highest concentration of people living in poverty. And so there is an argument to be made around serving, you know, hundreds of people in one zip code versus tens or . . . one or two people in certain zip codes. You see potentially community level benefits when you congregate those resources in the areas that need them most.

App. 2 at 46; *see* App. 2 at 89. The State does not mention that basis for the classification, let alone negate it.

To the extent the State objects to the random selection of participants from among eligible applicants (the focus of its petition but largely absent from the instant motion), its claim fails out of the gate because eligible applicants *are treated equally*—

each had an *equal* chance of being selected. *See Campbell v. Bd. of Educ.*, 310 F. Supp. 94, 103 (E.D.N.Y. 1970).

At any rate, a lottery is a rational tool of government in use for millennia.[21] If selection by lot is good enough for military drafts and jury pools (50 U.S.C. § 3805; Tex. Code Crim. Proc. Art. 35.11), it is good enough for public benefit pilot programs. Indeed, the State itself makes certain housing benefits dependent on the outcome of lotteries.[22] And college admissions.[23] Government use of lotteries for benefits abounds.

The State has not shown that the Program violates the Equal Protection Clause and that it is likely to succeed on the merits.

## V. The Balance of Equities Favors Denying the State's Requested Injunction.

The balance of equities cuts against granting the State's requested relief. *Contra* Mot. at 24. Granting a stay harms Harris County and its residents while not protecting the State from any violation of law.

---

[21] "The Archons of ancient Athens would undoubtedly have been surprised to learn that their selection by lot from among the citizenry was the result of an invidious discrimination." *Campbell*, 310 F. Supp. at 103.

[22] *TDHCA announces Housing Choice Voucher Program pre-application for wait-list to open May 2* (Apr. 28, 2022), https://www.tdhca.texas.gov/news/tdhca-announces-housing-choice-voucher-program-pre-applications-wait-list-open-may-2.

[23] 19 Tex. Admin. Code §5.5(g) (Tex. Higher Educ. Coordinating Bd., Uniform Admission Policy).

A stay harms Harris County because it precludes the County from continuing to work on a presumptively constitutional program years in the making. It will also harm Harris County residents expecting to receive constitutionally permissible relief. On the other hand, refusing a stay will not harm the State (1) because the program does not violate the law and (2) because Harris County will not be issuing payments before May 2025, App. 14 (Decl. of B. Maddox), giving this Court has ample time to conduct a merits review in the interim. For the same reason, there is no basis for the State's fear that the funds will become "permanently lost" prior to appellate review. Mot. at 25. A stay now is premature and prevents no alleged harm.

Temporary relief is not necessary to protect this Court's jurisdiction. *Contra* Mot. at 26. The Court will have jurisdiction because it can grant relief well into 2026, if the program is allowed to proceed. On the contrary, if the Court enjoins Harris County from committing funds to the Community Prosperity Program during this appeal, mootness and irreparable harm to Harris County will be much more imminent. Harris County must commit all SLFRF funds "by December 31, 2024." 42 U.S.C.A. § 803(c)(1); *see* App. 4 at 4. Building yet another program would take significant time and effort. And Harris County may not spend SLFRF funds "after September 30, 2026." 42 U.S.C.A. § 803(c)(6)(D). If the funds dedicated to the

Community Prosperity Program are in limbo at the end of this year, Harris County may lose them forever.

The equities favor the County.

*   *   *

After the Supreme Court stayed Uplift Harris, Harris County created the Community Prosperity Program to address the Court's concerns. But it was not enough for the State that Harris County followed the Supreme Court's explicit guidance and tightened the controls. Instead, it pursued this litigation against a program that is not only presumptively constitutional program but also explicitly designed to survive constitutional scrutiny. In doing so, the State has revealed its true project—to prevent Harris County from dispensing federal funds to Harris County's poorest residents. But the Attorney General's dislike of the policy does not present a constitutional bar. For the reasons above, the Program is likely constitutional, and a stay is unnecessary to prevent the State's alleged injury. The State's motion should be denied.

## Conclusion and Prayer

Appellees respectfully request that the Court deny the State's motion for temporary relief and grant the request for expedited briefing and submission.

Appellees respectfully request all other legal and equitable relief to which they are entitled.

Dated: November 21, 2024

Respectfully submitted,

**CHRISTIAN D. MENEFEE**
Harris County Attorney

*/s/ Jonathan G.C. Fombonne*
**JONATHAN G.C. FOMBONNE**
Deputy County Attorney and First Assistant
State Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
**TIFFANY S. BINGHAM**
Managing Counsel,
Affirmative & Special Litigation Division
State Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov
**CHRISTOPHER GARZA**
Senior Assistant Harris County Attorney
State Bar No. 24078543
Christopher.Garza@harriscountytx.gov
**ELEANOR MATHESON**
Assistant Harris County Attorney
State Bar No. 24131490
Eleanor.Matheson@harriscountytx.gov
**RYAN COOPER**
Assistant Harris County Attorney
State Bar No. 24123649
Ryan.Cooper@harriscountytx.gov
**EDWARD D. SWIDRISKI III**
Assistant Harris County Attorney
State Bar No. 24083929
Edward.Swidriski@harriscountytx.gov

Office of The Harris County Attorney
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5101
Fax: (713) 755-8924

Of Counsel:

Grant B. Martinez
State Bar No. 24104118
gmartinez@yettercoleman.com
Justin P. Tschoepe
State Bar 24079480
jtschoepe@yettercoleman.com
Lily E. Hann
State Bar No. 24133836
lhann@yettercoleman.com
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Phone: (713) 632-8000
Fax: (713) 632-8002

*Attorneys for Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was served on all counsel of record in this case, on November 21, 2024, electronically through the electronic filing manager in compliance with the Texas Rules of Appellate Procedure.

*/s/ Jonathan G.C. Fombonne*

Jonathan G.C. Fombonne

TAB 5

ACCEPTED
15-24-00120-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/2/2024 4:58 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00120-CV

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
2/2/2024 4:58:38 PM
CHRISTOPHER A. PRINE
Clerk

The State of Texas,

*Appellant,*

*v.*

Harris County, Texas; Harris County Commissioners Court; Lina Hidalgo, in her official capacity as Harris County Judge; Rodney Ellis, in his official capacity as Commissioner of Harris County Precinct 1; Adrian Garcia, in his official capacity as Commissioner of Harris County Precinct 2; Tom Ramsey, in his official capacity as Commissioner of Harris County Precinct 3; Lesley Briones, in her official capacity as Commissioner of Harris County Precinct 4; Harris County Public Health; and Leah Barton, in her official capacity as Executive Director of Harris County Public Health,

*Appellees.*

On Appeal from the
165th Judicial District Court, Harris County

## REPLY BRIEF IN SUPPORT OF THE STATE'S MOTION FOR EMERGENCY RELIEF

**To the Honorable Fifteenth Court of Appeals:**

The Texas Supreme Court has already explained why the State is likely to prevail on its request to enjoin the Program as unconstitutional. *In re State,* No. 24-0325, 2024 WL 2983176, at *2 (Tex. June 14, 2024). True, the Supreme Court's decision related to the County's Uplift Harris program, while this case involves Harris

County's Community Prosperity Program (the Program). But the few minor tweaks that the County made to the Program do not save it from the same fate as Uplift Harris—which, despite the County's hope (at 1) that Uplift Harris can survive, cannot pass constitutional muster for the reasons the Supreme Court explained. While Harris County attempts to reclassify the Program (at 2) as a "traditional public benefits program—in the vein of SNAP or TANF," its Program edits do not provide the quantum of control the state Constitution requires. And constitutional sufficiency is not a policy decision. *Contra* Resp. 57.

Unable to defend the merits of the Program, the County spends much of its response challenging the State's authority to enforce its own laws against the County, Resp. 22-35, and asserting that equity does not permit the State's requested relief, Resp. 12-20. The Court should reject both arguments. It should likewise reject the County's novel argument that it, not the Office of the Attorney General, may represent the State in the trial court. As the State has shown it is likely to prevail on the merits, the Court should grant the State's requested relief.

## Supplemental Statement

After the trial court denied Texas's motion for a temporary injunction and granted the Defendants' plea to the jurisdiction, State's Motion App. A, Harris County filed a separate Motion to Show Authority, see Tex. R. Civ. P. 12, again alleging that the Attorney General lacks the authority to represent the State. The trial court granted that motion and later signed an Amended Final Judgment incorporating its Rule 12 order. App. 1. The State filed a Rule 27.3 Notice in this Court, indicating that the Court "must treat th[is] appeal as from" the amended final judgment.

2

Tex. R. App. P. 27.3. The State addresses the County's Rule 12 arguments below. *Infra* Part III.D.

ARGUMENT

## I. Relief Pending Appeal is Warranted.

The parties agree that expedited briefing is appropriate in this case (Motion 4, Resp. 3). Nonetheless, whether framed as an administrative stay or temporary relief pending appeal, the Court should grant relief pending appeal, including by issuing an administrative stay while this motion is pending. The Supreme Court has already deemed relief pending appeal appropriate.

The Texas Supreme Court determined that relief pending appeal was appropriate in the Uplift Harris case, and its reasons apply here, too. Upon reviewing that program, the Court explained that "the County itself will suffer no cognizable injury unless its rights are incorrectly circumscribed during the pendency of the appeal." *In re State*, 2024 WL 2983176, at *5. Additionally, "[t]he County is not harmed by being required to follow the Texas Constitution." *Id.* While a "very small percentage of Harris County residents will temporarily be denied receipt of the disputed payments if a stay is granted, that "is not a harm that can tip the scales in the County's favor." *Id.*

So too here. As the State has explained, halting payments during the pendency of this matter requires the County to comply with the state Constitution, *infra* Part IV, and thus will not harm the County, *In re State*, 2024 WL 2983176, at *5. "Temporarily preventing expenditure of these funds while the State's appeal proceeds ensures public funds are not irrevocably spent in violation of the Texas Constitution."

3

*Id.* And this logic applies equally to an administrative stay pending this motion and relief pending the full appeal.

## A. Relief pending appeal and an administrative stay will not harm the County.

The County has agreed to an expedited appeal. It cannot credibly contend that relief pending that expedited appeal will harm the County if it in fact has no intentions of issuing payments before May 2025 as it now insists. Further, its program plans remain in flux. Testimony at the hearing showed that the County is still developing the Program and can continue to refine it during the pendency of this appeal. State's Motion App. L. 37:2-7. Brandon Maddox, the Director of Planning and Innovation for Harris County Public Health (HCPH), testified that "[t]here is still a lot more planning to do in this program to determine, you know, the frequency and the exact auditing that will take place." State's Motion App. L, 66:3-5. The form on which the County claims participants can indicate consent to the Program's terms, which Harris County touts as one of its controls, remains "a work in progress as we sit here today." State's Motion App. L, 90:7-11. Additionally, Program terms and restrictions may "be augmented and drafted differently by the time the program is finalized," State's Motion App. L, 90:18-22, and "there's still considerable planning that needs to be done between now and when we test out the work flows," State's Motion App. L, 90:25-91:2. All these items could be finalized "potentially, by the end of December." State's Br. App. L, 97:5-10. Relief pending appeal will not harm the County when the Program remains fluid, rendering the County unable to make payments imminently.

4

But the County's story on when it begins to make payments continues to shift. The County has offered several different timelines regarding when it expects to issue the first Program payments. Payments were initially expected "to begin in January, mid-January some time of [20]25." State's Motion App. L, 42:18-22. And as of October 24, 2024, the County had not had "any interim discussion of moving the anticipated launch date back." State's Motion App. L, 43:7-9. But now the County claims (at 14) that payments are not expected to be made "until at least May 2025." *See also* Decl. of B. Maddox, Resp. Tab 14.

Relief is certainly warranted amid the vast uncertainty, and that includes both an administrative stay while this motion is pending and relief pending appeal. It does not harm the County to prevent it from doing what it says it won't do, anyway. But the State would certainly experience harm if the County attempted to accelerate payments despite its protestations to the contrary—as it has already attempted to do in the Uplift Harris context. State's Motion 28. The Court should grant relief.

## II.  Texas Law Authorizes an Injunction Here.

The Rules of Appellate Procedure specifically authorize the relief the State has requested. The State agrees that "this appeal undisputedly follows a final judgment" and "Rule 29.3 therefore does not apply." Resp. 15. However, the Texas Rules of Appellate Procedure expressly authorize the relief the State has requested. Specifically, Rule 24.4(c) provides, "The appellate court may issue any temporary orders necessary to preserve the parties' rights." In fact, the State's Motion is titled "Appellant's Motion for Temporary Order." Desperate to avoid "examination of the underlying merits," Resp. 14, the County avers the "simple [] mistake [] dooms its

motion." Resp. 15. Such hyperbole is neither necessary nor accurate. The Texas Supreme Court has been abundantly (and consistently) clear that what parties call their motion does not matter so long as the substance of that motion requests the relief they seek. "Whenever possible," that Court "reject[s] form-over-substance machinations over reaching the merits." *Dudley Const., Ltd. v. Act Pipe & Supply, Inc.*, 545 S.W.3d 532, 538 (Tex. 2018); *see also, e.g.*, *Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 314 (Tex. 2000) (Hecht, J., concurring) ("Appellate procedure should not be tricky. It should be simple, it should be certain, it should make sense, and it should facilitate consideration of the parties' arguments on the merits."); Tex. R. Civ. P. 1 ("The proper objective of rules of civil"—and appellate—"procedure is to obtain a just, fair, equitable[,] and impartial adjudication of the rights of litigants under established principles of substantive law."). For example, in one case, the Court declined to "unnecessarily waste the parties' time and further judicial resources" by requiring a party to "file a separate document" with a more procedurally correct title "listed on the cover where the party ha[d] expressly requested" the relief it sought. *CMH Homes v. Perez*, 340 S.W.3d 444, 453 (Tex. 2011). Because the party had "specifically requested" the relief it sought, "and because judicial efficiency militate[d] against" it, the Court did not require the party to file its petition again under a different title. *Id.* at 454. Indeed, the Supreme Court frequently construes filings that have one title as a different type of filing. *E.g.*, *Surgitek, Bristol-Myers Corp. v. Abel,* 997 S.W.2d 598, 601 (Tex. 1999). Given the Supreme Court's express instructions not to elevate form over substance, the Court should treat the State's motion as one under Rule 24.4.

And the relief the State has sought aligns with the Supreme Court's order regarding Uplift Harris by ensuring that the County does not once again attempt to accelerate payments. Harris County avers (at 20) that "[a]ny order enjoining payment at this juncture is unnecessary and inappropriate because the County is months away from making any Program payments. So, this Court will have plenty of time to decide this motion and the merits of the appeal." Assuming this is true, no harm can arise from ensuring the County may not make Program payments. Since Harris County has already tried accelerating payments to thwart review of Uplift Harris, a temporary stay is necessary to preserve the parties' rights while this appeal proceeds. *See* State's Br. 8.

"A stay pending appeal is, of course, a kind of injunction, so the familiar considerations governing injunctive relief in other contexts will generally apply in this context as well." *In re State,* 2024 WL 2983176, at *2. In granting the State's prior motion for temporary relief related to Uplift Harris, the Court explained "this potential violation of the Texas Constitution could not be remedied or undone if payments were to commence while the underlying appeal proceeds." *Id.* at *3. The same remains true today, and the Court should temporarily stay any payments under the Program.

## III. The Trial Court Had Jurisdiction.

The County argues (at 23-24) that it retains governmental immunity even against the State and that the State has not shown standing to sue the individual Defendants. Both arguments are wrong. And the Court should reject out of hand the County's argument that the Attorney General may not represent the State here, as

the weight of Texas Supreme Court authority shows that the County is wrong about that, too.

## A. Harris County officials do not have immunity when they have acted ultra vires.

"'Ultra vires conduct' by local officials 'automatically results in harm to the sovereign as a matter of law.'" *Hollins*, 620 S.W.3d at 410. Violation of state law by local government officials "clearly inflicts irreparable harm on the State." *Tex. Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet denied) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)). And the State has a "justiciable interest" and "intrinsic right . . . to enforce its own laws." *Hollins*, 620 S.W.3d at 410 (first quoting *Yett*, 281 S.W. at 842; and then quoting *Naylor*, 466 S.W.3d at 790).

## B. The County entities are not immune from suit.

The County asserts (at 22-24) that because it has not waived governmental immunity, it, the Commissioners Court, and HCPH are not amenable to suit. But the Supreme Court of Texas has held that "'suits for injunctive relief' may be maintained against governmental entities to remedy violations of the Texas Constitution." *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007) (per curiam) (quoting *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995)). The County entities retain "immunity from suit unless the [Plaintiff has] pleaded a viable claim." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011). For the reasons discussed below, the State brings a valid claim. *See infra* Part III.A.

## C. The State showed that Program payments are traceable to Defendants.

The County next contends (at 24) that the State lacks standing to sue the individually named Defendants because it has failed to establish traceability to the Defendants. These assertions are hard to square with the fact that Defendants did not disburse Uplift Harris funds after the Supreme Court stayed them from making program payments. In re State, 2024 WL 2983176, at *5. If the State's injury is not traceable to Defendants or redressable by the relief the State has sought, Uplift Harris payments, and presumably Program payments, would have issued irrespective of the stay. See id. at *2 ("A stay pending appeal is, of course, a kind of injunction."); see also Rodney Ellis (@RodneyEllis), X (April 23, 2024, 1:39 PM), https://x.com/RodneyEllis/sta-tus/1782841748512817292 ("We were racing to get at least one payment out the door, but unfortunately we were not able to process them before the Supreme Court order came down."). In any event, the State has satisfied both the traceability and redressability requirements.

*First*, the State's injury is "fairly . . . trace[able] to the challenged action of the [D]efendant[s], and not . . . th[e] result [of] the independent action of some third party not before the [C]ourt." *Heckman v. Williamson County*, 369 S.W.3d 137, 154 (Tex. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In particular, the record in Uplift Harris reflects that Defendant Hidalgo signed the Uplift Harris contract with GiveDirectly, the entity that "administer[s] the Program by working with [the] County." Reply Br. for Appellant, *State v. Harris County*,

9

No. 15-24-00061-CV (Tex. App.—Austin [15th Dist.] Aug. 12, 2024) (citing the record in the Uplift Harris appeal). She also signed the amendment to the contract to instigate the Program. Resp. App. 9. She, at least, is thus responsible for the County's prospective conduct. The contract also reveals that Harris County is "acting by and through" HCPH, Resp. App. 9, which for the reasons above, lacks governmental immunity.

Moreover, the record reflects that HCPH—and, thus, its Executive Director—played a key role in revamping Uplift Harris to turn it into the new Program. After the Supreme Court issued the emergency stay relating to Uplift Harris, "[HCPH] started talking about, Okay. If this program doesn't continue, is there another program that – [HCPH] can implement that will have the same goals and the same – meet the same people, right, to fulfill the same purpose of Uplift Harris." State's Br. App. L, 9:14-24. In answer to that question, HCPH created "a new program called Community Prosperity." State's Br. App. L, 19:9-12. As a director with HCPH, Mr. Maddox explained "part of [his] duties [was] to put items on the commissioner's court agenda." State's Br. App. L, 14:11-15. On August 27, 2024, HCPH placed the Program on the Commissioners Court agenda requesting "court action to actually amend the agreement with GiveDirectly to launch the Community Prosperity Program," State's Br. App. L, 25:8-10, which was "voted on and approved by [the] commissioner's court." State's Br. App. L, 32:1-4, Resp. App. Tab 7. If nothing else,

then, the County's action is directly traceable to defendant Harris County Public Health.[1]

*Second*, the relief the State has sought would redress its injury. *Cf. State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (per curiam) (noting that ultra vires conduct automatically injures the sovereign as a matter of law). As the County has admitted, it controls GiveDirectly because the County "agreed to only provide [five] million up-front at a time." State's Br. App. L, 29:6-7. An order granting an injunction is binding on "parties to the action, their officers, agents, servants, employees, and attorneys, upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Tex. R. Civ. P. 683. Accordingly, an injunction running to the named Defendants would redress the State's harm by preventing the issuance of payments in violation of the Constitution.

## D.  The Attorney General is authorized to represent the State.

The County is wrong: The Attorney General may represent the State here. For well over a century, the Attorney General has been representing the State of Texas

---

[1] True, the traceability inquiry is defendant-specific. But even if only Harris County Public Health was the proper defendants, that would affect merely the *scope* of the trial court's injunction, not whether the State was entitled to an injunction in the first instance. *Cf. Huynh v. Blanchard*, No. 21-0676, 2024 WL 2869423, at *37 (Tex. June 7, 2024) ("[B]ecause each Defendant has a different function in the operation and the record shows differences in the equities among them, the trial court . . . should have considered how best to implement the necessary restrictions on a defend-ant-specific basis."). Even then, the effect would be minimal (at most) because, under Texas Rule of Civil Procedure 683, the injunction would be enforceable against anyone acting in concert with Defendant Harris County Public Health, which would include the remaining Defendants.

in its district courts in civil matters. *See* George D. Braden et al., The Constitution of the State of Texas: An Annotated and Comparative Analysis 354 (1977). "[I]t has been steadily held that an action or suit can be maintained by an attorney general in [sic] behalf of the state for the redress of injury to the public, or to prevent this and that he cannot maintain a suit or action when private rights alone are involved." *State v. Farmers' Loan & Trust Co.,* 17 S.W. 60, 65 (Tex. 1891). It is "the duty of the attorney general to institute necessary proceedings in the court to enforce or protect any right of the public that is violated, or to redress or prevent any injury done to the public that demands the intervention of the courts." *Queen Ins. Co. v. State,* 22 S.W. 1048, 1052 (Tex. Civ. App.), *rev'd on other grounds,* 24 S.W. 397 (1893). "[W]here the public are injured[,] the state *must sue* to redress the wrong by her attorney general, whether there be a statute to that effect or not." *Id.* (emphasis added).

Here, Harris County, a political subdivision of the State, acting through its officials, is blatantly violating the Texas Constitution by giving away monies to individuals without any authority to do so. "Texas law could not be clearer: The State's chief legal officer—sworn to 'preserve, protect and defend' Texas law—should in fact be permitted to preserve, protect and defend it." *In re State,* 489 S.W.3d 454, 456 (Tex. 2016) (Willett, J., concurring). Courts have also rejected the idea that locally elected county and district attorneys have the exclusive authority to represent the State in all matters before the district courts. *Cf. Brady v. Brooks,* 89 S.W. 1052, 1056 (Tex. 1905) ("Is it reasonable to suppose that it was the purpose to intrust absolutely the important function of representing the state as an attorney in all cases in which the state should be a party to the numerous county attorneys or to the district

attorneys, should the Legislature see fit to create that office for certain districts, elected, as the case may be, in their respective counties or districts, or to a general state officer, like the Attorney General, elected by the people of the whole state? To ask the question is to answer it.").

In any event, the County's novel argument flies in the face of *Hollins*. In that case, the State, acting through the Attorney General, sued the county clerk of Harris County. *State v. Hollins*, 620 S.W.3d 400, 404-05 (Tex. 2020). Importantly, it brought a common law ultra vires action. *Id*. at 405. The Texas Supreme Court held that the State had a "justiciable interest in its sovereign capacity in the maintenance and operation of its municipal corporations in accordance with law." *Id*. at 410. As "a sovereign entity, the State has an intrinsic right to . . . enforce its own laws." *Id*. Indeed, the "sovereign would be impotent to enforce its own laws if it could not temporarily enjoin those breaking them pending trial." *Id*. That the Attorney General never had the power sue Harris County officials in light of these holdings is nonsensical.

Finally, the County's judicial estoppel argument is wrong. First of all, "the State in its sovereign capacity, unlike ordinary litigants, is not subject to the defenses of limitations, laches, or estoppel." *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993); *accord Reyna v. Att'y Gen. of Tex.*, 863 S.W.2d 558, 559 (Tex. App.—Fort Worth 1993, no writ) (applying this rule to a case involving the Attorney General). But even so, the County's contention that the State is judicially estopped from arguing that it can bring an ultra vires cause of action against the County based on its brief in *Paxton v. Longoria*, *see* Br. for Atty. Gen. of Tex., No. 22-0224 (Tex. 2022) takes that brief

13

out of context. That brief addressed a certified question about whether the Attorney General could enforce civil penalties in the Texas Election Code. *Id*. at xiii. It explained that when the *Legislature* creates causes of action, the Attorney General must have some positive law, express or implied, to use them. The Attorney General wrote "'It is clear that when the Legislature creates a new or additional cause of action in favor of the State it may also constitutionally authorize the Attorney General to prosecute such cause of action in both the trial and appellate courts of the State.'" *Id*. at 39 (quoting *Smith*, 328 S.W.2d at 295). The Attorney General then explained that the Texas Supreme Court has "generally required a clear statement that expressly authorized the Attorney General, as well as any District or County Attorney, to institute and prosecute the *statutory suit* thus created." *Id*. at 39 (emphasis added). The Attorney General further explained that "it may be possible that the overall statutory context will permit the Attorney General to bring suit without express authorization." *Id*. These arguments were made in the context of whether the Attorney General could enforce civil penalties *authorized by a statute*. *Id*. at xiii.

By sharp contrast, this case, like *Hollins*, is a common-law ultra vires suit brought against Harris County officials. The Attorney General's brief expressly explained that it could enforce Texas elections laws through an ultra vires action *Id*. at 42-43. No doubt the County disagrees with that, but it is flatly wrong to suggest the Attorney General has contradicted himself or is judicially estopped. "An admission, agreement or waiver made by the attorney general in an action or suit to which the state is a party does not prejudice the rights of the state." Tex. Gov't Code § 402.004. The brief explained that the Election Code provision at issue "preserved

14

*pre-existing* remedies" and "this preservation of remedies was made in the context of this Court's decision in *Hollins*, which allowed the Attorney General to use an ultra vires action to rein in election officials who intended to violate the law." *Id.* at 43. The State has not contradicted itself, is not judicially estopped, and *Hollins* governs this case. The State did not concede in 2022 that it could not have brought *Hollins* against Harris County in 2020.

## IV. The Program Violates the Constitution.

The Program violates the Texas Constitution. Harris County claims (at 36) that the Program receives the presumption of constitutionality, but as the Supreme Court has pointed out, the State has already raised doubt about Uplift Harris's constitutional status. *In re State*, 2024 WL 2983176, at *3. The County designed this Program to meet "the same goals and the same – meet the same people, right, to fulfill the same purpose [as] Uplift Harris," State's Br. App. L, 9:14-24, and Uplift Harris's problems afflict this Program, too. The County misunderstands the historical evidence and misreads the Constitution—and its Program runs afoul of both.

### A. The County misstates the standard of review.

As an initial matter, two legal standards warrant clarification. *First,* the County tries (at, *e.g.*, 38,) to place matters of legal sufficiency beyond this Court's review by invoking the "deferen[ce]" supposedly due to the Commissioners Court. But a government official never has "discretion to violate the law and commits an ultra vires act if he or she acts in conflict with the law." *13335 Duluth Rest. & Bar, L.L.C. v. Hegar*, No. 14-20-00098-CV, 2021 WL 4314468, at *5 (Tex. App.—Houston [14th

15

Dist.] Sept. 23, 2021, no pet.) (mem. op.). "If the Commissioners Court acts illegally, unreasonably, or arbitrarily, a district court may so adjudge." *Commissioners Ct. of Titus Cnty. v. Agan*, 940 S.W.2d 77, 80 (Tex. 1997).

*Second*, the County is wrong (at 58) that the State cannot make "new arguments on appeal about other constitutional provisions." The County invokes (at, *e.g.*, 28, 33, 58) *In re Eagleridge Operating, LLC*, 642 S.W.3d 518, 525 (Tex. 2022) (orig. proceeding), for the proposition that the trial court could not have abused its discretion if the State did not present precisely the same argument below that it now offers to this Court. But *Eagleridge* says that no abuse of discretion occurs when a trial court does not consider "unpleaded and unpresented *issues*." *Id.* (emphasis added). It is black-letter law in Texas that, "while appellate courts 'do not consider *issues* that were not raised . . . below,' parties may 'construct new *arguments* in support of issues' that were raised." *E.g.*, *Li v. Pemberton Park Cmty. Ass'n*, 631 S.W.3d 701, 704 (Tex. 2021) (quoting *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014)). And issues are "treated as covering every subsidiary question that is fairly included." Tex. R. App. P. 38.1(f). For example, because the State raised the issue that the Gift Clauses prohibit the Program, all arguments regarding that issue are fair game.

## B. The Program violates the Gift Clauses.

### 1. The County misreads history.

**a.** Although Anglo-American governments have employed welfare systems to care for their citizens since at least the reign of Queen Elizabeth I, Martha

Doty Freeman, *Indigent Care in Texas: A Study of Poor Farms and Outdoor Relief*, Index of Tex. Archaeology 18 (2008), it has always been understood that guardrails are necessary to prevent abuse of the public treasury. For example, from Elizabeth I through the days of the early American Republic, tax money raised for the care of the poor would be "administered by overseers of the poor," *id.*; *e.g.*, *Rockingham County Overseers of the Poor 1787-1862* (tr. prepared by Kayla M. Heslin), https://tinyurl.com/RockinghamOverseers (last visited May 28, 2024) (transcribing meeting minutes of the overseers of the poor of Rockingham County, Virginia). In Elizabethan times, "children whose parents could not work and other married or unmarried persons who did not have an occupation [were required] to work" unless they were "unable to work." Freeman, *supra*, at 18. Those who refused could be jailed. *Id.* at 19. And in the colonies, "principles of local responsibility, family responsibility, and legal settlement" remained "the basis for poor relief systems." *Id.* In Virginia, for example, overseers required those receiving relief to attend overseers' meetings and would fine recipients if they missed a meeting without a good excuse. *Rockingham County*, *supra*, at 27 (discussing Mr. William Cravens).

These kinds of trends continued when Americans began to settle Texas. In the antebellum period, "Texas was always a nearly moneyless region, living year to year on a credit economy based on the future values of land." T.R. Fehrenbach, *Lone Star: A History of Texas and the Texans* 281 (1968). And the State was "ruined economically" by the Civil War; even over a decade postbellum, it was "disastrously in debt," and "[t]here was political, judicial, and social damage no one could repair"

17

*Id.* at 433. Before Texas's 1876 Constitution, counties responded to these circumstances by providing limited care for their poorest residents. Freeman, *supra*, at 34. When it was provided, care could fall into one of two buckets: "indoor" or "outdoor" care. *E.g.*, *id.* at 53. Indoor care referred to assistance provided to those living within a facility, *id.* at 5, like a county poor house and farm, for which the 1876 Constitution specifically provided, *see infra* p. 19. Outdoor care referred to assistance not specifically tied to a person's residence in a facility. Freeman, *supra*, at 5. Outdoor care could take one of two forms: either direct assistance from the county or indirect assistance from a third party the county reimbursed for the care provided. *Id.*

Perhaps unsurprisingly, given the shortage of specie, when counties did provide money to those in need, they maintained some level of control and oversight. In at least one case, "the recipient of the funds was required to present his accounts, justifying the expenses of care, to the [commissioners] court." *Id.* at 54. Moreover, Bell County's stipends could be used for "medical attention, lodging, food, clothing, coffins and graves," as well as transportation to the state hospital. *Id.* That Texas's early counties exercised this degree of control suggests that the county commissioners' courts filled the role that the overseers would have traditionally played. *See id.* at 35 (discussing the commissioners courts' role).

The 1869 and 1876 Constitutions made the policy choice to constitutionalize indoor relief: Former article XVI, section 8 of the 1869 Constitution permitted counties to provide "a manual labor poor house and farm, for taking care of, managing, employing and supplying the wants of its indigent and poor inhabitants." That provision survives today. *See* Tex. Const. art. XI, § 14. And, in a response to the political

patronage and corruption that ran rampant in the period following the Civil War, *see* Fehrenbach, *supra*, at 418, 421, the 1876 Constitution also included the Gift Clauses. Tex. Const. art. III, §§ 50, 51, 52(a); *id.* art. XI, § 3; *id.* art. XVI, § 6(a); *see* Braden, *supra*, at 2 (noting that the 1866, 1869, and 1876 Constitutions "reflected the political temper of the time," with the 1876 Constitution representing a response to Reconstruction); *see also, e.g.*, *id.* at 118 (noting that some aspects of the 1876 Constitution reflect "distrust of the legislature . . . traceable to the Republic and its constitution"). Together, these clauses generally prohibit "the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever." Tex. Const. art. III, § 51; *see also id.* art. III, § 50; *id.* art. XVI, § 6(a). In particular, article III, section 52 prohibits giving public money "in aid of . . . any individual." *Id.* art. III, § 52(a). That prohibition is generally categorical. *Bexar County v. Linden*, 220 S.W. 761, 762 (Tex. 1920).

But the people of Texas have provided exceptions to that general rule. In 1898, Texans amended article III, section 51 to provide a limited exception for public grants of money to individuals. Tex. H.J.R. 34, 25th Leg., R.S. (1897) (adopted, later removed). Specifically, that amendment allowed the Legislature to grant or authorize giving public money to former Confederate soldiers and their families. *Id.* As the Texas Supreme Court later noted, that exception's "evident purpose is to deny to the Legislature any power to grant or to authorize the grant of public money to *all others, absolutely*." *Linden*, 220 S.W. at 762 (emphasis added); *see also* Braden, *supra* at 241 ("Section 51 does not prohibit caring for the aged, the blind, the disabled, and the destitute. Only the handing out of cash is prohibited.").

Following the public calamity of the Great Depression and just days before the official end of World War II, the People of Texas amended the Constitution to permit the Legislature to provide welfare for certain "needy persons" in Texas. *See* Tex. Const. art. III, § 51-a(a)-(d); Tex. H.J.R. 13, 49th Leg., R.S. (1945) (adopted at election). That provision, like "[m]ost of the welfare amendments adopted since . . . 1933[, was] tied to the federal system of grants to the states." Braden, *supra* at 241. Earlier "welfare amendments" were "either designed to get aboard the federal system or to stay aboard after the United States made changes that conflicted with the Texas constitutional limitations," but the "[then-]current version of Section 51-a attempt[ed] to end the necessity for constant amendment to meet changing federal regulations." *Id.* Although the Constitution was subsequently amended to "[r]emov[e] the explicit requirement for federal matching *funds*," Texas Legislative Council, *Amendments to the Texas Constitution Since 1876* at 40 (May 2024), https://tinyurl.com/Constamend1876, the categories of those eligible remains closely aligned with federal law. For instance, the Constitution authorizes the Texas Temporary Assistance for Needy Families (TANF) program in article III, section 51-a(a), providing that "[t]he Legislature shall have the power, by General Laws, to provide . . . for assistance grants to needy dependent children and the caretakers of such children." The Constitution further permits welfare "for medical care, rehabilitation and other similar services for needy persons," Tex. Const. art. III, § 51-a(b), and maintains Texas's eligibility for federal matching money for such programs, *id.* art. III, § 51-a(c).

### b. The County misunderstands this history.

That localities may have typically overseen poverty-relief efforts merely means that local governments must oversee such relief in accordance with the Constitution, including with appropriate controls. *Supra* pp. 19-20. After all, "overseers of the poor" historically understood that they had to apply sufficient controls. *Supra* p. 17. The People of Texas have simply constitutionalized that requirement. *Supra* p. 19. But Harris County does not accord with the Constitution for the reasons the State explains below. *Infra* pp. 22-28.

The County's claim (at 47) that the Gift Clauses do not apply to the Program lacks merit. Texas courts read constitutional provisions together, *e.g.*, *Collingsworth County v. Allred*, 40 S.W.2d 13, 15 (Tex. 1931) (orig. proceeding), and the Texas Constitution has expressly permitted some forms of poverty relief, *see, e.g.*, Tex. Const. art. III, § 51-a(a)-(b). But if the Constitution always allowed all forms of poverty relief, it would not have needed to specify which ones it permitted. *See id. Contra* Resp. 46-47 (implying that because the Constitution permits some forms of aid, like county poor houses and farms, it must permit all forms). The County cannot ignore that clear constitutional indicator.

For example, the County's assertion (at 40-48) that the Texas Constitution's framers would not have understood article III, section 52(a) to address welfare or poverty relief cannot be squared with the fact that around twenty years after their Constitution's ratification, Texans provided (in a later-repealed exception to section 51) for the care of *indigent* and disabled Confederate veterans. Tex. H.J. Res. 34, 25th Leg., R.S., 1897 Tex. Gen. Laws 275, *repealed by* Tex. H.J. Res. 62, 76th Leg., R.S.,

21

1999 Tex. Gen. Laws 6611, 6630); *see Collingsworth County*, 40 S.W.2d at 15. Neither the addition nor its repeal would have been necessary if governmental entities had already had the "duty" the County claims to "provid[e] assistance to the poor." Resp. 45.

## 2. The Program does not satisfy the Gift Clause criteria.

The State is likely to show the Program violates the Gift Clause. The Supreme Court distilled the Gift Clause "into three principles": "public benefit, public purpose, and public control." *Borgelt v. Austin Firefighters Ass'n,* 692 S.W.3d 288, 301 (Tex. 2024). Specifically, a "challenged expenditure satisfies" the Gift Clauses when: (1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; *and* (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished. *Id.* The Program fails all three requirements, and no other constitutional provision authorizes it.

### a. The Program is gratuitous and lacks a public benefit.

"A political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002). While that consideration may take many different forms, Harris County receives nothing in return for Program funds. The only requirement the Program lays on applicants for the funds is that they reside within ten specified zip codes or are enrolled in ACCESS Harris and, of course, are lucky enough to win the County's lottery. State's Motion

22

App. J. at 8. Because fund recipients do not give consideration in exchange for program funds, those funds comprise an unconstitutional gift. *See Tex. Mun. League*, 74 S.W.3d at 383.

The County argues (at 48) that relief to the poor *is itself* consideration. But *Borgelt* forbade "a 'no strings attached' gratuity." 692 S.W.3d at 302. Poverty is not a "string." in this sense. That is, while poverty relief is a laudable goal, Program recipients do not give anything in return for the funds simply by receiving them. That is why it is no answer for the County to say that the program reduces poverty or could possibly improve self-sufficiency. *See* Resp. 49.

Instead, the County avers (at 48-49) that "detailed information" it receives from recipients "is valuable" and thus counts as consideration. But the "survey of [recipients'] financial status and spending habits" the County references is optional. Resp. 48. Irrespective of how "valuable" the County considers it, that information cannot constitute a bargained-for exchange for Uplift Harris payments when recipients may choose whether to participate in the survey. Resp. 48 (first citing Resp. App. 9 at Ex. B; and then citing Resp. App. 5).

The County's best attempt is to contend (at 48) that participants must share "account data directly with GiveDirectly and with the County." But that line of argument, like its previous argument that data collected from a "study" constitutes consideration because the study could obtain "no results" without recipients, depends upon the notion that mere participation in a giveaway renders that giveaway constitutional. But if that is so, the Gift Clauses mean nothing. That can't be right.

### b. The Program does not serve a public purpose.

The Gift Clauses require that a public expenditure's "*predominant* objective" be "to accomplish a legitimate public purpose, not to provide a private benefit." *Borgelt,* 692 S.W.3d at 304 (emphasis added). The adjective "predominant" matters: "[I]t is easy to adorn an otherwise-illegal transfer to a private recipient with a mere bauble of public purpose. Even if such a transfer technically complies with the 'gratuity' requirement, the Gift Clause still forbids a transfer when the public purpose is the caboose rather than the engine." *Id.* In its response, the County discusses (at 51-52) three purported public purposes "bear[ing] special mention" for Uplift Harris: recovery from a public calamity, economic development, and assisting the poor. But those do not predominate.

*First*, the record belies any notion that a desire to recover from a public calamity—here, COVID—is the predominant purpose. *See* Tex. Const. art. III, § 51. *Contra* Resp. 52. As the federal government has declared, COVID is over. *See* H.J. Res 7 (April 14, 2023). Moreover, nothing in the Program or its eligibility criteria links to COVID relief. *See, e.g.*, State's Motion App. E (eligibility criteria). Indeed, if anything, the Program's eligibility criteria speak to poverty relief, not relief from a public calamity.

*Second*, any economic benefits that may derive from the Program are too attenuated for economic development to be the program's driving force. As the Texas Supreme Court put it, "nearly any direct gift of public money that will likely be spent by the recipient could qualify as 'economic development'—on the theory that any

boost in overall consumer spending is good for the economy." *In re State*, 2024 WL 2983176, at \*4. That result would vitiate the Gift Clauses. *See id.*

*Third*, though assisting the poor is undoubtedly an admirable goal, it cannot, standing alone, satisfy the predominant-public-purpose requirement here. To start, the Gift Clauses do not contain an implicit carveout for assisting the poor. After all, article III, section 51-a(a) explicitly specifies classes of "needy" who may receive "grants." *See* Tex. Const. art. III, § 51-a(a). To say that a municipality can provide such grants to *other* classes in the name of helping the needy would impermissibly render that provision surplusage. *See Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). Rather, the program's predominant purpose seems to be to give away "use-it-or-lose-it" money the County has lying around. *See* 42 U.S.C. § 803(c)(6)(D).

### c. Harris County does not retain constitutionally sufficient control over the funds.

Harris County contends (at 54) that the Program "employs controls 'to ensure that the public purpose' of providing relief to the poor is 'accomplished'" and "ensure that funds are used responsibly and align with the program's focus on supporting basic needs." In particular, it trumpets (at 8) the changes it made to Uplift Harris to "assuage the Supreme Court's concerns." But those planned changes do not give the County constitutionally sufficient control.

*First*, as with Uplift Harris, the Program lacks mechanisms for the County to learn if participants are violating the Program's terms (let alone how they might be doing so). The County avers (at 9) that Program participants "contractually agree

25

they may only use the funds for 'basic needs.'" *See also* Resp. 54. But when asked how the County would know if someone was violating the Program's terms, Maddox explained that "there's still more planning to do in terms of identifying the specific mechanisms in which somebody is removed from the program." State's Motion App. L, 81:21-82:5. In other words, the County doesn't know. It must rely on "what we're going to hear from the friends, family of the participants." State's Motion App. L, 83:12-16. A "binding promise," Resp. 9, without a mechanism for ascertaining whether participants adhere to that promise does not count as constitutionally sufficient control. For the same reasons, the County's insistence (at 57) that it retains control because it purports to be able to remove a participant from the Program for "any violations of the Program's restrictions" is toothless.

*Second*, the County insists (at 9) that the "GiveCard" that Program participants will use "functions *only* at vendors covering 'basic needs.'" But those cards do not prevent participants from purchasing items other than basic needs at those vendors. State's Motion App. L, 55:25-56:7; 57:8-17. For example, as the State has explained, the GiveCard does not prevent a participant from, for example, purchasing alcohol or cigarettes at HEB. State's Motion 14. And, as Maddox stated, "Harris County won't be able to see what was purchased," State's Motion App. L, 55:22-24, so it will not be able to prevent participants from making purchases beyond "basic needs." After all, as Maddox admitted, the County "took a very loose approach to identify which [Merchant Category Codes (MCCs)] could potentially be mapped." State's Motion App. L, 56:11-18. If "item-level control 'just isn't feasible for this

26

type of program,'" Resp. 57 (quoting Resp. App. 2 at 55), that is telling that the Program is not like TANF or SNAP at all—it is a new animal that lacks sufficient control *by its nature* and *a fortiori* violates the Gift Clauses. And asking recipients "to comply with [Program] requirements," Resp. 55, is much different that actually enforcing, or at least having the ability to enforce, the County's requirements. "The Gift Clause[s] must be obeyed in reality, not just form." *Borgelt,* 692 S.W.3d at 310.

The County contends (at 55) that it "referred to constitutionally sound programs such as TANF and SNAP" when considering acceptable MCCs. But Maddox explained how TANF and SNAP differ from this Program. Specifically, the former two programs "have detailed systems that assign certain SKU numbers at the transaction level." State's Motion App. L, 54:25-55:3. This means that controls inherent in TANF and SNAP can actually prohibit participants in those programs from making prohibited purchases at the cash register. State's Motion App. L, 54:17-55:3. MCCs cannot. State's Motion App. L, 55:25-56:7. Indeed, County officials have admitted that they will remain completely unaware of what may be purchased with the funds so long as a participant makes the purchase at a vendor with an approved MCC. State's Motion App. L. 55:22-24. And while the County contends (at 55) that it has the "authority to audit" participants' purchases," *see also* Resp. 10, it has not even determined its audit procedures. State's Motion App. L, 65:21-66:25, 68:1-2. Mere ability to audit, without procedures in place to catch purchases that violate the Program's terms, does not provide evidence of control over the funds. *See* Resp. 56 ("Harris County will further enhance the audit process as the program is finalized.").

*Third,* the County contends (at 56) that it "exercises control on the front end: it restricts who may participate to ensure it is effective at achieving its stated goals." Eligibility criteria simply limit *who* will receive the County's largesse. Once the funds are in the recipients' hands, Harris County remains unable to identify any specific plan or procedure indicating it would have any further control over the funds.

*Fourth,* Harris County seems to believe (at 56) that releasing "funds to GiveDirectly in $5 million increments" indicates "control." But that's not what the incremental release of funds is for. When questioned why the County chose to release five months' worth of payments at a time, Maddox explained, "[I]t takes time to get payments into the hands of the providers . . . [a]nd in this case it's really a unique program where nothing is really being received, but we're expecting somebody to administer those funds on our behalf." State's Motion App. L, 52:1-7. This hardly meets the control requirements the Supreme Court envisioned.

Whether a government complies with the Constitution is not a policy decision. *Contra* Resp. 57. Because the County remains unable to monitor purchases under the Program, State's Motion App. L, 55:22-24, "it is unlikely the County will know how recipients spend the money and whether any legitimate public purpose was achieved thereby." *In re State,* 2024 WL 2983176, at *4. Unlike TANF and SNAP, the Program remains unable to guarantee funds are "only [] directed to their intended purpose." *Id.* Accordingly, Harris County remains unable to provide any "precedent indicating that a government in Texas may make such payments without running afoul of our Constitution's restrictions." *Id.*

### 3. No other constitutional provision authorizes the Program.

As the State has explained, *supra* p. 20, the Gift Clauses do include a limited welfare exception, which permits the Legislature to provide certain categories of aid for certain constitutionally eligible recipients, Tex. Const. art. III, § 51-a. Even now, in this second iteration of the Program, the County has not tried to fit Uplift Harris within its strictures. It cannot for the reasons the State has already explained (at 22-28). And the State has not waived these arguments for the reasons it has already explained. *Supra* p. 16. *Contra, e.g.*, Resp. 43 n.28, 57-58. The County's contrary arguments are unavailing.

*First*, the County contends (at 46) that the Constitution's framers would have referred to $500 monthly stipends to individuals as "relief," not "aid," and that the Constitution does not bar "relief." But the very dictionary that the County cites defines "aid" as "[h]elp; succor; support; assistance; *relief.*" *Aid*, Webster's Complete Dictionary of the English Language 32 (1864) (emphasis added). The County fares no better (at 45) when it maintains that an expenditure qualifies as a "grant" only if someone requested it. The County has apparently forgotten that recipients of Program funds had to apply and request to be accepted into the Program. State's Motion App. L, 10:20-11:4. Moreover, to *grant* something means "[t]o bestow or confer" it "by formal act." Grant, Oxford English Dictionary (2d ed. 1989); County Resp. 45. Assistance to the poor "bestow[s] or confer[s]" something even if it is the government's duty to do so. *See* Resp. 45. And the Gift Clauses would countenance a strange result if they allowed the State to give a robber baron free cash, but only if he didn't ask for it.

*Second*, the County insists (at 56-57) that it is a "fool's errand" to "examine[]" post-1876 constitutional amendments because "later additions cannot change the meaning of unamended text" and "are just as likely to be matters of political expediency rather than necessity." But the Texas Supreme Court has made clear that "[t]he Constitution must be read as a whole, and all amendments thereto must be considered as if every part had been adopted at the same time and as one instrument." *Collingsworth County*, 40 S.W.2d at 15. *Contra* Resp. 46 (averring that some provisions "framed and ratified at the same time" are "contradictory"). In particular, "[d]ifferent sections, amendments, [and] provisions of a Constitution which relate to the same subject[]matter"—as the Gift Clauses and related amendments the State has cited do—"should be construed together and considered in light of each other." *Id.*

*Third*, the County contends (at 59-60) that section 52-a's "notwithstanding clause" exempts any economic-development program under that section from constitutional strictures. But the Supreme Court has already expressed skepticism about that position. Under such a "permissive reading," the Court said, "nearly any direct gift of public money that will likely be spent by the recipient could qualify as 'economic development'—on the theory that any boost in overall consumer spending is good for the economy." *In re State*, 2024 WL 2983176, at *4. As the Supreme Court recognized, reading section 52-a that broadly would "come[] close to repealing the Gift Clauses' ban on 'gratuitous payments to individuals.'" *Id.* (quoting *Tex. Mun. League*, 74 S.W.3d at 383). Texas courts do not, however, lightly treat constitutional text as surplusage. *See, e.g.*, *Spradlin*, 34 S.W.3d at 580. Thus, the Supreme Court

30

posited, the better view is that "by authorizing 'grants of public money . . . for the public purposes of development and diversification of the economy of the state,'" section 52-a was "designed to clarify that 'development and diversification of the economy of the state' qualify as 'public purposes.'" *In re State*, 2024 WL 2983176, at *4 (quoting Tex. Const. art. III, § 52-a; *accord* State's Motion 12.

True, the Court did not conclusively "resolv[e]" this issue. *In re State*, 2024 WL 2983176, at *4. But its analysis tracks constitutional history as well as its text. As with any constitutional provision, courts "consider the history as well as the text in order to understand the constitution's original meaning." *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 857 (Tex. 2024). When section 52-a was passed in 1987, *Linden* (then the lead case on the Gift Clauses' meaning) required any public expenditure to have a "strictly governmental purpose[]" to survive Gift Clause scrutiny. 220 S.W. at 762. This requirement led to concern that the Gift Clauses would prevent Texans from enjoying "the general benefits resulting from the operation of a private industry." Tex. Att'y Gen. Op. No. H-357 (1974). The Legislature proposed, and the people ratified, section 52-a to confirm that the benefits that flow from private industry fulfill a public purpose, *see id.*—not to provide a wholesale end run around the Gift Clauses, *see* Tex. Const. art. III, § 52-a (providing that the Legislature may "provide for the creation of programs and the making of loans and grants of public money . . . for the *public purposes* of development and diversification of the economy of the state" (emphasis added)); *see also In re State*, 2024 WL 2983176, at *4.

Even if section 52-a does provide some sort of exception to the Gift Clauses' strictures, Uplift Harris is not an "economic development" program within that section's meaning. "[W]ords grouped in a list should be given related meanings," and the appropriate meaning is the "most general quality" common to the listed terms that is "relevant to the context, or the least common denominator, so to speak." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195-96 (2012); *see also U.S. Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex. 2008). Here, the phrase "development . . . of the economy of the state" is linked with "elimination of unemployment or underemployment in the state" is linked with "elimination of unemployment or underemployment in the state," "stimulation of agricultural innovation," and "development or expansion of transportation or commerce." Tex. Const. art. III, § 52-a. These phrases unambiguously reference grants in service of specific economic-development programs: Grants *for* new businesses to start, grants *for* research and development, and grants *for* employees' skills training all fit the bill. Guaranteed-income programs, which by their nature give money *for* no specific economic-development program, differ in kind.

*Fourth*, the County contends (at 58) that article III, section 51 does not apply to its actions because it "limits *State* spending, not counties.'" That's wrong. Courts (including the Texas Supreme Court) and commentators alike have recognized that "[s]ection 51 covers both 'grants' and 'loans' as such, whether the government involved is the state or a local unit." Braden, *supra*, at 259; *see, e.g.*, *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 834-35 (Tex. 2000) (applying article

III, section 51 to local-government action); *Byrd v. City of Dallas*, 6 S.W.3d 738, 739-41 (Tex. [Comm'n Op.] 1928) (same).

## C. The Program violates Texas's Equal Protection Clause.

The Program also runs afoul of the Texas Constitution's equal protection guarantee. *See* Tex. Const. art. I, § 3. The County maintains (at 61) that because the Texas Supreme Court did not reach the State's equal-protection argument in *In re State*, the Court must have disagreed with it. But that Court regularly declines to reach arguments it need not address to resolve the case. *VanDevender v. Woods,* 222 S.W.3d 430, 433 (Tex. 2007). That it did not reach the equal-protection issue has no bearing on that issue's merits.

The County contends (at 62-63) that "eligible applicants are treated equally—each had an equal chance of being selected." But the County's eligibility criteria are themselves arbitrary. *See* State's Br. 18-19. As the State has explained (at 18), "nothing rationally connects the source of the funds,"—that is, the federal government's COVID-focused moneys—"the eligibility criteria, and the putative purpose of the program." For example, as the State has noted (at 18), if the purpose were truly to improve financial or health outcomes, one would expect the classifications to focus on the poorest and sickest within Harris County. The Program has no health-related criteria. State's Motion App. H 4. And the County has drawn the wealth-based criteria so broadly that it had no choice but to choose randomly who receives the windfall.

## V. The Balance of Equities Favors the State.

Finally, the equities favor the State's request to enjoin the County's unconstitutional scheme. As the sovereign, the State is always harmed when its law is violated. *Hollins*, 620 S.W.3d at 410. The County's arguments to the contrary misunderstands the relevant "status quo" and misapplies precedent where the sovereign is the opposing party.

### A. The State has shown irreparable harm.

To start, "[w]hen the State files suit to enjoin *ultra vires* action by a local official, a showing of likely success on the merits is sufficient to satisfy the irreparable-injury requirement for a temporary injunction." *Id.* The County cannot dispute this because ultra vires conduct harms the sovereign as a matter of law. *Id.*

### B. The injunction the State seeks would preserve the status quo.

The aim of preserving the status quo also cuts in the State's favor. As the Texas Supreme Court has recognized, "how to define the status quo can descend quickly into lawyerly word-play, offering little help to a court tasked with providing 'just relief.'" *In re State*, 2024 WL 2983176, at *2 (quoting Tex. R. App. P. 52.10(b)). The status quo is "the last, actual, peaceable, non-contested status that preceded the pending controversy." *State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975). "If an act of one party alters the relationship between that party and another, and the latter contests the action, the status quo cannot be the relationship as it exists *after* the action." *EPG, Inc. v. RDM, Inc.*, No. 14-07-00415-CV, 2008 WL 323742, at *3 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (mem. op.).

Here, the status quo is that the County has *not* disbursed millions of dollars to individuals who will find it difficult, if not impossible, to return the funds should the Court ultimately hold the Program is unlawful. What matters is the status quo between the *parties. Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555-57 (Tex. 2016).

The *payment* of unlawful gifts harms the State as a matter of law, *Hollins,* 620 S.W.3d at 410. "The status quo can never be a state that allows a party to continue violating the law." *8100 N. Freeway Ltd. v. City of Houston*, 329 S.W.3d 858, 863 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *accord Hous. Compressed Steel Corp. v. State*, 456 S.W.2d 768, 773 (Tex. App.—Houston [1st Dist.] 1970, no writ).

## C.  Public interest and the balance of equities favor the State.

Finally, the County avers (at 75-76) that the State's interest and harm do not merge with the public's because the State is suing to enforce its laws against a County. This argument, however, depends on the premise that because the County is a subdivision of the State, the County's administrative status trumps the State's sovereignty. The Texas Supreme Court has held the opposite for more than a century: The State represents the public's interests, and the County "is merely an arm of the [S]tate," created for the State's convenience in the administration of its laws. *Childress County v. State*, 92 S.W.2d 1011, 1015 (Tex. 1936); *accord Bexar County v. Linden*, 220 S.W. 761, 763 (Tex. 1920) ("[Counties] are essentially instrumentalities of the State. . . . Their chief purpose is to make effective the civil administration of the State government. The policy which they execute is the general policy of the

State."); *see also Hollins*, 620 S.W.3d at 403-04 (noting that counties are "subordinate and derivative branch[es] of state government" (quoting *Avery v. Midland County*, 406 S.W.2d 422, 426 (Tex. 1966), *vacated on other grounds*, 390 U.S. 474 (1968))). The State's harm is the public's harm, and it trumps the County's parochial desire to violate the Constitution.

Harris County's other arguments are internally inconsistent and fail. The State did not request relief prohibiting the County from "continuing to work" on its new program or "committing" its funds in the sense of earmarking or planning. Mot. at 64; *see in re State*, 2024 WL 2983176, at *5 n.5. Rather, it sought relief prohibiting the County from "making payments under the Program during the pendency of this appeal." Mot. at 28. The County also claims that if this Court issues relief, then it will harm Harris County residents who expect those payments. That argument is internally inconsistent with the County's representations that it doesn't plan to issue payments until May 2025 and seeks an expedited appeal to decide this case by that time. Resp. at 64. In any event, as the Texas Supreme Court already held, a "very small percentage of Harris County citizens will temporarily be denied receipt of the disputed payments if a stay is granted. But if those payment would have been illegal, then the temporary denial of them is not a harm that can tip the scales in the County's favor." *In re State*, 2024 WL 298317, at *5.

## P R A Y E R

The Court should grant temporary relief prohibiting Defendants from making payments under the Program during the pendency of this appeal. It should also issue an administrative stay pending this motion and expedite this appeal.

36

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

WILLIAM WASSDORF
Deputy Chief

BRENT WEBSTER
First Assistant Attorney General

/s/ William H. Farrell
WILLIAM H. FARRELL
Assistant Attorney General
State Bar No. 00796531
Tel: (512) 936-2650
Biff.Farrell@oag.texas.gov

RALPH MOLINA
Deputy First Assistant
    Attorney General

JAMES LLOYD
Deputy Attorney General
    for Civil Litigation

Office of the Attorney General
General Litigation Division
P.O. Box 12548 (MC-019)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

KIMBERLY GDULA
Chief

Counsel for Appellant

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this brief contains 9994 words, excluding exempted text.

/s/ William H. Farrell
WILLIAM H. FARRELL

37

# TAB 6

ACCEPTED
15-24-00120-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/4/2024 4:43 PM
CHRISTOPHER A. PRINE
CLERK

# YetterColeman LLP

December 4, 2024

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/4/2024 4:43:34 PM
CHRISTOPHER A. PRINE
Clerk

**<u>Via Electronic Filing</u>**
Christopher A. Prine, Clerk
Fifteenth Court of Appeals
300 W. 15th Street, Suite 607
Austin, Texas 78701

Re:     *State of Texas v. Harris County, Texas, et al.*, No. 15-24-00120-CV

Dear Mr. Prine:

Appellant the State of Texas filed a reply in support of its motion for temporary relief that abandons the original basis for relief and raises a wholly new basis. Appellees briefly respond. Please forward this correspondence to the panel that will decide the motion.

The Reply contains all the concessions this Court needs to dispose of the State's motion. The motion has two main requests: the State "seeks a temporary order under Texas Rule of Appellate Procedure 29.3 or, alternatively, an expedited appeal." Mot. 9. *First*, the Reply abandons Rule 29.3 as the basis for relief. "The State agrees that . . . 'Rule 29.3 . . . does not apply.'" Reply 5 (quoting Resp. 15). *Second*, the parties now all "agree that expedited briefing is appropriate in this case" and request an expedited appeal. Reply 3, 36. Given these express agreements, the Court can readily deny the request for relief under Rule 29.3 and, if it agrees, set an expedited briefing and submission schedule.

The Reply also abandons the motion's request for an "administrative stay" lasting for the entirety of the appellate process, including Supreme Court merits review. *See* Mot. 27-28; Resp. 17-20. Instead, the Reply now only requests such an administrative order "while this motion is pending." Reply 3-5, 36. But that limited relief is unnecessary and inappropriate. Payments under this program will not go out until May 2025 at the earliest. Resp. Tab 14. And the Reply's concessions enable this Court to dispose of the motion now, obviating the need for such interim relief.

811 Main Street, Suite 4100, Houston, Texas 77002
phone 713.632.8000   fax 713.632.8002

The inapplicability of Rule 29.3 is not a superficial defect in the "title" of the motion, as the State suggests, Reply 5-6; rather, it is a fundamental, substantive defect that the State has no legal authority permitting this Court to grant the temporary relief sought. The State framed its motion around Rule 29.3. *See* Mot. 9 (discussing, for nearly a page, only the standards for relief under Rule 29.3). It identified and invoked no other authority for temporary relief. The collapse of that sole stated basis for temporary relief should be substantively fatal to the motion.

Having abandoned Rule 29.3, the Reply mistakenly invokes an entirely new source of authority, never mentioned in the motion: Rule 24.4. Reply 5-6. Whether Rule 24.4 authorizes temporary relief was not raised in the motion, and the Court should reject this new contention for that reason alone. *Jinsun, LLC v. Mireskandari*, 694 S.W.3d 773, 778 (Tex. App.—Houston [14th Dist.] 2024, no pet.) ("We generally do not consider issues raised for the first time in a reply brief and decline to do so here.").

More importantly, the State misses the mark yet again: Rule 24.4 does not apply here, either. Rule 24 controls "the supersedeas process"—the "process for suspending enforcement of the judgment." *In re Tex. Educ. Agency*, 619 S.W.3d 679, 682, 687 (Tex. 2021) (orig. proceeding); *see generally* Tex. R. App. P. 24. When a trial court issues a supersedeas ruling, "Rule 24.4 authorizes an appellate court to engage in a *limited* supersedeas review." *Mendell v. Scott*, 2022 WL 2951666, at *3 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (emphasis added). "Rule 24.4 . . . only permits this Court to review a trial court's ruling on a motion to suspend enforcement of a judgment." *In re Destiny's Home Health Care*, 2017 WL 2793973, at *1 (Tex. App.—Dallas 2017, orig. proceeding).

In turn, Rule 24.4(c) only permits temporary orders in connection with this appellate review of trial-court supersedeas rulings: "'The appellate court may issue any temporary orders necessary to preserve the parties' rights' *in connection with its review of the trial court's ruling on supersedeas*." *Pedernales Elec. Coop., Inc. v. White*, 2021 WL 401982, at *3 (Tex. App.—Austin 2021, no pet.) (quoting Tex. R. App. P. 24.4(c)) (emphasis added); *see also O'Quinn v. Wood*, 2009 WL 2367133, at *2 (Tex. App.—Tyler 2009, no pet.) ("*In conducting its review* [under Rule 24.4], the appellate court may issue any temporary orders necessary to preserve the parties' rights." (emphasis added)).

The State cites no court that has ever treated Rule 24.4(c) as free-standing authority to issue injunctions without any connection to the supersedeas process. And it provides no legal argument explaining why Rule 24.4 applies here.

In sum, Rule 24.4 only applies to appellate motions seeking review of trial courts' supersedeas rulings, and Rule 24.4(c) only authorizes temporary orders in the context of such supersedeas review. Because *nothing* in this Court has anything to do with suspending enforcement of the judgment—let alone appellate review of a trial court's supersedeas ruling—Rule 24.4 simply does not apply. The State has swung and missed again.

Appellees request that the Court grant expedited briefing and submission and deny all other relief requested by the State.

Sincerely,

Grant B. Martinez
Counsel for Appellees

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrea Mintzer on behalf of Jonathan Fombonne
Bar No. 24102702
andrea.mintzer@harriscountytx.gov
Envelope ID: 96060235
Filing Code Description: Motion
Filing Description: Appellees' Motion to Vacate Injunction
Status as of 1/10/2025 7:07 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Yetter Coleman | | efile@yettercoleman.com | 1/9/2025 6:07:01 PM | SENT |
| Christopher Garza | 24078543 | christopher.garza@harriscountytx.gov | 1/9/2025 6:07:01 PM | SENT |
| Edward Swidriski | 24083929 | Edward.Swidriski@harriscountytx.gov | 1/9/2025 6:07:01 PM | SENT |
| Jonathan Fombonne | 24102702 | jonathan.fombonne@harriscountytx.gov | 1/9/2025 6:07:01 PM | SENT |
| Grant Martinez | | gmartinez@yettercoleman.com | 1/9/2025 6:07:01 PM | SENT |
| Christian Menefee | 24088049 | christian.menefee@harriscountytx.gov | 1/9/2025 6:07:01 PM | SENT |
| Ryan Cooper | 24123649 | ryan.cooper@harriscountytx.gov | 1/9/2025 6:07:01 PM | SENT |
| William Farrell | | biff.farrell@oag.texas.gov | 1/9/2025 6:07:01 PM | SENT |
| Andrea Mintzer | | Andrea.Mintzer@harriscountytx.gov | 1/9/2025 6:07:01 PM | SENT |
| Eleanor Matheson | 24131490 | Eleanor.matheson@harriscountytx.gov | 1/9/2025 6:07:01 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 1/9/2025 6:07:01 PM | SENT |
| Lily Hann | | lhann@yettercoleman.com | 1/9/2025 6:07:01 PM | SENT |
| Marisa Mata | | mmata@yettercoleman.com | 1/9/2025 6:07:01 PM | SENT |